# EXHIBIT A

Court of Appeal, First Appellate District
Charles D. Johnson, Clerk/Executive Officer
Electronically RECEIVED on 3/24/2021 at 8.38.30 AM

Court of Appeal, First Appellate District
Charles D. Johnson, Clerk/Executive Officer
Electronically FILED on 3/24/2021 by M. Garcia, Deputy Clerk

Case No. A155785

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIRST APPELLATE DISTRICT, DIVISION FOUR

———————————

### THE PEOPLE OF THE STATE OF CALIFORNIA,

*Plaintiff and Respondent*,

v.

### REMBER GENARO MOLINA,

*Defendant and Appellant*.

———————————

Appeal from a Judgment of
the Superior Court of San Mateo County
Case No. 17SF002494
Honorable Joseph Scott, Judge

———————————

## APPELLANT'S OPENING BRIEF

———————————

WALDEMAR D. HALKA
ATTORNEY AT LAW
State Bar No. 137915
P.O. Box 99965
San Diego, CA 92169
Telephone: (858) 395-8626
e-mail: halkalaw@gmail.com

Attorney for Defendant and
Appellant Rember Genaro Molina

By appointment of the Court of
Appeal under the First District
Appellate Project program.

# TABLE OF CONTENTS

Page

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

STATEMENT OF APPEALABILITY. . . . . . . . . . . . . . . . . . . . . 20

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    A.   Investigation by Hayward Police. . . . . . . . . . . . 21

    B.   CALICO Interviews. . . . . . . . . . . . . . . . . . . . . . . . 21

        1.  XD's Statements. . . . . . . . . . . . . . . . . . . . . . . . . 22

        2.  RD's Statements. . . . . . . . . . . . . . . . . . . . . . . . . 23

    C.   Investigation by Redwood City Police. . . . . . . . 28

        1.  Interview of RD. . . . . . . . . . . . . . . . . . . . . . . . . . 28

        2.  Interview of XD. . . . . . . . . . . . . . . . . . . . . . . . . . 29

        3.  Medical Examination of RD. . . . . . . . . . . . . . . 29

        4.  Interview of the Parents. . . . . . . . . . . . . . . . . . . 30

        5.  Interview of Molina. . . . . . . . . . . . . . . . . . . . . . . 33

    D.   Trial Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . 35

        1.  XD's Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . 35

        2.  RD's Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . 37

        3.  The Parents' Testimony. . . . . . . . . . . . . . . . . . . 38

        4.  Child Sexual Abuse Accommodation
            Syndrome Evidence.. . . . . . . . . . . . . . . . . . . . . 42

ARGUMENTS............................................ 43

I.    THE TRIAL COURT PREJUDICIALLY
      ERRED AND VIOLATED MOLINA'S
      FIFTH, SIXTH AND FOURTEENTH
      AMENDMENT RIGHTS WHEN IT
      ALLOWED EXPERT TESTIMONY
      REGARDING CHILD SEXUAL ABUSE
      ACCOMMODATION SYNDROME
      BECAUSE THE TESTIMONY WAS
      INADMISSIBLE, IRRELEVANT AND ITS
      PROBATIVE VALUE WAS
      OUTWEIGHED BY ITS PREJUDICIAL
      IMPACT...................................... 43

      A.    PERTINENT FACTS. ...................... 43

            1.  In Limine Motions.................... 43

            2.  Expert Testimony.................... 45

            3.  Jury Instructions on CSAAS. .......... 51

      B.    STANDARD OF REVIEW. ................... 52

      C.    LAW GOVERNING THE ADMISSIBILITY
            OF EXPERT TESTIMONY. ................. 52

      D.    THE TESTIMONY CONCERNING
            CSAAS WAS IRRELEVANT. ............... 56

      E.    THE TRIAL COURT ERRED WHEN IT
            ADMITTED THE TESTIMONY
            CONCERNING CSAAS BECAUSE IT
            LACKS ANY SHOWING OF SCIENTIFIC
            RELIABILITY............................ 59

F.    THE EVIDENCE SHOULD ALSO HAVE
BEEN EXCLUDED BECAUSE ANY
PROBATIVE VALUE WAS
SUBSTANTIALLY OUTWEIGHED BY THE
LIKELIHOOD THE JURY WOULD
MISUSE THE EVIDENCE TO INFER
GUILT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

G.    THE ERROR VIOLATED MOLINA'S
FIFTH, SIXTH AND FOURTEENTH
AMENDMENT RIGHTS TO A FAIR TRIAL
AND DUE PROCESS AND REQUIRES
REVERSAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

H.    PREJUDICE. . . . . . . . . . . . . . . . . . . . . . . . . . 72

II.    GIVING THE MODIFIED CALCRIM NO.
1193 INSTRUCTION PERMITTED THE
JURY TO CONSIDER THE CSAAS
EVIDENCE AS EVIDENCE THAT RD
WAS TELLING THE TRUTH, WHICH
VIOLATED MOLINA'S RIGHT TO DUE
PROCESS BY REDUCING THE
PROSECUTION'S BURDEN OF PROOF. . . . . . . . 77

A.    COGNIZABILITY ON APPEAL AND
STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . 78

B.    THE CALCRIM NO. 1193
INSTRUCTION EFFECTIVELY
PERMITTED THE JURY TO USE THE
CSAAS EVIDENCE AS EVIDENCE THAT
MOLINA WAS GUILTY. . . . . . . . . . . . . . . . . . . 80

C.    CALCRIM NO. 1193 DEPRIVED
MOLINA OF DUE PROCESS BY
REDUCING THE PROSECUTION'S
BURDEN OF PROOF AND RESULTED IN
PREJUDICE REQUIRING REVERSAL. . . . . . . . . . 87

4

III.   ALL   CONVICTIONS   SHOULD   BE
REVERSED  BECAUSE  RD'S  OUT-OF-
C O U R T   S T A T E M E N T S   W E R E
INADMISSIBLE  UNDER  EVIDENCE
CODE SECTION 1360. . . . . . . . . . . . . . . . . . . . . . . 90

   A.    THE ERROR. . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

   B.    PREJUDICE. . . . . . . . . . . . . . . . . . . . . . . . . . . 98

IV.   ALL   CONVICTIONS   SHOULD   BE
R E V E R S E D   B E C A U S E   T H E
CONVICTIONS  ARE  BASED  ON  RD'S
"FALSE" TESTIMONY. . . . . . . . . . . . . . . . . . . . . . 100

V.    ALL   CONVICTIONS   SHOULD   BE
R E V E R S E D   B E C A U S E ,   A S
INTERPRETED  BY  CALIFORNIA
COURTS AND APPLIED TO THIS CASE,
EVIDENCE   CODE   SECTION   1235
VIOLATES  DUE  PROCESS  AND  THE
SIXTH  AMENDMENT  RIGHTS  TO
CONFRONTATION  AND  CROSS-
EXAMINATION. . . . . . . . . . . . . . . . . . . . . . . . . . . 104

VI.   THE   CHARGING   INFORMATION
I M P R O P E R L Y   S O U G H T ,   A N D
ULTIMATELY  LED  TO,  DUAL
CONVICTIONS  FOR  CONTINUOUS
SEXUAL ABUSE AND INDIVIDUAL SEX
CRIMES  UPON  THE  SAME  VICTIM
DURING THE SAME TIME PERIOD, IN
VIOLATION OF PENAL CODE SECTION
288.5(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

VII.  CUMULATIVE PREJUDICE FROM THE
ERRORS REQUIRES REVERSAL OF ALL
CONVICTIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . 116

5

VIII. A REMAND FOR RESENTENCING IS REQUIRED BECAUSE MOLINA WAS CONVICTED OF NON-FORCIBLE LEWD ACT UNDER PENAL CODE SECTION 288(A), BUT THE TRIAL COURT ERRONEOUSLY SENTENCED HIM FOR FORCIBLE LEWD ACT UNDER PENAL CODE SECTION 288(B).. . . . . . . . . . . . . . . . . . . . . 118

IX. THE IMPOSITION OF THE FINES AND ASSESSMENTS VIOLATED MOLINA'S RIGHT TO DUE PROCESS.. . . . . . . . . . . . . . . . . . 121

CONCLUSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

CERTIFICATE OF WORD COUNT . . . . . . . . . . . . . . . . . . . . . 123

DECLARATION OF SERVICE.. . . . . . . . . . . . . . . . . . . . . . . . 124

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Alleyne v. United States* (2013) 570 U.S. 99. . . . . . . . . . . . . . . 119

*Apprendi v. New Jersey* (2000) 530 U.S. 466.. . . . . . . . . . . . . . 119

*Arizona v. Fulminante* (1991) 499 U.S. 279. . . . . . . . . . . . . . . . 72

*California v. Green* (1970) 399 U.S. 149. . . . . . . . . . . . . . 104, 105

*Cargle v. Mullin* (10th Cir. 2003) 317 F.3d 1196. . . . . . . . . . . 117

*Chambers v. Mississippi* (1973) 410 U.S. 284.. . . . . . . . . . . . . . 72

*Chapman v. California* (1967) 386 U.S. 18.. . . . . . . . . . . . . 72, 98

*Commonwealth v. Dunkle*
      (Pa. 1992) 602 A.2d 830. . . . . . . . . . . . . . . 57-58, 64, 68, 71

*Concord Communities v. City of Concord*
      (2001) 91 Cal.App.4th 1407. . . . . . . . . . . . . . . . . . . . . . . 52

*Conde v. Henry* (9th Cir. 1999) 198 F.3d 734. . . . . . . . . . . . . . 87

*Crawford v. Washington* (2004) 541 U.S. 36.. . . . . . . . . . . 106, 107

*Descamps v. United States* (2013) 570 U.S. 254. . . . . . . . . . . . 119

*Estelle v. McGuire* (1991) 502 U.S. 62.. . . . . . . . . . . . . . . . . . 71

*Franklin v. Henry* (9th Cir. 1997) 122 F.3d 1270. . . . . . . . . . . . 65

*Frye v. United States* (D.C. Cir. 1923) 293 F. 1013.. . . . . . . . 43, 62

*Idaho v. Wright* (1990) 497 U.S. 805. . . . . . . . . . . . . . . . . . 95, 97

*In re Amber B.* (1987) 191 Cal.App.3d 682. . . . . . . . . . . . . . 63, 64

*In re Carmen O.* (1994) 28 Cal.App.4th 908. . . . . . . . . . . . . . . 93

*In re Cindy L.* (1997) 17 Cal.4th 15. . . . . . . . . . . . . . . . . . . 93-95

*In re Figueroa* (2018) 4 Cal.5th 576. . . . . . . . . . . . . . . . . . . . . 101

*In re Martin* (1987) 44 Cal.3d 1. . . . . . . . . . . . . . . . . . . . . . . . 76

*In re Masters* (2019) 7 Cal.5th 1054. . . . . . . . . . . . . . . . . . 102, 103

*In re Robert L.* (1993) 21 Cal.App.4th 1057. . . . . . . . . . . . . . . 95

*In re Rogers* (2019) 7 Cal.5th 817. . . . . . . . . . . . . . . . . . . 101-103

*In re Sassounian* (1995) 9 Cal.4th 535. . . . . . . . . . . . . . . . . . 102

*In re Winship* (1970) 397 U.S. 358. . . . . . . . . . . . . . . . . 87, 120

*Johns v. City of Los Angeles* (1978) 78 Cal.App.3d 983. . . . . . . . 95

*Lawson v. Borg* (9th Cir. 1995) 60 F.3d 608. . . . . . . . . . . . . . . 75

*Leonard v. Watsonville* (1956) 47 Cal.2d 509. . . . . . . . . . . . . . . 99

*Lilly v. Virginia* (1999) 527 U.S. 446. . . . . . . . . . . . . . . . . . . . 95

*Lisenba v. California* (1941) 314 U.S. 219. . . . . . . . . . . . . . . . . 71

*Madden v. State* (Fla. 1997) 690 So.2d 573. . . . . . . . . . . . . . . 68

*Maryland v. Craig* (1990) 497 U.S. 836. . . . . . . . . . . . . . . . . . 107

*Mathis v. United States* (2016) 579 U.S. __
     [136 S.Ct. 2243]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

*McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378. . . . . . . . . . . 71, 72

8

*Mooney v. Holohan* (1935) 294 U.S. 103. . . . . . . . . . . . . . . . . . . 102

*Neder v. United States* (1999) 527 U.S. 1.. . . . . . . . . . . . . . . . 88, 98

*New Jersey v. J.L.G.* (2018) 190 A.3d 442. . . . . . . . . . . . . . . . . . 65

*Newkirk v. Commonwealth* (Ky. 1996) 937 S.W.2d 690. . . . . . . . 68

*Ohio v. Clark* (2015) 576 U.S. 237. . . . . . . . . . . . . . . . . . . . . . . . 98

*Ohio v. Roberts* (1980) 448 U.S. 56.. . . . . . . . . . . . . . . . . . . . . . . 97

*People v. Aledamat* (2019) 8 Cal.5th 1.. . . . . . . . . . . . . . . . . . . . 72

*People v. Andersen* (1994) 26 Cal.App.4th 1241. . . . . . . . . . . . . 79

*People v. Bergschneider* (1989) 211 Cal.App.3d 144. . . . . . . . . . 56

*People v. Berryman* (1993) 6 Cal.4th 1048.. . . . . . . . . . . . . . . . . 78

*People v. Bledsoe* (1984) 36 Cal.3d 236. . . . . . . . . . . . 59-61, 64, 69

*People v. Bolin* (1998) 18 Cal.4th 297. . . . . . . . . . . . . . . . . . . . . 67

*People v. Bowker*
     (1988) 203 Cal.App.3d 385. . . . .   55-56, 60-61, 64, 67, 75, 77

*People v. Brodit* (1998) 61 Cal.App.4th 1312.. . . . . . . . . . . . . 93, 94

*People v. Brown* (2004) 33 Cal.4th 892. . . . . . . . . . . . . . . . . . . . 61

*People v. Cardenas* (1982) 31 Cal.3d 897.. . . . . . . . . . . . . . . . . . 75

*People v. Cowan* (2010) 50 Cal.4th 401. . . . . . . . . . . . . . . . . . . . 43

*People v. Cribas* (1991) 231 Cal.App.3d 596. . . . . . . . . . . . . . . . 76

*People v. Crosier* (1974) 41 Cal.App.3d 712.. . . . . . . . . . . . . . . . 80

9

*People v. Cruz* (1964) 61 Cal.2d 861.................... 74, 98

*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790..... 52, 53

*People v. Dejourney* (2011) 192 Cal.App.4th 1091............. 61

*People v. Dueñas* (2019) 30 Cal.App.5th 1157............... 121

*People v. Eccleston* (2001) 89 Cal.App.4th 436......... 93, 95-97

*People v. Filson* (1994) 22 Cal.App.4th 1841................. 75

*People v. Flood* (1998) 18 Cal.4th 470...................... 88

*People v. Freeman* (1971) 20 Cal.App.3d 488........... 104, 105

*People v. Gallardo* (2017) 4 Cal.5th 120................... 120

*People v. Gilbert* (1992) 5 Cal.App.4th 1372................ 55

*People v. Godinez* (1992) 2 Cal.App.4th 492................ 76

*People v. Gonzalez* (2017) 16 Cal.App.5th 494............... 83

*People v. Griffin* (2004) 33 Cal.4th 1015................... 56

*People v. Guizar* (1986) 180 Cal.App.3d 487................ 79

*People v. Harlan* (1990) 222 Cal.App.3d 439............. 55, 61

*People v. Hill* (1998) 17 Cal.4th 800....................... 116

*People v. Holt* (1984) 37 Cal.3d 436....................... 117

*People v. Housley*
  (1992) 6 Cal.App.4th 947......... 55-56, 69, 77, 81, 85-87

*People v. Jacobs* (2007) 156 Cal.App.4th 728................ 52

*People v. Jaramillo* (1976) 16 Cal.3d 752. . . . . . . . . . . . . . . . . 115

*People v. Johnson* (2002) 28 Cal.4th 240. . . . . . . . . . . . . . 111-113

*People v. Johnson* (2009) 180 Cal.App.4th 702. . . . . . . . . . . . 78

*People v. Jones* (2013) 57 Cal.4th 899. . . . . . . . . . . . . . . . . . 101

*People v. Kasim* (1997) 56 Cal.App.4th 1360. . . . . . . . . . . . . . 102

*People v. Kelly* (1976) 17 Cal.3d 24. . . . . . . . . . . . . . . . . . 43, 62

*People v. Kopatz* (2015) 61 Cal.4th 62. . . . . . . . . . . . . . . . . . 94

*People v. Kovacich* (2011) 201 Cal.App.4th 863. . . . . . . . . . . . . 61

*People v. Leahy* (1994) 8 Cal.4th 587. . . . . . . . . . . . . . . . . . . 62

*People v. Ledesma* (1987) 43 Cal.3d 171. . . . . . . . . . . . . . 79, 116

*People v. Ledesma* (2006) 39 Cal.4th 641. . . . . . . . . . . . . . . . 101

*People v. Loy* (2011) 52 Cal.4th 46. . . . . . . . . . . . . . . . . . . . 116

*People v. Lucas* (2014) 60 Cal.4th 153. . . . . . . . . . . . . . . . 53, 54

*People v. Martin* (2000) 78 Cal.App.4th 1107. . . . . . . . . . . . . . 78

*People v. McAlpin* (1991) 53 Cal.3d 1289. . . . . . . . . 52, 55, 61, 77

*People v. McDonald* (1984) 37 Cal.3d 351. . . . . . . . . . . . . . . . 64

*People v. Mejia* (2007) 155 Cal.App.4th 86. . . . . . . . . . . . . . . 110

*People v. Merriman* (2014) 60 Cal.4th 1. . . . . . . . . . . . . . . . . 72

*People v. Mitchell* (2020) 46 Cal.App.5th 919. . . . . . . . . . . . . 94

*People v. Morrison* (2004) 34 Cal.4th 698. . . . . . . . . . . . . . . . 52

*People v. Mower* (2002) 28 Cal.4th 457. . . . . . . . . . . . . . . . . . . . . 73

*People v. Myers* (1999) 69 Cal.App.4th 305. . . . . . . . . . . . . . . . 94

*People v. Neal* (2003) 31 Cal.4th 63. . . . . . . . . . . . . . . . . . . . . . . 98

*People v. Partida* (2005) 37 Cal.4th 428. . . . . . . . . . . . . . . 72, 116

*People v. Patino* (1994) 26 Cal.App.4th 1737.. . . . . . . 45, 55, 70, 71

*People v. Pettie* (2017) 16 Cal.App.5th 23. . . . . . . . . . . . . . . . . . 83

*People v. Pope* (1979) 23 Cal.3d 412. . . . . . . . . . . . . . . . . . . . . . 79

*People v. Powell* (1967) 67 Cal.2d 32. . . . . . . . . . . . . . . . . . . . . . 72

*People v. Purvis* (1963) 60 Cal.2d 323. . . . . . . . . . . . . . . . . . . . 116

*People v. Rangel* (2016) 62 Cal.4th 1192. . . . . . . . . . . . . . . . . . . 98

*People v. Robbie* (2001) 92 Cal.App.4th 1075. . . . . . . . . . . . . . . 57

*People v. Roberto V.* (2001) 93 Cal.App.4th 1350. . . . . . . . . . . . 93

*People v. Rodriguez* (2002) 28 Cal.4th 543. . . . . . . . . . . . . . . . 111

*People v. Roybal* (1998) 19 Cal.4th 481. . . . . . . . . . . . . . . . . . . . 53

*People v. Sanchez* (2014) 228 Cal.App.4th 1517. . . . . . . . . . 73, 117

*People v. Sanchez* (2016) 63 Cal.4th 665. . . . . . . . . . . . . . . . 82, 83

*People v. Sandoval* (2015) 62 Cal.4th 394. . . . . . . . . . . . . . . . . . 73

*People v. Sims* (1993) 5 Cal.4th 405. . . . . . . . . . . . . . . . . . . . . . 72

*People v. Stoll* (1989) 49 Cal.3d 1136. . . . . . . . . . . . . . . . . . . 53, 54

*People v. Stone* (1999) 75 Cal.App.4th 707. . . . . . . . . . . . . . . . . 94

12

*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968. . . . . . 94

*People v. Taylor* (2010) 48 Cal.4th 574. . . . . . . . . . . . . . . . . . . . 79

*People v. Torres* (2002) 102 Cal.App.4th 1053. . . . . . . . . . 112, 114

*People v. Valenti* (2016) 243 Cal.App.4th 1140. . . . . . . . . . . . . 111

*People v. Vasquez* (1996) 51 Cal.App.4th 1277. . . . . . . . . . . . . 110

*People v. Vines* (2011) 51 Cal.4th 830. . . . . . . . . . . . . . . . 102, 103

*People v. Watson* (1956) 46 Cal.2d 818.. . . . . . . . . . . 73, 89, 99, 117

*People v. Whisenhunt* (2008) 44 Cal.4th 174. . . . . . . . . . . . . . . . 99

*People v. Wilkins* (2013) 56 Cal.4th 333.. . . . . . . . . . . . . . . . 98, 99

*People v. Williams* (1971) 22 Cal.App.3d 34. . . . . . . . . . . . . . . . 75

*People v. Williams* (1997) 16 Cal.4th 635. . . . . . . . . . . . . . . . . . 99

*People v. Woodard* (1979) 23 Cal.3d 329. . . . . . . . . . . . . . . 74, 98

*People v. Woods* (2006) 146 Cal.App.4th 106.. . . . . . . . . . . . . . 117

*People v. Yu* (1983) 143 Cal.App.3d 358. . . . . . . . . . . . . . . . . . . 67

*Sanderson v. Commonwealth* (Ky. 2009) 291 S.W.2d 610. . . . . . 65

*Sargon Enterprises, Inc. v. University of Southern California*
  (2012) 55 Cal.4th 747. . . . . . . . . . . . . . . . . . . . . . . . 54-55, 63

*Stack v. Stack* (1961) 189 Cal.App.2d 357. . . . . . . . . . . . . . . . . . 95

*State v. Anderson* (Tenn. Cr. App. 1994) 880 S.W.2d 720.. . . . . . 68

*State v. Ballard* (Tenn.1993) 855 S.W.2d 557. . . . . . . . . . . . . . . 68

13

*State v. Bolin* (Tenn. 1996) 922 S.W.2d 870. . . . . . . . . . . . . . . 68

*State v. Davis* (Ohio Ct. App. 1989) 581 N.E.2d 604. . . . . . . . . . 58

*State v. Marks* (Kan. 1982) 647 P.2d 1292.. . . . . . . . . . . . . . . 61

*State v. Maule* (Wash. App. 1983) 667 P.2d 96. . . . . . . . . . . . . 65

*State v. Schimpf* (Tenn. Crim. App. 1989) 782 S.W.2d 186. . . . 58

*State v. Stribley* (Iowa App. 1995) 532 N.W.2d 170. . . . . . . . 67, 68

*Sullivan v. Louisiana* (1993) 508 U.S. 275. . . . . . . . . . . 72, 88, 117

*United States v. Bighead* (9th Cir. 1997) 128 F.3d 1329. . . . . . 69

*United States v. Gaudin* (1995) 515 U.S. 506. . . . . . . . . . . . . 120

*United States v. Mandujano* (1976) 425 U.S. 564. . . . . . . . . . . 101

*United States v. Owens* (1988) 484 U.S. 554. . . . . . . . . . . 105-108

*United States v. Wong* (1977) 431 U.S. 174. . . . . . . . . . . . . . . 101

*Yates v. Evatt* (1991) 500 U.S. 391. . . . . . . . . . . . . . . . . . . . . . 72

## CONSTITUTIONS

California Constitution

article I, § 7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

article I, § 15. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87, 117

United States Constitution

14th Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71, 87, 117

S<small>TATUTES</small>

Evidence Code

§ 210. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

§ 350. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

§ 770. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

§ 800, subdivision (a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

§ 1200, subdivision (a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93, 100

§ 1200, subdivision (b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93, 100

§ 1235. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

§ 1360. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90, 91

Government Code

§ 70373. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

Penal Code

§ 12. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

§ 288, subdivision (a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

§ 288, subdivision (b)(1). . . . . . . . . . . . . . . . . . 18, 19, 112, 118, 119

§ 288.5, subdivision (a). . . . . . . . . . . . . . . . . . . . . . . . . 19, 110, 112

§ 288.5, subdivision (c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

§ 288.7, subdivision (a). . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 112

15

§ 288.7, subdivision (b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 112

§ 290.3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

§ 664.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 112

§ 1191.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

§ 1202.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

§ 1202.4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

§ 1203.066, subdivision (a)(8). . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

§ 1203.1, subdivision (h)(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

§ 1237.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

§ 1465.8. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

§ 1473, subdivision (b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

§ 1473, subdivision (c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

**RULES OF COURT**

rule 4.433(c)(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

**STANDARD JURY INSTRUCTIONS**

CALCRIM No. 1120 (2020 ed.), Related Issues.. . . . . . . . . . . . 112

CALCRIM No. 3516. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

CALJIC No. 10.64.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

LEGISLATION

Stats. 1989, ch. 1402, § 1(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

OTHER AUTHORITIES

Cara Gitlin, Expert Testimony on Child Sexual Abuse
Accommodation Syndrome: How Proper Screening Should
Severely Limit Its Admission
     26 Quinnipiac L. Rev. 497, 525 (2008). . . . . . . . . . . . . . . . . 57

Disclosure of Child Sex Abuse: What Does the Research Tell
Us About the Ways Children Tell?
     11 Psychology, Public Policy, and Law, No. 1 (2005). . . . . 65

*Problems With Child Abuse Accommodations Syndrome*
     Scientific Review of Mental Health Practice (2012). . . . . . 65

Review of the Contemporary Literature on how Children
Report Sexual Abuse to Others: Findings, Methodological
Issues, and Implications for Forensic Interviewers
     (2008) Memory 16. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Summit, Abuse of the Child Sexual Abuse Accommodation
Syndrome
     (1992) 1 J. of Child Sexual Abuse 153. . . . . . . . . . . . . . . . . 66

## STATEMENT OF THE CASE

A San Mateo County information filed on December 20, 2017, charged defendant and appellant Rember Genaro Molina with ten sexual offenses upon Rachel Doe ("RD") committed between May 28, 2010 and May 27, 2016.  (1-CT 10-19.)

Count one charged sexual intercourse with a child 10 years of age or younger.  (10-CT 11; Pen. Code, § 288.7, subd. (a).)[1]

Counts two and three charged two crimes arising from an incident in which Molina allegedly penetrated RD's vagina with his finger while in her bedroom: sexual penetration of a child 10 years of age or younger (§ 288.7, subd. (b) – count 2) and forcible lewd or lascivious act upon a child under 14 years ("forcible lewd act") (§ 288, subd. (b)(1) – count 3).  (1-CT 11-12.)

Counts four and five charged two crimes arising from an incident in which Molina allegedly attempted to penetrate RD's vagina with his finger while she was sleeping and she screamed: attempted sexual penetration of a child 10 years of age or younger (§§ 664/ 288.7, subd. (b) – count 4) and forcible lewd act (§ 288, subd. (b)(1) – count 5).  (1-CT 12-13.)

Counts six and seven charged two crimes arising from an incident in which Molina allegedly attempted to penetrate RD's vagina with his finger while she was sleeping and she slapped Molina: attempted sexual penetration of a child 10 years of age or younger (§§ 664/288.7, subd. (b) – count 6) and forcible lewd act (§

---

[1]  All unspecified statutory citations are to the Penal Code.

288, subd. (b)(1) – count 7).  (1-CT 14-15.)

Count eight charged forcible lewd act based on Molina's alleged placing of RD's hand on his penis (1-CT 16; § 288, subd. (b)(1) – count 8), and count nine charged forcible lewd act based on Molina's alleged holding of RD's hand while he masturbated and ejaculated (1-CT 17; § 288, subd. (b)(1) – count 9).

Count ten charged continuous sexual abuse of RD, a child under 14 years of age.  (1-CT 18; § 288.5, subd. (a) – count 10.)

Four of the five forcible lewd act charges (counts 3, 5, 7 & 8) and the continuous sexual abuse charge (count 10) included allegations that Molina had substantial sexual conduct with the victim who was under the age of 14 years.  (§ 1203.066, subd. (a)(8); 1-CT 12-18.)

On July 6, 2018, after jury trial, Molina was convicted of all charges, except that in counts 3, 5, 7, 8 and 9 the jury found that he was guilty of non-forcible lewd acts upon a child under the age of 14 years, in violation of section 288, subdivision (a).  (2-CT 468-482; 10-RT 1121-1127.)  The jury also sustained all allegations of substantial sexual conduct with the victim.  (2-CT 471, 474, 477, 479, 482; 10-RT 1121-1127.)

On October 12, 2018, Molina was sentenced to 45 years to life in prison.  (2-CT 565-569, 581-584; 11-RT 1137-1140.)  His sentence consists of a 25-year-to-life term for the section 288.7(a) conviction in count 1 and four consecutive 5-year prison terms for the lewd act convictions in counts 5, 7, 8 and 9.  (2-CT 565-569, 581-584; 11-RT 1137-1138.)  The court also imposed a concurrent

term of 15 years to life for the count 2 section 288.7(b) conviction. (2-CT 565-569, 581-584; 11-RT 1137, 1140.)  Sentences for the remaining convictions (counts 3, 4, 6 & 10) were imposed but were stayed.  (2-CT 565-569, 581-584; 11-RT 1138.)

Without making a finding as to Molina's ability to pay, the court imposed various assessments and fines.  (11-RT 1138-1139.)

Molina timely appealed on November 5, 2018.  (2-CT 585.)

## STATEMENT OF APPEALABILITY

This appeal from a final judgment of criminal conviction is authorized by Penal Code section 1237.  (§ 1237.)

## STATEMENT OF FACTS

On September 15, 2016, ten-year-old Xiomara Doe ("XD") told a substitute teacher at Tyrrell Elementary School in Hayward that her maternal uncle (Molina) really liked RD, XD's eight-year-old sister.[2]  (2-RT 162, 168, 179, 181-182.)  XD said the uncle had spanked RD's butt, called RD "sexy," touched RD near her vagina, and had RD touch his penis when RD was three years old.  (2-RT 168-171, 183.)  XD did not use the word "vagina," but when the teacher asked her to clarify her statement, XD touched her inner thigh, which the teacher thought was "uncomfortably close" to her vagina.  (2-RT 170, 183.)  XD asked the teacher to

_____

[2]  RD was born on May 28, 2008.  (1-CT 216; 6-RT 634.) Molina's birth date is November 17, 1988.  (7-RT 875.)

not tell anyone because she did not want the uncle to get in trouble.  (2-RT 169.)  RD was present when XD made these statements to the teacher, but did not say anything.  (2-RT 168, 176.)

The teacher reported XD's statements to the school administration.  (2-RT 165, 172-174, 179.)  Her report led to an investigation by Hayward Police Department.  (3-RT 281-282.)

### A.   INVESTIGATION BY HAYWARD POLICE.

Hayward Police detective Claudia Mall was assigned to the case on October 5, 2016.  (2-RT 282.)  She attempted to schedule an interview of XD and RD (collectively "the girls") and the girls' parents (Edson and Nidia)[3], but the investigation stalled for a couple of months because the parents and the girls failed to show up for their interviews.  (2-RT 284, 288-289.)  When an officer later met with Nidia, she would not make eye contact with the officer and appeared not to want any police involvement in the matter.  (2-RT 289-290.)

### B.   CALICO INTERVIEWS.

On January 11, 2017, the girls were interviewed by Holly, a forensic interviewer at the Child Abuse Listening, Interviewing and Coordination Center (CALICO) in Alameda County.  (2-RT 291; 3-RT 282-283, 291.)

---

[3]  In this brief, appellate counsel will continue the trial court practice of referring to the parents by their first names.

### 1. XD's Statements.

XD told Holly she had made a mistake in reporting the touching as inappropriate and that her statements to the teacher were misunderstood. (1-CT 201-202, 204, 205.) XD explained that three to four years earlier, when her family was living in Redwood City, Molina rubbed RD's leg and "private part" area after he had accidentally hit RD with a ball while playing. (1-CT 201-203.) Following her statements to the teacher, XD talked to Nidia and realized the touching was not sexual but was intended to make RD feel better because she was hurt. (1-CT 201-202, 204.) XD said she did not know why she had told the teacher that the touching was inappropriate. (1-CT 202.)

XD also said that Molina is nice, is not "that type of guy" and that he loves his nieces. (1-CT 204.) They love him, too. (1-CT 204.) He would never try to sexually touch RD. (1-CT 204, 206.) Molina has other nieces and XD had never heard anything "bad about that." (1-CT 204, 206.)

XD explained she had mistakenly thought the touching she witnessed was sexual because from the time the girls were very young their mother taught them that nobody should touch them and that they should report if someone touches them. (1-CT 204-206.) Also, after the girls' father (Edson) found out that Molina had touched RD, he became angry and told Molina to never come back. (1-CT 205.) Edson later gave Molina another chance because Molina explained that he had only rubbed RD because she was hurt. (1-CT 205.)

When asked if Molina had ever made RD touch him, XD described an incident which happened while RD was playing "tickles" with Molina on a bed.  (1-CT 206-207, 209.)  As they were playing, Molina was lying down and RD went on top of him and "hit him right there."  (1-CT 207, 209.)  Molina yelled because he was hurt, and RD started laughing.  (1-CT 209.)  XD, who was on the bed with them, saw Molina holding RD's hand which was in a fist form going toward his "private area."  (1-CT 208, 209.)  XD reported her observations to her parents, and the parents talked to Molina, who explained that he had held RD's hand because she accidentally hit him in the groin and was trying to hit him there again.  (1-CT 207-210.)  This incident happened when RD was three to four years old and the family lived in Redwood City.  (1-CT 207.)  Molina was wearing his pants and shirt when it happened.  (1-CT 208.)

## 2.  RD's Statements.

RD said that Molina was her favorite uncle.  (1-CT 249.)  Initially, she did not disclose anything and said that she did not know why XD had made the statements to the teacher and that XD probably misinterpreted Molina's rubbing of RD's leg when she was hit with a ball.  (1-CT 222-227.)  RD repeatedly denied any inappropriate touching by Molina.  (1-CT 228-240.)

RD said she was nervous talking to Holly because Nidia did not want any problems and told the girls that if they were not careful in what they said, they could be taken away from the family.  (1-CT 240, 243-244.)  RD also recalled an incident when

the police investigated a report that Edson hit the girls for discipline.  (1-CT 241-243.)  The police told Edson he would be arrested if he continued hitting the girls and the girls could be taken away from the family.  (1-CT 241-242.)

When Holly asked if RD had any questions, RD asked if Holly had been inappropriately touched.  (1-CT 245.)  After being assured by Holly that she was not going to take the girls away from their parents, RD described an incident in which Molina accidentally had touched her butt as he and XD "high-fived" each other.  (1-CT 247.)  Molina apologized to RD, but RD believed that he wanted to touch her more.  (1-CT 247-248.)  XD told Nidia about the incident and Molina was "kicked out."  (1-CT 247.)

RD said that XD is always worried about her and always tells Nidia when Molina tries to touch RD or even when RD sits next to him.  XD always "thinks, like, kind of bad."  (1-CT 248.)

When Holly asked RD why did she think that Molina wanted to touch her more during the "high-five" incident, RD said it was because a long time ago Molina touched RD's "private part" and XD saw it and told Nidia about it.  (1-CT 249.)  RD said it happened when she was two to three years old, that she did not remember it and Nidia had told her about it and that this touching was the reason that Molina was kicked out.  (1-CT 249.)

When asked what was the first incident that she could remember, RD said they were on the bed and covered with a blanket when Molina tried to put his finger in her "private part." (1-CT 262-263.)  She told Molina to stop and slapped him and

24

screamed.  (1-CT 263.)  XD overheard it and told Nidia that he was "doing it again."  (1-CT 263.)  Nidia was going to call the police but stopped when Molina ran out of the house.  (1-CT 263.)

Another incident happened when RD was six years old.  (1-CT 249, 251.)  RD was ill and she, XD and Molina were covered with a blanket on the couch in the living room and were watching television while Nidia was taking a nap in the bedroom.  (1-CT 249, 251, 256, 259.)  Molina took off his pants and partially removed his shorts.  (1-CT 250-251, 256.)  RD accidentally touched his penis (which she described as his private part with which he pees) while trying to hug him.  (1-CT 250, 251, 265.)  He let go off her hand, and her hand slipped and touched the bare skin of his penis.  (1-CT 251-252, 256.)  She got disgusted and moved away but he reached over and moved closer to her.  (1-CT 250, 251, 256.)  It felt "really wrong" and she started crying.  (1-CT 252, 256.)  She told him, "Stop coming closer to me," and he stopped because XD was with them.  (1-CT 256.)  Molina put on his shorts and pants and left because she told him to leave.  (1-CT 256-257.)  RD later told Nidia about this incident.  (1-CT 252.)

RD also told Holly about another incident in which Molina tried to pull down her shorts.  (1-CT 252, 253.)  She said, "Stop it, I don't like it."  (1-CT 252.)  She told XD about it and Molina was kicked out again.  (1-CT 253.)

RD said that on another occasion Molina had tried to put his hand in her "private part."  (1-CT 253.)  She did not "really remember" it but she thought she was sleeping when she felt

something under her pants and underwear. (1-CT 253, 254.) She checked what it was and found Molina's hand. (1-CT 253-254.) He tried to go inside her "private part". (1-CT 255.) She said, "Stop," slapped him, and kicked him out of the room. (1-CT 253-254, 255.) When Nidia later inquired why RD had kicked Molina out of the room, RD told Nidia what had happened. (1-CT 255.) Nidia became worried and panicked, and told Molina never to come back and not to see or talk to the girls. (1-CT 255, 259.)

The last time Molina touched RD was when she was five or six years old in the Redwood City house. (1-CT 259.)

When asked about the worse incident, RD described an event which happened in the "old house" when she was seven years old. (1-CT 260-261, 262.) Both girls were on the bed with Molina sitting between them. (1-CT 261, 262.) He pulled off RD's pants and underwear. (1-CT 261.) She was "like, 'Stop it. I don't like what you're doing.'" (1-CT 261.) Molina touched inside her "private part" with his finger and he did not care that she told him to stop and kicked him. (1-CT 261.) "He just wanted to do it more." (1-CT 262.) RD was "very mad" that he did not care that she was his niece. She told Molina, "I'm your niece, why are you doing that to your niece?" (1-CT 262.) He thought about it and did not do it anymore. (1-CT 262.)

XD saw what happened and called Nidia. (1-CT 262.) The girls told Nidia what had happened. (1-CT 261, 262.) Molina left the house when Nidia pretended to call the police, and the girls never saw him again. (1-CT 261, 262.)

26

RD told Holly that Molina frequently visited them and
sometimes stayed for a few days with them in the old house.  (1-
CT 263, 264.)  One time, when Nidia was ill, Molina pulled off
RD's pants and underwear.  (1-CT 264.)  XD was playing with
their young brother, and Edson was in the kitchen preparing
food.  (1-CT 263-265.)  As RD was sitting on the couch and Molina
was standing, he tried to put his penis in her vagina.  (1-CT 264,
265.)  He grabbed her legs and put them up and spread them
apart.  (1-CT 264, 265, 266.)  He tried to put "it" inside.  (1-CT
264, 265, 266.)  When asked if Molina put "it" inside, she said
that he did.  (1-CT 266.)  Her body did not "seem comfortable,"
"did not like it."  (1-CT 264.)  It felt "uncomfortable," "like,
someone was gonna, like, I don't know, kill me or something"
because it hurt.  (1-CT 266.)

According to RD, Edson saw Molina touching RD and hit
Molina.  (1-CT 265.)  RD ran to her room and told Nidia.  (1-CT
265.)  The parents called the police.  The police came, but Nidia
did not let them arrest Molina.  (1-CT 265.)  It never happened
again because Molina never came over again.  (1-CT 266.)

RD said that Molina also tried to touch her in her "private
part" and in her butt with his hands.  (1-CT 267.)  She pushed
him away and did not let him.  (1-CT 267.)

There was also an incident in the old house when Molina
made her touch him while they were sitting on the couch.  (1-CT
267.)  He grabbed her hand and tried to touch his private part
with it.  (1-CT 267.)  She said, "Stop," and punched him when he

grabbed her hand even harder.  (1-CT 267.)  She only touched the top of "it" and "it" felt wet.  (1-CT 269.)  He grabbed his private part and shook it and then "white stuff" started to come out of it.  (1-CT 269, 270.)  She became disgusted, said "stop grabbing my hand," and ran to the room and locked it because she felt he might come in and try to do more.  (1-CT 269.)

### C.    INVESTIGATION BY REDWOOD CITY POLICE.

Because RD told Holly that all incidents happened in the "old house" (Redwood City), Hayward police transferred the investigation to the Redwood City Police ("RCP").  (3-RT 292-293, 309; 7-RT 875-876, 883.)

On January 11, 2017, RCP detective Angela McGibney was assigned to the case.  (7-RT 875-876, 883.)  Her investigation included new interviews of the girls, interviews of the girls' parents, an interview of Molina, and a medical examination of RD.  (7-RT 876-878, 883-884.)

### 1.    Interview of RD.

McGibney interviewed RD on February 3, 2016, at Selby Lane Elementary School in Redwood City.  (7-RT 876, 878, 883.)  RD told McGibney that her CALICO statements were not true and that she had made up the allegations.  (2-CT 348.)  She said she did not know why she made up the allegations and stated that they "just flew out of her mind for no reason."  (2-CT 349.)

## 2.   Interview of XD.

XD said she had not observed Molina improperly touch RD because Nidia was always with them.  (1-CT 211.)  When asked about her previous report to the teacher, XD stated she mistook Molina's grabbing of RD's hand as inappropriate when RD punched his "private part" and hurt him while playing.  (1-CT 211-213.)  XD told Nidia about the incident and Nidia initially believed there was inappropriate touching and informed Edson about it.  (1-CT 212-213.)  When Molina later explained to Edson that he had grabbed RD's hand to prevent her from hitting him again, Edson accepted the explanation.  (1-CT 212-213.)

## 3.   Medical Examination of RD.

Dr. Rachel Gilgoff, a child abuse pediatrician at the Center for Child Protection at U.C.S.F. Benioff Children's Hospital in Oakland, examined RD on February 21, 2017.  (3-RT 204, 206.)  The examination was unremarkable and did not prove nor disprove prior sexual abuse.  (3-RT 207-210, 212, 221, 224.)

Dr. Gilgoff testified that some penetrations of young girls' vaginas leave no injuries or heal without any scarring.  (3-RT 209-210.)  A tear, bleeding, or bruising can heal within 48 hours to two weeks.  (3-RT 210.)  According to Dr. Gilgoff, hymens of prepubescent girls are "exquisitely tender" and any penetration or touching of a prepubescent girl's hymen would be very painful to the girl.  (3-RT 213-214, 222.)

### 4.  Interviews of the Parents.

Detectives McGibney and Daniel Valencia interviewed Nidia and Edson on March 2 and 9, 2017.  (4-RT 410-412; 7-RT 878; 1-CT 274-300; 2-CT 301-344.)

Nidia told the detectives the family was Christian and did not teach the girls about sex because they were too young.  (1-CT 281.)  The girls were not exposed to pornography at home, but had sex education at school and talked about sex with their friends.  (2-CT 325-328.)

The family lived in a one-bedroom apartment in Redwood City before moving to Hayward.  The parents and the children (the two girls and a young son) slept in the same bedroom.  (1-CT 300.)  When Molina occasionally spent a night in the apartment, he slept on the couch in the living room.  (1-CT 297-300.)  Molina never stayed with them once they moved to Hayward in May of 2016.  (1-CT 296.)

According to Nidia, XD was always present when RD was with Molina.  (1-CT 299.)  RD has never told Nidia about any inappropriate touching by Molina.  (1-CT 281; 2-CT 320.)

In October 2016, when XD told Nidia that Molina had touched RD and that she had seen him pull down RD's pants, Nidia questioned RD if Molina had touched her, and RD said "No."  (1-CT 280; 2-CT 304-306.)  RD said that he only had pulled down her pants but did not touch her.  (1-CT 281; 2-CT 304.)

Nidia was suspicious and felt that something was going on because Molina pulled down RD's pants.  (2-CT 307, 308.)  She

30

told Edson about it and Edson questioned RD if Molina had touched her. (2-CT 308.) RD denied any touching. (2-CT 308.) Edson told Nidia he did not want Molina coming over to their apartment after that. (2-CT 308-309.)

Nidia told the detectives about an incident which took place about a year before the interview. In this incident RD was hit with a ball and Molina rubbed the area of her body where she got hit. (1-CT 277, 279; 2-CT 320.) XD misinterpreted this rubbing as sexual and told Edson that Molina had rubbed RD's "private part." (1-CT 278.) When Edson confronted Molina about it, Molina explained the touching was not improper and said that he would not have sexually touch his niece. (1-CT 278-279.) Edson barred Molina from coming over and spending time with the girls. (1-CT 279.) The girls also stopped visiting their maternal grandparents because Molina lived with there. (1-CT 282.)

Although Edson barred Molina from coming over, Nidia thought her brother was incapable of harming his nieces and gave him the benefit of the doubt. (2-CT 307.) She allowed Molina to come over and spent time with the girls when Edson was at work. (1-CT 288.) Nidia was always present when Molina was with the girls. (1-CT 277, 289.)

When confronted with RD's CALICO statements in which she described numerous molestations by Molina and RD's claim that Nidia was told about these incidents, Nidia denied being told about them by the girls. (1-CT 285.) Nidia said that she had asked XD about any touching, and XD said "No." (1-CT 285.)

31

Nidia said that one time she kicked Molina out of the house because XD told her that Molina had touched RD's butt. (1-CT 286.) This happened on XD's birthday in 2015. (1-CT 287.)

Nidia also said that XD told her in August of 2015 that Molina had touched RD by squeezing her buttocks from behind. (1-CT 290-293.) Although Molina denied any wrongdoing, Nidia "ran him off from the house." (1-CT 291.) Molina did not return because Nidia threatened to tell his parents. (1-CT 293.)

Nidia told the detectives that she took RD for a medical checkup after XD reported that Molina had touched RD. (1-CT 297.) Nidia asked the doctor to check RD's "private part" and said that everything was fine. (1-CT 297.)

After the family moved to Hayward in May 2016, Molina came over to their apartment several times but Nidia did not let him inside. (1-CT 280, 295.) One time, in June 2016, he brought a bag of food from his parents and wanted to play with the girls. (1-CT 295-296.) When Nidia did not allow it, he kicked a ball which hit RD in the back. (1-CT 295.) He said it was not on purpose and ran over to RD and began massaging the area on her back where she was hit by the ball. (1-CT 295.)

Nidia said the last time they had contact with Molina was in November 2016 when they bought a gift for his birthday. (2-CT 305-306.) In another part of the interview, Nidia said that Molina came to their Hayward residence on three occasions around Christmas to bring gifts for the girls. (1-CT 280.) Nidia did not let him into the residence. (1-CT 280.)

32

Nidia denied avoiding the police.  She denied receiving phone calls from the Hayward police or social worker after XD's statements to the teacher.  (2-CT 335.)  She found out the police was trying to get in touch with her when an officer came to the apartment.  During that period of time XD was hospitalized and Nidia was at the hospital with her.  (2-CT 334-335.)

When Nidia talked to the Hayward police, she was instructed not to talk to Molina.  (2-CT 336.)  She nevertheless called Molina afterwards and told him what the police had told her.  (2-CT 336.)  Molina came over and Nidia talked to him in the garage about the allegations.  (2-CT 336-337.)  She denied telling Molina not to talk to police.  (2-CT 337.)  She told him not to talk to anybody unless he first told his parents because his parents did not know about the allegations and it would put them in a bad situation.  (2-CT 337-338.)

On December 7, 2016, Nidia moved the girls from their school in Hayward to a school in Redwood City.  (1-CT 280-281; 2-CT 330-332.)  She moved the girls because XD was being bullied at the Hayward school.  (2-CT 332-333.)  It did not have anything to do with the girls' report of sexual abuse.  (2-CT 333-334.)

### 5.  Interview of Molina.

Molina was arrested after Nidia's and Edson's interviews.  (8-RT 879-880.)  He was advised of his *Miranda* rights and was interviewed by the detectives.  (4-RT 413; 7-RT 881.)  A video recording of the interview was played for the jury.  (7-RT 900; People's Exhibits Nos. 8A [video] & 8B [transcript].)

33

Molina knew about the girls' accusations against him but did not know why they were making them. (2-CT 365-369, 386.) He said both girls were liars and lied a lot. (2-CT 410.)

Molina went to the apartment in Redwood City two to three times per week and played with the girls. (2-CT 369, 372-374.) They usually sat on the couch in the living room and played video games and watched television. (2-CT 374-375.) When Nidia had visitors, Molina and the girls played in the bedroom. (2-CT 383.)

Molina usually left the apartment when Edson got home. (2-CT 375.) He denied having any problems with Edson and said they had worked together for a period of time. (2-CT 376-377.) Their relationship changed after XD accused Molina of touching RD's butt. (2-CT 390-392.) Edson got angry and told Molina he did not care if it was accidental or not and, if it happened again, he would beat up Molina and kick him out. (2-CT 390-391, 397.)

Molina denied inappropriately touching RD and said the only time he had touched RD was when he tried to console her after she was hit with a ball. (2-CT 369, 371, 395-396.) He also said that when RD was three to four years old, she accidentally touched his penis while they were sitting on the couch. (2-RT 377-378.) When confronted with RD's account that his pants were off and that he put her hand on his penis, Molina denied holding her hand or placing it on his penis but said that his pants were falling off because he was not wearing a belt. (2-RT 378.)

Molina said the only time he took off RD's pants was when she was going to the bathroom and could not unzip her pants. (2-

34

CT 397.)  He unzipped the pants for her but he did not pull them down.  (2-CT 397-398.)  He also denied pulling down his pants. (2-CT 398.)

Molina denied putting his penis in RD's vagina.  (2-CT 402.) He also denied masturbating in the girls' presence.  (2-CT 383, 411-412.)  He denied grabbing RD's butt, but when he was told that Nidia told the police that XD had reported seeing him touch RD's butt, he said it could have happened accidentally while they were playing.  (2-CT 381-382.)  He denied touching RD's vagina, but said that if it did happen, it was accidental while they were play-wrestling.  (2-CT 384.)  According to Molina, RD was always wearing her pants when they were wrestling.  (2-CT 394.)

Molina said that when the girls made their accusations against him, Nidia called him and said they needed to talk in private.  (2-CT 388-389.)  When they met, Nidia told him about the accusations and told him not to talk to anyone.  (2-CT 388.) He denied kicking the ball at RD and then rubbing her on the day he came to their residence in Hayward for the last time.  (2-CT 404-405.)

### D.  TRIAL TESTIMONY.

#### 1.  XD's Testimony.

XD testified that Molina is her favorite uncle and that she and RD had a good relationship with him.  (2-RT 91-92.)  He was helpful to Nidia.  He frequently picked up the girls from school, babysat them, and spent time in their apartment.  (2-RT 91-95.)

35

When they played video games, Molina and the girls sat on the couch in the family's living room while Nidia cooked in the kitchen.[4]  (2-RT 95-96.)  Sometimes they would tickle each other's armpits while playing.  (2-RT 126, 150-151.)  There were no blankets on the sofa.  (2-RT 96, 151-152.)

XD never thought that Molina inappropriately touched RD. (2-RT 110-111.)  One time, Molina spanked RD on her butt, and XD reported this to Nidia, who told him to never hit the girls again.  (2-RT 113-114, 142.)

XD testified she did not remember her statements to the teacher (2-RT 96-97) and denied remembering her CALICO statements (2-RT 116, 117).[5]  She also denied telling Nidia that Molina had inappropriately touched RD.  (2-RT 120.)

When she was shown the teacher's report, XD denied telling the teacher that Molina had inappropriately touched RD or made RD touch him.  (2-RT 98-99, 111.)  She also denied pointing to any parts of her body while talking to the teacher.  (2-RT 102.)  She told the teacher about the time Molina rubbed RD's leg when she got hurt with s ball.  (2-RT 104-107, 122, 142.)  She denied saying that he had touched RD's "private area."  (2-RT 107.)  According to XD, the report was a mistake and that she had

_____

[4]  The one-bedroom apartment in which the family lived in Redwood City was very small and there was no walls or doors that separated the living room from the kitchen.  (2-RT 134-137.)

[5]  A video recording of her CALICO interview was played for the jury.  (3-RT 227, 230, 267-268; People's Exhibits Nos. 3 [video] & 3A [transcript].)

misinterpreted the touching because she had been taught that other people should not touch the girls.  (3-RT 232-233.)  XD later talked to Nidia and realized the touching was not sexual.  (2-RT 140, 149.)

XD also denied reporting that Molina had made RD touch his "private part."  (2-RT 127.)  She testified that what she had observed was Molina covering his "private part" and taking RD's hand away when she tried to hit him there.  (2-RT 126-127.)  XD thought that might be "sexual abuse."  (3-RT 254.)

XD denied that Nidia or Edson instructed her not to tell anybody what Molina had done.  (2-RT 140-141.)  They never told her to lie to help Molina.  (2-RT 141.)

## 2.   RD's Testimony.

RD, who was ten years old at the time of trial (3-RT 313), testified that Molina is her favorite uncle (3 RT 314) and that he had never made her feel uncomfortable or inappropriately touched her (3-RT 319; 4 RT 380-381).[6]  He had never touched her "private part" or tried to undress her or make her touch his "private part."  (3-RT 320-322.)  She denied saying that she did not want to be around him.  (4-RT 386.)

RD testified the touching she had reported in her CALICO interview occurred accidentally.  (3-RT 320.)  After the video of her CALICO interview was played for the jury, RD testified she

---

[6]  During RD's testimony, a video recording of her CALICO interview was played for the jury under Evidence Code section 1235 and 1360.  (3-RT 326-328; People's Exhibits Nos. 4A & 4B.)

did not recall making some of the statements in her interview or the events themselves.  (4-RT 335-336, 342, 346, 347, 351, 352, 377, 378, 379, 382, 383.)  Her CALICO statements were not true (4-RT 371-375, 378, 379, 383, 386, 396), she wished she could take them back (4-RT 396), and she did not know why she had made them (4-RT 352-353, 375).  No one told her what to say at trial. (4-RT 362, 397.)

Detective McGibney interviewed RD at school in Redwood City and she had told the detective that Molina had never touched her in a bad way.  (4-RT 389-390.)  McGibney grabbed RD's arm "really hard" and yelled at her.  (4-RT 391.)

### 3.  The Parents' Testimony.

Edson testified that when RD was between three and eight years old, they lived in a one-bedroom apartment in Redwood City.  (5-RT 432, 443, 461-462, 473.)  Molina frequently came over, spent time with the girls, and occasionally slept in the apartment when he worked with Edson.  (5-RT 432, 442-443, 466-467.)  When he spend the night, Molina slept on the couch in the living room.  (5-RT 443-444.)  He and the girls would play and watch television in the living room.  (5-RT 444.)  Edson and Nidia would not leave him alone with the girls (5-RT 467-468), but sometimes Molina would be alone with the girls while Edson took a shower (5-RT 445).

The girls were not exposed to nudity, pornography or sex at home, and the family did not discuss sexual matters in the girls' presence.  (5-RT 457-459, 481.)

From a very young age the girls were taught about inappropriate touching and were told that only their doctors and parents were allowed to touch them.  (5-RT 471-472, 481.)  The family was very vigilant about sexual abuse because Nidia had been a victim of sexual abuse and was afraid that her children would also become victims of abuse.[7]  (5-RT 472.)

When RD was about three years old, Nidia told Edson that RD had reported being touched by Molina on her genitals.  (5-RT 433. 468-469.)  Edson confronted Molina who denied touching her.  (5-RT 433-434, 469.)  Because of the report, Edson became more careful with the girls and told Nidia and Molina that the girls should never be alone with Molina.  (5-RT 434-435, 469-470.)

As an older sister, XD was told to look after RD.  (5-RT 471.)  Whenever Edson asked XD about any inappropriate touching, she always said that everything was fine.  (5-RT 439, 441-442.)  There were no other reports of Molina's touching of the girls.  (5-RT 483.)

Edson did not notice any changes in RD's behavior and there were no reports from school about any bad behavior or her acting out inappropriately.  (5-RT 479-480, 490-491.)

---

[7]  In her interview with the detectives Nidia never stated that she had been sexually abused and, as a result, was hyper-vigilant about sexual abuse.  (7-RT 878-879.)  Nidia's high school counselor in 1997-1998, Guadelupe Navarette, testified for the defense that in Spring of 1998 Nidia disclosed to Navarette that Nidia had been a victim of sexual abuse.  (7-RT 894-895.)

About five years after RD's initial report of touching, Edson learned about XD's report to the teacher. (5-RT 437, 477, 478.) The girls then had their CALICO interviews, and Edson did not discussed with them their accusations. (5-RT 437-438.) He asked Nidia about the accusations, and Nidia said that nothing had happened. (5-RT 440.) In his subsequent police interviews Edson learned that Nidia was letting Molina spent time alone with the girls while Edson was at work. (5-RT 440-441, 450-451.)

Edson denied there was an incident (reported by RD in her CALICO interview) in which Edson observed Molina pull down RD's clothes, take off his clothes, and put his fingers and his penis in RD's vagina. (5-RT 451, 463-464.) Edson also denied intervening in this alleged incident and hitting Molina. (5-RT 451, 464, 465.) Edson said this entire allegation was ridiculous and not true. (5-RT 464-465.) Also, the police was not called and did not come to the apartment following this alleged incident. (5-RT 451, 465.)

Edson was never awakened by RD's screaming, hitting of Molina, or telling Molina to stop. (5-RT 474-475.) Edson also denied there was an incident or incidents after which he sent Molina away and told him not to come back. (5-RT 475, 476.)

Both Edson and Nidia testified that while they were living in Redwood City Edson would watch pornography, masturbate, and have sex with Nidia in the bedroom while their children were asleep in the same bedroom and that Edson would clean his penis after they had intercourse. (6-RT 697-700, 712; 7-RT 904-909.)

Molina is Nidia's younger brother.  (5-RT 498.)  She loves him and is very close to him.  (5-RT 500.)  She trusts him and does not believe that he would hurt her daughters.  (6-RT 717.) She never saw him touch the girls inappropriately or undress them.  (6-RT 693-695.)

Nidia testified she had been a victim of sexual abuse and is hyper-vigilant and overprotective of her daughters.  (6-RT 647, 680-681.)  She taught the girls about inappropriate touching and often cautioned them to be careful around men, including Molina. (6-RT 680-681.)

Nidia denied leaving the girls alone with Molina when he visited them in Redwood City.  (5-RT 504-505; 6-RT 717-718.) Usually during his visits, Nidia would cook in the kitchen and he and the girls would sit on the couch in the living room and play video games or watch television.  (5-RT 504; 6-RT 694-697.)  Nidia never let Molina go into the bedroom with the girls.  (6-RT 694.)

Molina occasionally spent the night (sometimes a week when he worked with Edson) in their apartment.  (5-RT 501-502, 619.)  He slept on the couch in the living room and the girls and the parents slept in the bedroom.  (5-RT 502.)

Nidia testified there were two incidents in which RD was hit with a ball.  (6-RT 653-654.)  One of the incidents happened when RD was three years old and Molina hit her with a ball while they were playing.  (5-RT 624-625.)  The ball hit RD on her right inner thigh.  (5-RT 625-626.)  Molina rubbed the area of her leg where the ball had hit her.  (5-RT 626.)  XD saw it and told Nidia

that Molina had touched RD.  (5-RT 627.)

XD told Nidia a few times that Molina had touched RD.  (6-RT 640-644.)  When asked why she had failed to report these allegations to police, Nidia said the girls were liars and lied about many things.  (6-RT 650.)  Whenever Nidia asked the girls if they were certain that Molina had touched them inappropriately, they denied it.  (6-RT 650.)  One time Nidia asked RD what happened, and RD said that "nothing happened," that Molina only had pulled down her pants, and RD did not want him to go to jail.  (6-RT 645-647.)  Nidia told Edson about it and Edson got angry and said he would talk to Molina.  (6-RT 644-645, 692.)  Edson told Molina that he should not be in the apartment when Edson is not there.  (6-RT 692-693.)

### 4. Child Sexual Abuse Accommodation Syndrome Evidence.

Both sides presented expert testimony concerning the child sexual abuse accommodation syndrome ("CSAAS").  (5-RT 518-609; 7-RT 791-872.)  This testimony will be discussed more fully in Argument I, *post*.

/ / /

/ / /

## ARGUMENTS

## I.

**THE TRIAL COURT PREJUDICIALLY ERRED AND VIOLATED MOLINA'S FIFTH, SIXTH AND FOURTEENTH AMENDMENT RIGHTS WHEN IT ALLOWED EXPERT TESTIMONY REGARDING CHILD SEXUAL ABUSE ACCOMMODATION SYNDROME BECAUSE THE TESTIMONY WAS INADMISSIBLE, IRRELEVANT AND ITS PROBATIVE VALUE WAS OUTWEIGHED BY ITS PREJUDICIAL IMPACT.**

Reversal of all convictions is required because the trial court committed prejudicial error in allowing the prosecution to introduce expert testimony regarding CSAAS.

## A.   PERTINENT FACTS.

### 1.  In Limine Motions.

Before trial, the defense filed a "motion to exclude certain evidence of myths and child accommodation syndrome and testimony on characteristics of molest victims."  (1-CT 112-118.) This motion objected to the CSAAS evidence on the *Kelly/Frye*[8]

---

[8]  *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*); *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013 (*Frye*), collectively *Kelly/Frye*. In *People v. Cowan* (2010) 50 Cal.4th 401, 469, fn. 22, the California Supreme Court noted that, while *Kelly* relied on *Frye*, it has become more appropriate to refer to *Kelly* alone because the United States Supreme Court has ruled that the Federal Rules of Evidence superseded *Frye*.  This brief refers to the "*Kelly*/Frye" rule because that is the designation used in the trial court.

grounds and requested the trial court to exclude any evidence equivalent to a profile of a child molester or victim of a molest under the subterfuge of dispelling myths about child molesters or victims of molest.  (1-CT 113-118.)  The motion also requested that if the prosecution intends to introduce expert testimony regarding characteristics of molest victims, that the court issue a protective order that: (1) the only purpose of the proposed testimony be to dispel alleged myths or misconceptions regarding victims of molest; (2) there be a hearing outside the presence of the jury for the prosecution to specify the alleged myths and misconceptions and a contested hearing as to whether or not it actually is a myth or misconception; and (3) the testimony be narrowly limited to only those items found by the court to actually be myths or misconceptions.  (1-CT 113.)

The prosecution's motions in limine (1-CT 133–143) included a motion requesting that the trial court admit evidence of CSAAS, and in particular Miriam Wolf's expert testimony, to explain why children who are victim of sex assault may react to sex crimes in ways which appear inconsistent with actual victimization to lay people with little or no knowledge of common chile reactions to molest.  (1-CT 142-144.)  The prosecution argued that California courts routinely permit expert testimony on common reactions to sexual abuse, that the courts routinely allow the People to introduce such testimony in the case-in-chief, especially when the victim's credibility is placed at issue due to paradoxical behavior, including a delay in reporting.  (1-CT 143-

44

144.)  The motion stated Wolf would not opine that she believed the victim was actually molested in this case.  (1-CT 142.)

The hearing on the motions took place on June 14, 2018. (1-RT 17.)  The trial court ruled it would allow such testimony "with the proviso that the expert will not render any opinion as to whether the victim was actually molested in this case, as indicated in the moving papers, and not to render any opinion that the [alleged victim] suffers from the Accommodation Syndrome."  (1-RT 17-18.)  "My understanding, Ms. Samant [the prosecutor], that this is -- you are going to utilize this expert to help educate the jury to explain certain aspects of all alleged victim's behavior after an assault, including recantation, late reporting, and that type of thing.  So, I am going to allow it."  (1-RT 18.)  The court also stated that based on *People v. Patino* (1994) 26 Cal.App.4th 1737 (*Patino*), the expert's testimony could take place during the People's case-in-chief but only after the alleged victim's testimony, and that the court would allow defense counsel to submit a jury instruction on the CSAAS testimony similar to the one given in *Patino*.  (1-RT 18.)

## 2.  Expert Testimony.

Due to a scheduling issue, the defense expert on child sexual abuse, Dr. O'Donohue, testified out of order on June 28, 2018.  (1-CT 179-180; 5-RT 515-518.)  O'Donohue is a licensed psychologist and a professor of clinical psychology who specializes in child sexual abuse.  (5-RT 518, 526.)  He has published 80 books (including two-volume book on the sexual abuse of children

and a book on forensic interviewing of children who may have been sexually abused), over 200 journal articles, and over 250 book chapters. (5-RT 520-522.) Since the early 1980s, O'Donohue has treated over 2,000 sexually abused children and conducted research into the false memories and suggestibility of child sexual abuse victims. (5-RT 518-519, 522-523.) He has engaged in research critiquing CSAAS and has published two peer-reviewed publications regarding CSAAS. (5-RT 521, 525-526.) O'Donohue has served on the Nevada Attorney General's committees on child sexual abuse, prevention of child sexual abuse, and children's ways of testifying in court about sexual abuse. (5-RT 522.)

O'Donohue explained the genesis for CSAAS was an article published in the 1980s by Dr. Ronald Summit, a psychiatrist, written to dispel the myths and misconceptions held by adults why children were not believed when they made allegations of sexual abuse. (5-RT 526-527.) Summit used CSAAS, which has five components (secrecy; helplessness; entrapment and accommodation; delayed, conflicted or unconvincing disclosure; and recantation) to describe a pattern of behavior exhibited by children who reported sexual abuse. (5-RT 527-535.) Summit based his article on his own clinical experience and interviews without any scientific data to support them. (5-RT 527-528, 540-541, 549-551.) There is also no data that people believe the myths identified in the article. (5-RT 527.)

In 1992, Summit published a second article in which he stated that CSAAS was not a product of science, that it was only

46

a theory and not a syndrome, that it was not a diagnostic tool which could support or prove the presence of sexual abuse, that it was never intended for use in courts, and that it was being misused in courts to differentiate true allegations from false ones. (5-RT 529-531, 547-548, 552.)

In his trial testimony O'Donohue critiqued CSAAS and questioned the methodology and conclusions of the theory.  (5-RT 527-553.)  O'Donohue testified that children who have been sexually abused usually manifest some sort of trauma and that the most common diagnosis for a child who has been sexually abused is port-traumatic stress disorder ("PTSD").  (5-RT 523, 534-535, 538-539, 595.)  PTSD criteria are: anxiety, avoidance, nightmares and re-experiencing phenomenon, hypervigilance, and depression or other negative affect.  (5-RT 535-536.)  The memories of abuse are frequent, salient and disturbing to the children.  (5-RT 539-540.)  According to O'Donohue, the problem with CSAAS is that its criteria do not overlap with the PTSD diagnostic criteria.  (5-RT 535.)

O'Donohue testified that researchers are finding that about 60 percent of sexually abused children meet all diagnostic criteria.  (5-RT 536.)  His research found that in 97 percent of the cases children were consistent in their core details (that children were consistently telling about their abuse) which is evidence against Summit's fourth criterion that the allegations are delayed and unconvincing.  (5-RT 537.)  Also, 94 percent of the cases did not contain any fantastical details, which contradicts Summit's

assertions that the allegations of sexual abuse are told in contradictory manner with fantastical details. (5-RT 537.) In his article Summit wrote that the more fantastical are a child's allegation, the more likely they are to be true, which according to O'Donohue defies the logic. (5-RT 538.)

With respect to recantation, O'Donohue testified about a published, peer-reviewed study, which O'Donohue described as the best study, conducted by April Bradley and James Wood at the University of Texas at El Paso, which found that only 4 percent of sexually abused children recant their allegations. (5-RT 541-542, 553, 598.)[9] This study contradicted Summit's claim that most abused children recant. (5-RT 542.)

O'Donohue published an article with Dr. Lorraine Benuto in which they identified 22 problems with Summit's original article and its conclusions and called CSAAS "junk science." (5-RT 543-544, 554.) CSAAS cannot be used to discriminate between true and false allegations of sexual abuse. (5-RT 552.) O'Donohue agreed with Summit's second article that CSAAS is being misused in courts. (5-RT 552.) But, O'Donohue disagreed with the second article to the extent it described CSAAS a "teaching tool." (5-RT 548.) Something can be a teaching tool only if it is true and accurate, and CSAAS has elements that are false. (5-RT 548-549.)

_____

[9] There are other studies on recantation, which show a higher percentage of recantation (as high as 16 or 20 percent), but according to O'Donohue, those studies are not as thorough as the Bradley and Wood study. (5-RT 542-543.)

On cross-examination, O'Donohue stated that studies show that between 85 to 94 percent of people believe children who allege sexual abuse.  (5-RT 564.)

Although the current rate of false reports of child sexual abuse is unknown, most children who allege sexual abuse are not making false allegations.  (5-RT 568-569, 591.)  When children report sexual abuse "on their own, out of the blue," it indicates the disclosure is not affected by suggestibility.  (5-RT 569.)  In verified cases of sexual abuse, children tend to consistently tell the same story and give the same "core" details when interviewed multiple times.  (5-RT 570-571, 599-601.)  Descriptions of pain, what part of the body was touched, what happened to the perpetrator's body, and the location of the parents when the abuse took place are "core" details.  (5-RT 571-572.)

O'Donohue testified that improbable allegations of sexual abuse made by young children should not be automatically dismissed as false and that children making such allegations should be given a chance to explain further.  (5-RT 575-576, 584-584.)  The vast majority of children who report sexual abuse do not make implausible or fantastical claims.  (5-RT 577-583, 606-607.)  If such claims are made, they usually reflect the child's wishful fantasy thinking that someone (a superhero or family member) would rescue the child.  (5-RT 586-590.)

Minor abuse like touching when the child is unaware of the touching can leave no symptoms.  (5-RT 595.)  A child may not act out in a minor abuse situations.  (5-RT 597.)

49

An unsupportive mother is a factor that increases the likelihood that the child will recant.  (5-RT 597.)

The prosecution expert on CSAAS, Miriam Wolf, a licensed clinical social worker and a forensic interview specialist at the Keller Center for Family Violence Intervention at the San Mateo Medical Center, testified about the origin of CSAAS and its five components, which she views not as a diagnostic tool but as a useful framework to organize a conversation about dynamics of how children report sexual abuse.  (7-RT 791-793, 796-797, 800-801, 811-814, 868-871.)  Wolfe, who was present in the courtroom during O'Donohue's testimony, testified that for the most part she agreed with his testimony.  (7-RT 811, 843.)

Wolf testified CSAAS is not a classic syndrome.  (7-RT 832-833.)  It's first component (secrecy) describes an abused child's tendency to keep the abuse secret for an extended period of time.  (7-RT 814-815.)  The second component (helplessness) refers to the child's inability to understand what to do or how to behave when sexually abused.  (7-RT 816.)  The third component (entrapment and accommodation) describes the child's feeling that he or she is stuck in the situation without outside help and must figure out some way to cope with or live with the abuse.  (7-RT 817-818.)  When a sexually abused child reveals the abuse, the disclosure may be delayed, conflicted or unconvincing (fourth component) because children do not relate an event with a clear beginning, middle and end, with everything that happened disclosed all at one time.  (7-RT 820-822.)  The fifth component

50

(recantation) is based on the observation that a substantial portion of children who allege sexual abuse recant. (7-RT 822-823.)

Wolf agreed with O'Donohue that the Bradley and Wood study of recantation was a very well-constructed study, but she also thought that later studies which came up with different recantation rates were equally well researched. (7-RT 834-836.) According to Wolf, there is a greater likelihood of recantation when the child victim has a family-like, close relationship with the perpetrator. (7-RT 833-834.)

Wolf also testified about the Dalenberg study which found that 2 percent of the 104 children participating in the study reported fantastical or implausible elements. (7-RT 823-824.) The number of children reporting such elements increased to 7 percent in cases in which there was external corroborating evidence that sexual abuse had occurred, and up to 15 percent in cases in which there was severe abuse, penetrating offense, and ongoing sexual abuse by a known perpetrator. (7-RT 824.) Wolf said that abused children come up with implausible or fantastical claims of someone rescuing them in order to cope with the abuse. (7-RT 825-828.) Some children incorporate these false claims as facts into their truthful reports. (7-RT 826.)

### 3.  Jury Instructions on CSAAS.

Following Wolf's testimony, the trial court read to the jury a modified standard jury instruction of CSAAS. (7-RT 873.) Additionally, after the evidence taking part of the trial, the court

instructed the jury on expert testimony according to CALCRIM
No. 332 (2-CT 501) and according to a modified CALCRIM No.
1193, the standard jury instruction on CSAAS (2-CT 502).

### B.   STANDARD OF REVIEW.

A trial court's decision to admit expert testimony is
reviewed under the abuse of discretion standard.  (*People v.
McAlpin* (1991) 53 Cal.3d 1289, 1299 (*McAlpin*).)  It is not enough
that the court's ruling appears "rational."  (*People v. Jacobs*
(2007) 156 Cal.App.4th 728, 737.)  The decision must be based on
findings supported by substantial evidence and it must be made
in accordance with applicable legal principles.  (*Concord
Communities v. City of Concord* (2001) 91 Cal.App.4th 1407,
1417.)  If the evidence is not shown to be relevant, the court has
no discretion to admit it.  (*People v. Morrison* (2004) 34 Cal.4th
698, 724.)

### C.   LAW GOVERNING THE ADMISSIBILITY OF EXPERT TESTIMONY.

Under *Kelly*/*Frye*, " 'when faced with a novel method of
[scientific] proof,' " the California Supreme Court requires " 'a
preliminary showing of general acceptance of the new technique
in the relevant scientific community' before the scientific evidence
may be admitted at trial."  (*People v. Daveggio and Michaud*
(2018) 4 Cal.5th 790, 831 (*Daveggio*).)  As the Supreme Court has
also instructed, "Because the inventions and discoveries which
could be considered 'scientific' have become virtually limitless in

the near-70 years since *Frye* was decided, application of its principle has often been determined by reference to its narrow 'common sense' purpose, i.e., to protect the jury from techniques which, though 'new,' novel, or ' "experimental," ' convey a ' "misleading aura of certainty." ' "  (*People v. Stoll* (1989) 49 Cal.3d 1136, 1155-1156.)  In other words, *Kelly*/*Frye* " 'is intended to prevent lay jurors from being unduly influenced by procedures which seem scientific and infallible, but which actually are not.' " (*Daveggio*, *supra*, 4 Cal.5th at 831.)

*Kelly*/*Frye* involves "a three-pronged test to establish the reliability of scientific testing and its scientific basis to determine its admissibility.  'The first prong requires proof that the technique is generally accepted as reliable in the relevant scientific community.  [] The second prong requires proof that the witness testifying about the technique and its application is a properly qualified expert on the subject.  [] The third prong requires proof that the person performing the test in the particular case used correct scientific procedures.' "  (*People v. Lucas* (2014) 60 Cal.4th 153, 244 (*Lucas*), citations omitted.)  The proponent of the evidence has the burden of satisfying each prong.  (*People v. Roybal* (1998) 19 Cal.4th 481, 505.)  There is "no clear definition of science" under *Kelly*/*Frye*.  (*Lucas*, *supra*, 60 Cal.4th at 223.)  "Accordingly, the application of that term is guided by resort to the 'narrow "common sense" purpose' behind the rule: 'to protect the jury from techniques which . . . convey a " 'misleading aura of certainty.' " ' . . . The analysis is designed to

53

address 'scientific evidence or technology that is so foreign to everyday experience as to be unusually difficult for laypersons to evaluate.' " (*Lucas*, *supra*, 60 Cal.4th at 223.)

The California Supreme Court has instructed that the *Kelly*/*Frye* standard "applies to that limited class of expert testimony which is based, in whole or part, on a technique, process or theory which is new to science and, even more so, the law. The courts are willing to forgo admission of such techniques completely until reasonably certain that the pertinent scientific community no longer views them as experimental or of dubious validity. This all-or-nothing approach was adopted in full recognition that there would be a ' "considerable lag" ' between scientific advances and their admission as evidence in a court proceeding." (*People v. Stoll*, *supra*, 49 Cal.3d at 1156.)

In *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747 (*Sargon*), the Supreme Court acknowledged that trial judges are the "gatekeepers" with regard to a determination of the admissibility of scientific or expert testimony. The court set forth three criteria to determining admissibility of this kind of testimony. (*Id.* at 771-772.) These criteria go beyond the traditional view of *Kelly* and *Frye*. To come to this conclusion, the *Sargon* court relied upon Evidence Code sections 801 and 802. (*Id.* at 771.) "[U]nder Evidence Code sections 801, subdivision (b), and 802, the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely,

54

(2) based on reasons unsupported by the material on which the expert relies, or (3) speculative. (*Sargon*, *supra*, 55 Cal.4th at 771-772.) Additionally, "[o]ther provisions of law, including decisional law, may also provide reasons for excluding expert opinion testimony." (*Id*. at 772.)

It is well-established that expert testimony regarding characteristics of children who have been impacted by sexual abuse is not admissible to prove that the alleged victim has, in fact, been sexually abused. (*McAlpin*, *supra*, 53 Cal.3d at 1300.) Instead, it is admissible to disabuse jurors of commonly held misconceptions about child sexual abuse through rebuttal testimony from an expert. (*Id*. at 1301.)

Such evidence can also be adduced in the People's case-in-chief if an issue has been raised about the victim's credibility. (*Patino*, *supra*, 26 Cal.App.4th at 1745; *People v. Housley* (1992) 6 Cal.App.4th 947, 956 (*Housley*).) The evidence must, however, be addressed to a specific myth or misconception suggested by the evidence. (*Id*. at 985; *People v. Harlan* (1990) 222 Cal.App.3d 439, 449-450.) The evidence also should be limited to testimony concerning the behavior of sexually abused children as a class and should avoid testimony that recites the facts of the case or obviously similar facts. (*People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1384.) The expert is not permitted to testify that the complaining witness is credible because he or she manifests the characteristics generally exhibited by sexually abused children. (*People v. Bowker* (1988) 203 Cal.App.3d 385, 391 (*Bowker*).) In

an effort to lessen the danger that the jury will use this evidence
as evidence that defendant committed the charged crimes, trial
courts must give a limiting instruction sua sponte.  (*Housley*,
*supra*, 6 Cal.App.4th at 957-958.)

### D. THE TESTIMONY CONCERNING CSAAS WAS IRRELEVANT.

Here, expert testimony regarding characteristics of children
who have been impacted by sexual abuse was irrelevant and
inadmissible because there are no longer misconceptions to
correct and there is no evidence that any juror in this case held
misconceptions related to how abuse victims should act and,
because there are no misconceptions, the expert testimony was
used to support RD's prior statements that Molina was guilty.

For expert testimony to be admissible, the evidence must be
relevant to a disputed material issue that the jury is not capable
of resolving on its own.  (Evid. Code, §§ 210, 350, 800, subd. (a);
*Bowker*, *supra*, 203 Cal.App.3d at 390.)  Expert testimony,
explaining that children who delay reporting, recant and provide
inconsistent stories are sometimes actually molested, has been
held admissible to "disabuse" the jury of this common
misconception.  (*Id*. at 391; see *People v. Bergschneider* (1989) 211
Cal.App.3d 144, 158, fn. 13, overruled on other grounds in *People
v. Griffin* (2004) 33 Cal.4th 1015, 1028.)  To admit such evidence,
"it is the People's burden to identify the myth or misconception
the evidence is designed to rebut.  Where there is no danger of
jury confusion, there is simply no need for the expert testimony."

(*Bowker*, *supra*, 203 Cal.App.3d at 394.)  The misconceptions that this sort of testimony has been upheld to refute are no longer present.  Moreover, in this case, there was no evidence that any of the jurors held the misconceptions that previously prevailed in our society.  Accordingly, the expert testimony was irrelevant and inadmissible.

Courts and commentators have acknowledged, that the public no longer holds the presumed misconceptions this testimony purports to address.  (See e.g., *People v. Robbie* (2001) 92 Cal.App.4th 1075, 1086, fn. 1; [the "public misconception" assumption should be reexamined]; Cara Gitlin, Expert Testimony on Child Sexual Abuse Accommodation Syndrome: How Proper Screening Should Severely Limit Its Admission, 26 Quinnipiac L. Rev. 497, 525 (2008) ["There is debate over whether jurors hold such misconceptions about sexual abuse victims; courts do not agree on whether knowledge about how a child sexual abuse victim might respond is within the common understanding of a jury."].)

As the Pennsylvania court recognized in 1992, the reasons why sexually abused children may not immediately come forward to report abuse "are easily understood by lay people and do not require expert analysis."  (*Commonwealth v. Dunkle* (Pa. 1992) 602 A.2d 830, 836 (*Dunkle*).)  In *Dunkle*, the Pennsylvania Supreme Court stated,

> It is understood why sexually abused children do not always come forward immediately after the abuse: They are afraid or embarrassed; they are convinced

by the abuser not to tell anyone; they attempt to tell someone who does not want to listen; or they do not even know enough to tell someone what has happened. In the case sub judice, the expert testified that a "[m]ajor reason would be any threats that were made to the child." Also, she stated that "[t]hey also could not disclose for fear of embarrassment, for fear they are damaged in some way, they are not a perfect person." "[T]hey do not disclose out of fear of loss that they may have to leave the home, that someone within the home may have to leave them...." All of these reasons are easily understood by lay people and do not require expert analysis.

(*Dunkle*, *supra*, 602 A.2d at p. 836.)

The *Dunkle* court further concluded that expert testimony is not necessary to explain why children who are abused sometimes omit details, cannot recall details or do not recall details, because all are within the common knowledge of jurors. (*Id*. at 183-184; see also *State v. Schimpf* (Tenn. Crim. App. 1989) 782 S.W.2d 186, 194 ["We daily submit to juries the question of whether unlawful sexual activity has occurred. They routinely return verdicts without the assistance of expert psychological testimony. Couched in scientific terms as it was, it could only have confused and misled them."]; *State v. Davis* (Ohio Ct. App. 1989) 581 N.E.2d 604, 611 [finding that, where the victim is knowledgeable and competent to testify, CSAAS evidence is inadmissible].)

As courts in other jurisdictions have recognized, the public's knowledge of child sexual abuse, delays in reporting, recanting allegations and inability to recall details, are no longer novel

concepts that are foreign to jurors and jurors are more than capable of hearing testimony from witnesses and judging their credibility without the aid of expert testimony. The fact that many sexual assault victims, including adults and children, delay reporting, downplay the abuse, recant the abuse and have reoccurring contact with their perpetrator are generally known by the public. It would be the rare juror who would not understand these concepts.

Expert testimony is no longer necessary to explain misconceptions about abuse victims, because such misconceptions are no longer generally held. The CSAAS evidence was therefore irrelevant and inadmissible. Since there were no misconceptions about how abuse victims should act, the testimony concerning CSAAS was likely misused by the jury to impermissibly bolster RD's and XD's prior accusations and prove Molina's guilt.

> ### E.  THE TRIAL COURT ERRED WHEN IT ADMITTED THE TESTIMONY CONCERNING CSAAS BECAUSE IT LACKS ANY SHOWING OF SCIENTIFIC RELIABILITY.

First, the California Supreme Court has never addressed the question of whether testimony regarding characteristics of children who have been impacted by sexual abuse is scientific evidence, and this Court is not bound by *Bowker*.

In *People v. Bledsoe* (1984) 36 Cal.3d 236, 251 (*Bledsoe*), the Court held that testimony about "rape trauma syndrome" was erroneously admitted. The court reasoned that this clinical tool, which assumes the truth of the rape allegation in order to better

treat the client's trauma, is simply irrelevant to the question whether the charges are true. (*Bledsoe*, *supra*, 36 Cal.3d at 250-251.) The court did not hold or even suggest that "rape trauma syndrome" was not subject to *Kelly/Frye*. Indeed, at the outset, the court noted that the prosecution did "not contend that the *Frye* standard is not the proper basis for determining the admissibility of the rape trauma syndrome testimony at issue in this case." (*Id.* at 247, fn. 7.) The court further noted that whether the testimony was offered to prove that the rape occurred or that the victim's conduct was not inconsistent with having been raped, "other state courts which have passed on the question have applied the *Frye* test." (*Id.* at 247-248, and cases cited.) Thus, the *Bledsoe* court agreed "there is a close connection between the relevance of testimony on rape trauma syndrome and the reliability of that testimony under the Frye test." (*Id.* at 247.)

The court expressly disavowed any suggestion that it had determined whether rape trauma syndrome was reliable under *Kelly/Frye* when offered for the purpose for which it was created, and that its opinion is only to be read as concluding it fails that test when offered to prove whether the rape actually occurred. (*Id.* at 251.) Moreover, the court made no broad statement that such evidence was admissible in every rape case.

In *Bowker*, *supra*, 203 Cal.App.3d 385, the appellate court mistakenly read *Bledsoe* to "suggest[] that even though rape trauma syndrome fail[s] the *Kelly-Frye* test, evidence related to the syndrome could be admissible to '[disabuse] the jury of some

widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths.' " (*Bowker*, *supra*, 203 Cal.App.3d at 391, quoting *Bledsoe*, *supra*, 36 Cal.3d at 247-248.)  What the *Bowker* court failed to appreciate was that the *Bledsoe* court recognized that even when offered for this purpose, the admissibility of rape trauma syndrome must be ruled reliable under *Kelly*/*Frye*.  (*Bledsoe*, at 248, citing *State v. Marks* (Kan. 1982) 647 P.2d 1292 [rape trauma syndrome is accepted under *Frye* and admissible in a case where the defense is consent].)  Thus, to the extent *Bowker* analogized CSAAS to rape trauma syndrome to determine admissibility of the testimony, it erred in concluding it need not be evaluated under *Kelly*/*Frye*.

*Bowker*'s misreading of *Bledsoe* has been uncritically cited to justify admission not only of testimony concerning the characteristics of children who have been impacted by sexual abuse, but a growing host of what is essentially victim profile evidence.  (See *McAlpin*, *supra*, 53 Cal.3d at 1300-1301 [CSAAS testimony]; *People v. Brown* (2004) 33 Cal.4th 892, 907 ["cycle of violence" syndrome in domestic violence cases]; *People v. Kovacich* (2011) 201 Cal.App.4th 863, 899 ["intimate partner abuse" syndrome]; *People v. Dejourney* (2011) 192 Cal.App.4th 1091, 1111 [victims with developmental disabilities sexual abuse accommodation syndrome]; *Harlan*, *supra*, 222 Cal.App.3d at 448-449.)  If, as Molina argues and as *Bledsoe* suggests, such testimony is scientific evidence, which, if reliable, may be

relevant to dispel misconceptions about a victim's "self-impeaching" conduct, then it must be evaluated under *Sargon*/*Kelly*/*Frye*. Here, there was no such evaluation despite defense counsel's express challenge to the evidence under *Kelly*/*Frye*. Further, since no court has performed that evaluation, it cannot be held that the conclusions are a reliable description of how child victims of sexual abuse do, in fact, act.

Second, expert testimony regarding characteristics of children who have been impacted by sexual abuse constitutes scientific evidence requiring a showing of reliability and acceptance under *Sargon*/*Kelly*/*Frye*.

Where a test is used to produce case-specific evidence, *Kelly* requires "the proponent of the evidence . . . demonstrate that correct scientific procedures were used in the particular case." (*People v. Leahy* (1994) 8 Cal.4th 587, 594.) However, *Kelly*'s reliability requirement is not applicable only to test methodology. It is also broadly concerned with the reliability of the scientific principles on which the proffered testimony or evidence is based. (*Kelly*, *supra*, 17 Cal.3d at 31.) "[T]he evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." (*Kelly*, *supra*, 17 Cal.3d at 30, quoting *Frye*, *supra*, 293 F. at 1014; *People v. Leahy*, *supra*, 8 Cal.4th at 594.)

The value of this sort of testimony as information beyond lay knowledge must be determined by its foundational scientific reliability. Assuming for the sake of this argument that the testimony concerning CSAAS was relevant to explain RD's behavior, its relevance rests in its scientific reliability as a statement about real victims according to which the jurors may confidently evaluate RD's conduct in this case. If it was not derived from sound scientific investigation, or is not widely accepted as accurate by the scientific community, then its reliability and relevance are sufficiently suspect to render the testimony inadmissible at trial. (*Sargon*, *supra*, 55 Cal.4th 747.)

This is similar to the use of anatomically correct dolls in the forensic setting of child sexual abuse cases, which have been held to require *Kelly*/*Frye* scrutiny. In *In re Amber B.* (1987) 191 Cal.App.3d 682, 691 (*Amber B.*), the use of anatomically correct dolls failed to meet the *Kelly*/*Frye* foundational requirements for the admissibility of scientific evidence. As the court in *Amber B.* recognized, when confronted by an expert who recites a litany of credentials then propounds upon theories and research relating to a specific area of psychology, jurors do not make a distinction between "opinion" evidence and evidence which, from all appearances, purports to have a basis in scientific inquiry. Psychological evidence is no different than any other sort of scientific evidence. And the "purpose of the *Kelly*/*Frye* test is to prevent factfinders from being misled by the 'aura of infallibility' that may surround unproven scientific methods." (*Id*. at 686,

citing *People v. McDonald* (1984) 37 Cal.3d 351, 372-373.)

*Amber B.* addressed the method of proof relied upon by the doctor in that case was "closely analogous to that in *Bledsoe*, because in both cases the expert witnesses relied upon a psychological analysis of a subject's behavior to determine whether sexual abuse had previously occurred.  Thus, the decision in *Bledsoe* strongly suggests evidence of the sort admitted here . . . should be subject to *Kelly-Frye*." (*Amber B.*, *supra*, 191 Cal.App.3d at 688.)

As *Bledsoe* noted, the rape syndrome is scientific evidence subject to *Kelly/Frye*. (*Bledsoe*, *supra*, 36 Cal.3d at 247 & fn. 7.) Furthermore, notwithstanding *Bowker*'s assumption that similar testimony does not function as scientific evidence, the court's observation (*Bowker*, *supra*, 203 Cal.App.3d at 391) that "syndrome evidence . . . provid[es] the jury with recent findings of professional research on the subject of a victim's reaction to sexual assault" describes scientific evidence.

Third, the prosecution expert's conclusions are not widely accepted by the scientific community.

Twenty-seven years ago, commentators criticized this sort of expert testimony as being therapeutically and forensically unhelpful because they are as true for sexually abused children as for those who had not been sexually abused.  (*Dunkle*, *supra*, 602 A.2d at 836 [concluding CSAAS was not generally accepted by the scientific community].)  In addition to Pennsylvania, courts in Tennessee, Kentucky, and Washington have held CSAAS

64

evidence inadmissible.  (See *Sanderson v. Commonwealth* (Ky. 2009) 291 S.W.2d 610, 614; *State v. Maule* (Wash. App. 1983) 667 P.2d 96, 100-101 [theory that sexually abused children manifest particular identifiable characteristics is not supported by accepted medical or scientific opinion].)  The same is true for the Ninth Circuit.  "CSAAS has been examined by several courts in the context of criminal prosecutions and found wanting.  It has been found, in fact, to be an impermissible way of bolstering the credibility of a child witness."  (*Franklin v. Henry* (9th Cir. 1997) 122 F.3d 1270, 1273, citing *Dunkle*.)  Moreover, its scientific validity is subject to an ongoing considerable debate.  (Review of the Contemporary Literature on how Children Report Sexual Abuse to Others: Findings, Methodological Issues, and Implications for Forensic Interviewers (2008) Memory 16 (1), 29-47; and Disclosure of Child Sex Abuse: What Does the Research Tell Us About the Ways Children Tell? (2005), Psychology, Public Policy, and Law, Vol. 11, No. 1, 194-226.)  In *Problems With Child Abuse Accommodations Syndrome*, an article published in 2012 in the Scientific Review of Mental Health Practice, the authors list the numerous flaws in the CSAAS and conclude that CSAAS should be considered as an exemplar of junk science and should not be used in any way in any context particularly in legal settings.

Most recently, the New Jersey Supreme Court ruled in *New Jersey v. J.L.G.* (2018) 190 A.3d 442, that CSAAS evidence is no longer generally accepted by the scientific community, with the

exception of the delayed disclosure element, and expert testimony is only admissible to explain delayed disclosure where the state establishes that the issue is beyond the understanding of the average juror.

These conclusions appear to only have gained uncritical acceptance among law enforcement professionals who find this evidence useful in obtaining convictions. (See, Summit, Abuse of the Child Sexual Abuse Accommodation Syndrome (1992) 1 J. of Child Sexual Abuse 153 [criticizing the forensic use of what was supposed to be an aid for clinicians treating abuse victims].)

In the absence of general acceptance in the relevant scientific community, testimony that child victims of sexual abuse behave in any particular way is inadmissible. This Court should therefore find that the trial court erred when it ruled that testimony concerning CSAAS was admissible.

F.    **THE EVIDENCE SHOULD ALSO HAVE BEEN EXCLUDED BECAUSE ANY PROBATIVE VALUE WAS SUBSTANTIALLY OUTWEIGHED BY THE LIKELIHOOD THE JURY WOULD MISUSE THE EVIDENCE TO INFER GUILT.**

As demonstrated above, expert testimony concerning CSAAS was not probative of any material fact. The only disputed facts were whether Molina sexually abused RD and whether intercourse and/or digital penetration was involved in the abuse. As argued above, expert testimony concerning CSAAS was not admissible to bolster RD's credibility because there are no longer generally held misconceptions about how a child victim of sexual

abuse should act and there was no evidence the jurors held these misconceptions.  To the extent this testimony could have some probative value as a tool to educate the jury about behavior of child molest victims in general, such value hinges on its acceptance as reliable by scientific community.  Although the *Bowker* court mistakenly concluded admission of CSAAS to educate the jury about the behavior of child molest victims is not subject to *Kelly/Frye* test, the court nevertheless observed that such evidence "provid[es] the jury with recent findings of professional research on the subject of a victim's reaction of sexual assault." (*Bowker*, *supra*, 203 Cal.App.3d at 391.)  Such evidence has value for the jury if it has been accepted as generally reliable in the scientific community; there is no need to inform the jury about junk science.

Because the expert testimony was not relevant to any material issue in dispute, the slightest prejudicial impact of the testimony justified its exclusion under Evidence Code section 352.  The prejudice against which section 352 protects is the tendency of the evidence to engage the passions of the jurors against the defendant and to improperly bolstering a witness based on the misuse of pseudoscience.  (*People v. Bolin* (1998) 18 Cal.4th 297, 320; *People v. Yu* (1983) 143 Cal.App.3d 358, 377.)  As stated by the court in *State v. Stribley* (Iowa App. 1995) 532 N.W.2d 170, "[t]he problem with this type of evidence is it may incorrectly be used by a fact finder as evidence of abuse.  There is a very fine line between an opinion that is helpful to a jury and an opinion

that merely conveys a conclusion concerning the defendant's guilt." (*State v. Stribley*, *supra*, 532 N.W.2d at 173-174; see *Madden v. State* (Fla. 1997) 690 So.2d 573, 577.)  Courts in a number of jurisdictions have found CSAAS evidence inadmissible for all purposes because the likelihood of a jury misusing the evidence substantially outweighed its probative value.  (*Newkirk v. Commonwealth* (Ky. 1996) 937 S.W.2d 690, 693, 695; *State v. Ballard* (Tenn.1993) 855 S.W.2d 557, 562 [expert testimony on CSAAS is more prejudicial than probative because such testimony encourages the jury to conclude that because a child exhibits symptoms consistent with CSAAS, the defendant is more likely to have committed the charged crime]; *State v. Bolin* (Tenn. 1996) 922 S.W.2d 870, 873; *Dunkle*, *supra*, 602 A.2d at 837-838; *State v. Anderson* (Tenn. Cr. App. 1994) 880 S.W.2d 720, 730; *State v. Stribley*, *supra*, 532 N.W.2d at pp. 173-174; *Madden v. State*, *supra*, 690 So.2d at 577.)

Expert testimony from which the jurors could conclude that RD acted consistently with a victim of a sex offense has the potential to evoke sympathy for her and improperly bolster her credibility based on what amounts to junk science, and where, as here, there was no legitimate inference to be drawn from it, that potential substantially outweighed the prejudicial impact of the testimony.  Lay jurors generally do not have the resources to evaluate whether an expert's opinion is based on valid scientific principles or empirical research.  Rather, any expert who can present a seemingly reasonable explanation for his or her

conclusions is likely to lend an "aura of special reliability and trustworthiness" to the contention of the party for whom he or she testifies. (*Bledsoe, supra*, 36 Cal.3d at 247-248; *Housley, supra*, 6 Cal.App.4th at 957, and authorities cited.)

When a defendant is charged with a sex offense against an alleged victim perpetrated in secret, in years past based on generic testimony, and the only real contest for the jurors to decide is which of the two is telling the truth, "[i]f [the defendant's] own denial is not enough, he must show the accuser has a motive and demonstrate how implausible and inconsistent [her] story is." (*United States v. Bighead* (9th Cir. 1997) 128 F.3d 1329, 1334, dissent. opn. of Noonan, J.) "In this difficult situation, a witness who can bolster the accuser's charge is of great importance, [and] when the witness comes in the guise of an expert the bolstering is doubled." (*Ibid*.)

The problem with this evidence was the likelihood it would be misused by the jury as a diagnostic tool of RD's being sexually molested. The jury was permitted to reason that, assuming molestation had occurred (and they would assume molestation had occurred otherwise the expert testimony would not have been offered), a victim would behave in a manner similar to RD – she acted that way and therefore, Molina was guilty of the crimes. This was an improper inference. Such evidence is generic testimony unrelated to the case at hand or the alleged victim. Here, as in most cases in which the testimony is offered, the "expert" has never spoken with the alleged victim. The evidence

is so generic that it lacks probative value, because the particular aspects of the testimony "are as consistent with false testimony as with true testimony." (*Patino*, *supra*, 26 Cal.App.4th at 1744.) Accordingly, such evidence does not effectively describe the myths surrounding sexual abuse, because every possible behavior by a molestation victim – or one who falsely claims to have been molested – is consistent with the testimony and with being sexually molested. The expert evidence tells the jury no matter how the child has behaved – disclosing or not disclosing, remembering details or forgetting, avoiding or not avoiding the abuser, recanting or not recanting, short or long delays in reporting – the child acted consistently with an abused child.

This danger is not lessened by *Bowker*'s semantic limitation on admission of such evidence to educate the jury about behavior of child sex abuse victims, or to evaluate RD's credibility. As already explained and discussed in detail below, by following this instruction, the jury still relies on the expert testimony to bolster RD's story, i.e., the jury is allowed to use it as circumstantial evidence of Molina's guilt.

Given the non-existent probative value of expert testimony concerning CSAAS to any disputed material fact and the substantial danger of jury confusion and unfair prejudice emanating from his testimony, it was objectively unreasonable for the trial court to fail to exclude the CSAAS evidence.

### G.    THE ERROR VIOLATED MOLINA'S FIFTH, SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO A FAIR TRIAL AND DUE PROCESS AND REQUIRES REVERSAL.

Presenting this irrelevant and prejudicial evidence to the jury violated Molina's right to due process.  (U.S. Const., 14th Amend.; *Lisenba v. California* (1941) 314 U.S. 219, 236; *McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378, 1384; but see *Patino*, *supra*, 26 Cal.App.4th at 1744.)  *Patino* erroneously analogized CSAAS to battered child syndrome evidence found not to violate due process under the Fourteenth Amendment in *Estelle v. McGuire* (1991) 502 U.S. 62, 69-70. However, the California Supreme Court distinguished battered child syndrome evidence from CSAAS in *Bledsoe*, as has the Pennsylvania Supreme Court.  (*Dunkle*, *supra*, 602 A.2d at 835-836.)  Further, *Estelle v. McGuire* concluded admission of the evidence did not violate the Fourteenth Amendment specifically because it was relevant.  (*Estelle v. McGuire*, *supra*, 502 U.S. at 70.)  Unlike the battered child syndrome evidence, the evidence here was irrelevant because it was not material to any disputed issue, there were no misconceptions that needed to be corrected, and because it was unreliable.  In the absence of a legitimate inference from the expert's testimony, its prejudicial nature rendered its admission a violation of due process.  (*McKinney v. Rees*, *supra*, 993 F.2d at 1384.)

### H.    PREJUDICE.

The error was prejudicial and requires reversal.

The error implicates federal constitutional rights directly affecting the ascertainment of Molina's guilt.  (*Chambers v. Mississippi* (1973) 410 U.S. 284, 302-303.)[10]  Accordingly, prejudice is presumed and the judgment must be reversed unless the People can prove the error harmless beyond a reasonable doubt under the *Chapman* test.  (*McKinney v. Rees*, *supra*, 993 F.2d at 1384; *Chapman v. California* (1967) 386 U.S. 18, 24.) Such a showing may not rely solely on the strength of the evidence against Molina (*Arizona v. Fulminante* (1991) 499 U.S. 279, 302; *People v. Powell* (1967) 67 Cal.2d 32, 56-57), but must be demonstrated based on the record and establish that the guilty verdict was surely unattributable to the error.  (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279; *People v. Aledamat* (2019) 8 Cal.5th 1, 3.)  "To say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question . . . ." (*Yates v. Evatt* (1991) 500 U.S. 391, 403.)  "Overwhelming evidence" is insufficient to rebut the presumption of prejudice. (*People v. Sims* (1993) 5 Cal.4th 405, 448.)  Here, the People cannot meet this high burden.

---

[10]  The California Supreme Court has recognized that "the admission of evidence in violation of state law may also violate due process, but only if the error rendered the defendant's trial fundamentally unfair."  (*People v. Merriman* (2014) 60 Cal.4th 1, 70; *People v. Partida* (2005) 37 Cal.4th 428, 439.)

Even if the error did not violate the federal Constitution, reversal is still required under *People v. Watson* (1956) 46 Cal.2d 818. Under *Watson*, the trial court's error is prejudicial and requires reversal if it is "reasonably probable" the defendant would have obtained a more favorable outcome in the absence of the error. (*Id.* at 836.) A "probability" does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility. (*People v. Sandoval* (2015) 62 Cal.4th 394, 422.) A hung jury is a more favorable outcome in this context. (*People v. Sanchez* (2014) 228 Cal.App.4th 1517, 1535.) Where there is "at least such an equal balance of reasonable probabilities as to leave the court in serious doubt as to whether the error affected the result", the error is prejudicial under *Watson*. (*People v. Mower* (2002) 28 Cal.4th 457, 484.)

Here, in light of RD's and XD's recantations at trial and in their police interviews, the key issue in this case was whether the girls' prior reports of Molina's sexual abuse of RD were credible. In order for Molina's defense to prevail, he needed at least one juror to question RD's CALICO interview statements and XD's prior statements to the teacher and harbor a doubt as to whether the prosecution proved sexual abuse, lewd acts, sexual intercourse and/or digital penetration beyond a reasonable doubt. Molina denied any molestation or inappropriate touching of RD. The girls' parents explained how the girls could have obtained knowledge of sexual matters and testified that the girls were hypervigilant and misinterpreted appropriate touching because

73

they were repeatedly taught that no one should touch them
except for their parents of doctors.

Given the state of the evidence there is a reasonable chance
that absent the CSAAS evidence, a juror may have harbored a
doubt and thus, been unable to convict Molina of the charged
crimes.  The prosecutor recognized the need to bolster RD' prior
statements and that is exactly what the CSAAS evidence did.

The prosecutor relied on the CSAAS evidence to bolster
RD's CALICO statements during closing argument.  (8-RT 962-
963, 965-967, 1004, 1011; 9-RT 1095-1101.)  The prosecutor's
reliance on the inadmissible statements establishes prejudice.
(*People v. Cruz* (1964) 61 Cal.2d 861, 868.)  There is no reason
why this Court should treat the expert testimony any less crucial
than the prosecutor – and so presumably the jury – treated it.
(*Ibid.*; see *People v. Woodard* (1979) 23 Cal.3d 329, 341 [the
prosecutor's reliance on the erroneously admitted evidence in his
closing argument shows prejudice].)

Had the jury not heard the CSAAS evidence, but was
instead left only with RD's prior CALICO statements and her
subsequent recantation during trial and in her statements to
police, there is a reasonable chance at least one juror would have
concluded that the prosecution failed to prove Molina's guilt
beyond a reasonable doubt.  Indeed, without the CSAAS evidence,
there would be no evidence that RD had a "rescue fantasy" to
explain some of her bizarre allegations, and especially her
fantastical claim that Molina had a sexual intercourse with her,

74

while Edson and XD were nearby, and that Edson intervened and beat up Molina.  Edson denied that this incident occurred and called it ridiculous.  (5-RT 451, 463-465.)

In the context of the CSAAS evidence, the major premises are that perpetrator and victim act in certain ways; Molina and RD acted that way; therefore Molina was a perpetrator and RD was a victim.  This invited the jury to conclude that if Molina and RD exhibited certain behaviors, then Molina was guilty as charged.  "Even the most casual observer of the legal scene is aware of the crucial and often determinative weight an expert's opinion may carry."  (*Bowker*, *supra*, 203 Cal.App.3d at 390.)  Having the CSAAS evidence corroborate the veracity of the accuser was devastating to the defense.

The jury's lengthy deliberations (1-CT 192, 197) and its request for readback of the teacher's testimony regarding XD's disclosure (1-CT 192; 2-RT 415) establish the closeness of the case in the eyes of the jury.  (See *People v. Cardenas* (1982) 31 Cal.3d 897, 904-907 [six hours of deliberation shows a close case]; *Lawson v. Borg* (9th Cir. 1995) 60 F.3d 608, 612 [nine hours of deliberations deemed "protracted"]; *People v. Filson* (1994) 22 Cal.App.4th 1841, 1852 [lengthy deliberations and request for additional instructions indicates closeness of the case]; *People v. Williams* (1971) 22 Cal.App.3d 34, 38-40 [jury request for readback of testimony shows closeness of the case].)  Lengthy deliberations and jury requests for transcripts of testimony can only mean the jurors found some weakness in the prosecution's

case.  (*In re Martin* (1987) 44 Cal.3d 1, 51; *People v. Godinez* (1992) 2 Cal.App.4th 492, 504; *People v. Cribas* (1991) 231 Cal.App.3d 596, 607-608.)

Accordingly, the error was not harmless and requires reversal of all convictions.

/ / /

/ / /

## II.

### GIVING THE MODIFIED CALCRIM NO. 1193 INSTRUCTION PERMITTED THE JURY TO CONSIDER THE CSAAS EVIDENCE AS EVIDENCE THAT RD WAS TELLING THE TRUTH, WHICH VIOLATED MOLINA'S RIGHT TO DUE PROCESS BY REDUCING THE PROSECUTION'S BURDEN OF PROOF.

As discussed above, the CSAAS evidence, if admissible, is admissible, at most, only to rebut myths and misconceptions about the behavior of abused children, and not to prove that abuse occurred.  (*McAlpin*, *supra*, 53 Cal.3d at 1300; *Housley*, *supra*, 6 Cal.App.4th at 955-956.)  Therefore, when the testimony concerning CSAAS is allowed, "the jury must sua sponte be instructed that (1) such evidence is admissible solely for the purpose of showing the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested; and (2) the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (*Housley*, at 959.)  Also, "[t]he jurors must understand that the research on child sexual abuse accommodation syndrome assumes a molestation occurred and seeks to describe and explain children's common reactions to the experience."  (*Bowker*, *supra*, 203 Cal.App.3d at 394.)

CALCRIM No. 1193 not only does an inadequate job of explaining these principles, but effectively instructs the jurors that they may take such testimony as evidence of the defendant's guilt.  Thus, the trial court erred in instructing pursuant to

CALCRIM No. 1193.  The error lessened the prosecution's burden of proof in violation of Molina's Fifth, Sixth and Fourteenth Amendment rights and was prejudicial, thereby requiring reversal of all convictions.

### A.  COGNIZABILITY ON APPEAL AND STANDARD OF REVIEW.

An appellate court reviews assertions of instructional error, including claims that an instruction is legally incorrect or that a defense requested pinpoint instructions should have been given, de novo.  (*People v. Berryman* (1993) 6 Cal.4th 1048, 189; *People v. Johnson* (2009) 180 Cal.App.4th 702, 707 [de novo review applied to the refusal to give defense pinpoint].)  "The proper test for judging the adequacy of instructions is to decide whether the trial court 'fully and fairly instructed on the applicable law.' " (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.)

Although Molina's trial counsel did not object to CALCRIM No. 1193, he submitted a proposed jury instruction on the CSAAS evidence, which the trial court did not give.  (1-CT 159.)[11]  This

---

[11]  The proposed instruction stated: "A witness had given testimony relating to the child sexual abuse accommodation syndrome.  This evidence is not received and must not be considered by you as proof that the alleged victim's molestation is true.  Child sexual abuse accommodation syndrome research is based upon an approach that is completely different from that which you must take to this case.  The syndrome research begins with an assumption that a molestation has occurred, and seeks to describe and explain common reactions of children to that experience.  As distinguished from that research approach, you

(continued...)

preserved the error.  Moreover, an appellate court may "review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." (*People v. Taylor* (2010) 48 Cal.4th 574, 630, fn. 13; see § 1259.)  The determination of whether a defendant's substantial rights have been affected "necessarily requires an examination of the merits of the claim." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.)

Furthermore, if Molina's counsel was required to make a formal objection or request for modification of CALCRIM No. 1193, counsel was ineffective in failing to do so.  While ineffective assistance claims are generally best raised in habeas corpus proceedings, so that trial counsel may explain the reasons for the complained of action, the claim is appropriate on appeal where there "simply could be no satisfactory explanation" for counsel's action.  (*People v. Pope* (1979) 23 Cal.3d 412, 426; *People v. Guizar* (1986) 180 Cal.App.3d 487, 492, fn. 3.)  Counsel is required to investigate all possible defenses, research applicable law, make proper objections, make informed recommendations to the client regarding an appropriate strategy and present that strategy on behalf of the client.  (See e.g., *People v. Ledesma* (1987) 43 Cal.3d

---

[11](...continued)
are to presume the defendant innocent.  The People have the burden of proving guilt beyond a reasonable doubt.  Thus, you may consider the evidence concerning the syndrome and its effect only for the limited purpose of showing, if it does, that the alleged victim's reaction, as demonstrated by the evidence, are not inconsistent with her having been molested." (1-CT 159.)

171, 222.) " '[T]he duty of counsel to a criminal defendant includes careful preparation of and request for all instructions which in his judgment are necessary to explain all of the legal theories upon which his defense rests.' " (*People v. Crosier* (1974) 41 Cal.App.3d 712, 721.)

Here, if this Court concludes that CALCRIM No. 1193 is misleading or incorrect and that the error was prejudicial, defense counsel was necessarily ineffective in failing to make a further objection or request for modification.

Molina's argument should therefore be addressed on the merits.

### B. THE CALCRIM NO. 1193 INSTRUCTION EFFECTIVELY PERMITTED THE JURY TO USE THE CSAAS EVIDENCE AS EVIDENCE THAT MOLINA WAS GUILTY.

Following Wolf's testimony, the trial court read to the jury a modified standard jury instruction of CSAAS:

> You've heard testimony from Dr. William O'Donohue and Miriam Wolf, a licensed clinical social worker, about child abuse accommodation theory.
>
> Testimony about this syndrome is not evidence that the defendant committed any of the crimes charged against him.
>
> You may consider this evidence only in deciding whether or nor [RD]'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony.
>
> (7-RT 872-873.)

80

After the evidence taking part of the trial, the court instructed the jury on expert testimony according to CALCRIM No. 332 (2-CT 501) and according to a modified CALCRIM No. 1193, the standard jury instruction on CSAAS (2-CT 502).

The problem with the modified CALCRIM No. 1193 is that it permits the jury to use this testimony "in evaluating the believability of [RD's] testimony," but it never makes the point that *Housley* makes in no uncertain terms: that "the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (*Housley*, *supra*, 6 Cal.App.4th at 959.)  The instruction is worded entirely in terms of the purposes for which the jury can use the testimony; it does not say that there is any purpose for which they cannot use it.  It is true that it says that the testimony can be used "only" for the authorized purposes, the jury would first need to understand, without any instruction telling them, that there is a difference between "the complaining witness is believable" (one of the purposes authorized by the instruction) and "the victim's molestation claim is true" (the purpose forbidden by *Housley*). This is a distinction without a difference.  Here, the RD's CALICO statements were, for all intents and purposes, the prosecution's entire case.  If RD's recanted statements describing different acts of molestation, intercourse and/or digital penetration were to be believed, Molina was guilty.  If RD's statements were not to be believed, there was not enough evidence to establish Molina's guilt beyond a reasonable doubt.

81

There is virtually no difference between RD was "credible" and Molina was guilty of the charged crimes. Since Molina's guilt turned on the believability of RD's CALICO statements, using the CSAAS evidence as evidence that RD was "believable", a use the instruction permitted, is indistinguishable from using it as evidence that Molina committed the crimes charged against him, which is not permissible.

The highly technical distinction between "the defendant is guilty" and "the complaining witness is telling the truth" that CALCRIM No. 1193 expects jurors to draw is somewhat reminiscent of the distinction between "the expert's testimony about what he heard outside of court is admitted for its truth" and "the testimony is not hearsay because it's admitted only as the basis for the expert's opinion" that the Supreme Court rejected in *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*). *Sanchez* explains that "If an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay." (*Sanchez*, at 685.) Similarly, if an expert's testimony may be regarded by a jury as evidence that certain key prosecution witnesses are telling the truth, then the jury must necessarily regard it as evidence that the defendant is guilty.

Approving of CALCRIM No. 1193 would require indulging in the sort of wishful thinking that the *Sanchez* court put an end to with respect to expert basis evidence. If a juror uses this

82

testimony to decide the complaining witness' testimony is believable, and the defendant's guilt turns on the believability of the complaining witness' testimony, then a limiting instruction cannot change the fact that the testimony, as a practical reality, is being used as proof the defendant committed the charged offenses.  (See *Sanchez*, *supra*, 63 Cal.4th at 684 ["hearsay and confrontation problems cannot be avoided by giving a limiting instruction that such testimony should not be considered for its truth"]; *People v. Pettie* (2017) 16 Cal.App.5th 23, 63.)

Molina acknowledges that in *People v. Gonzalez* (2017) 16 Cal.App.5th 494, 504, the court concluded there was no conflict in CALCRIM No. 1193.  The *Gonzalez* court found that a reasonable juror would understand the instruction to mean that the jury can use the expert's testimony to conclude that the victim's behavior does not mean she lied when she said she was abused, and would also understand it cannot use the expert's testimony to conclude the victim was, in fact, molested.  (*Ibid*.) "Thus, under CALCRIM No. 1193, a juror who believes [the expert's] testimony will find both that [the victim's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested."  (*Ibid*.)

Molina respectfully submits that *Gonzalez* was wrongly decided and the appellate court's explanation of how the jury would understand the instruction is why the instruction is problematic.  It is one thing to make jurors aware that behavior one would normally associate with fabricated accusations is "not

inconsistent" with having been molested; it is another for the jury
to take away from this testimony that such behavior "does not
affect [the witness's] believability one way or the other."  The
latter suggests that this evidence can be used to wholly dismiss
as irrelevant behaviors, testimonial gaps, and inconsistencies
that jurors typically rely when assessing the credibility of any
witness.  This goes well beyond merely making the jury aware
that such factors are not inconsistent with the witness having
been molested, which is only to say that they do not prove the
accusations are false.  If a jury uses the CSAAS evidence to
disregard what would ordinarily be deemed impeaching behavior,
this heavily tilts the playing field against the defendant.  This is
especially true in the common situation where the defendant's
only plausible line of defense is to rely on actions and statements
by the alleged victim which raise a doubt about her veracity.
There is simply no reason why CALCRIM No. 1193 should
contain language which makes it vary from the relevant law in
ways that will potentially mislead jurors.

    In contrast, CALJIC No. 10.64, which is virtually identical
to the jury instruction submitted by defense counsel (1-CT 159;
see fn. 11, *ante*), adequately instructs jurors on the relevant law
by tracking *Housley*.  CALJIC No. 10.64, which is a lucid
description of the nature and purpose of CSAAS evidence, and
which is faithful to the holdings of the authorities cited above,
provides:

> Evidence has been presented to you concerning [child
> sexual abuse accommodation] [rape-trauma]

syndrome.  This evidence is not received and must
not be considered by you as proof that the alleged
victim's [molestation] [rape] claim is true.

[Child sexual abuse accommodation] [Rape trauma]
syndrome research is based upon an approach that is
completely different from that which you must take to
this case.  The syndrome research begins with the
assumption that a [molestation] [rape] has occurred,
and seeks to describe and explain common reactions
of [children] [females] to that experience.  As
distinguished from that research approach, you are to
presume the defendant innocent.  The People have
the burden of proving guilt beyond a reasonable
doubt.]

You should consider the evidence concerning the
syndrome and its effect only for the limited purpose of
showing, if it does, that the alleged victim's reactions,
as demonstrated by the evidence, are not inconsistent
with [him] [her] having been [molested] [raped].

(CALJIC No. 10.64.)

This instruction plainly accomplished both of the
requirements imposed by *Housley*.  The requirement that the jury
be instructed that the testimony was admitted only to show that
victim's reactions were consistent with having been molested is
met by the third paragraph of the instruction, which says
precisely that.  (*Housley*, *supra*, 6 Cal.App.4th at 959.)  And the
second requirement, that the jury be instructed that the expert's
opinion should not be used to establish the truth of the victim's
claims, is accomplished by the first paragraph.  (*Ibid*.)

85

In contrast, however, CALCRIM No. 1193 completely overlooks the first *Housley* requirement. It does not affirmatively state that the evidence may not be "used to determine whether the victim's molestation claim is true." (*Housley*, *supra*, 6 Cal.App.4th at 959.) This is more than a mere technical defect; it opens up a very real possibility that the jury will apply the testimony in an incorrect and highly prejudicial manner. That possibility is greatly exacerbated, to the point of becoming a strong probability, by the fact that CALCRIM No. 1193 explicitly says that the CSAAS evidence may be used "in evaluating the credibility of [RD's] testimony." It is possible that what that passage is intended to convey is "in evaluating whether the complaining witness' testimony seems more credible once the myths and misconceptions about the behavior of abused children have been rebutted", but it does not even come close to saying that.

By allowing the jurors to consider the evidence in evaluating the accuser's credibility, CALCRIM No. 1193 effectively circumvents the holdings in *Housley* and *Bowker* and permits the jurors to consider this expert testimony as supportive of the truth of the allegations made against the defendant.

In *Housley*, the court observed that CSAAS testimony, "especially from one recognized as an expert in the field of child abuse, easily could be misconstrued by the jury as corroboration for the victim's claims; where the case boils down to the victim's word against the word of the accused, such evidence could

unfairly tip the balance in favor of the prosecution." (*Housley*, at 958.) Here, where the jurors have been told that they may consider the CSAAS evidence in evaluating RD's credibility, it is almost certain the jurors would utilize the CSAAS evidence in one way – as supportive of the truth of the charges made against Molina.

This is improper given the limited purposes for which such evidence is admissible under the case law. Therefore, the CALCRIM No. 1193 instruction is not only erroneous, but it is prejudicial in the present case.

### C. CALCRIM No. 1193 Deprived Molina of Due Process by Reducing the Prosecution's Burden of Proof and Resulted in Prejudice Requiring Reversal.

Because the deficient jury instruction misled the jury into relying on the CSAAS evidence to bolster RD's credibility, it lessened the prosecution's burden of proving guilt beyond a reasonable doubt. Thus, it violated Molina's rights to due process under the federal constitution. (U.S. Const., 14th Amend.; Cal. Const., art. I, §§ 7, 15; *In re Winship* (1970) 397 U.S. 358, 364; *Conde v. Henry* (9th Cir. 1999) 198 F.3d 734, 740.)

Because the error resulted in a violation of Molina's federal constitutional right to due process of law, it should be reviewed for prejudice under the *Chapman* test set forth in Argument I, *ante*. Under *Chapman*, error is presumed to require reversal unless the beneficiary of an error proves beyond a reasonable

87

doubt that the error complained of did not contribute to the verdict obtained. An error is harmless under *Chapman* when it does not contribute to the verdict because it is "unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." (*People v. Flood* (1998) 18 Cal.4th 470, 494.)

Under *Chapman*, the reviewing court does not reweigh the evidence of guilt to determine whether the jury would have reached the same result even without the inadmissible evidence. The review looks to the basis on which the jury actually rested its verdict. "The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but rather whether the guilty verdict actually rendered in this trial was surely unattributable to the error." (*Sullivan v. Louisiana*, *supra*, 508 U.S. at 279.)

Accordingly, the question is not whether the prosecution presented a strong case for guilt independent of the CSAAS evidence. The question is whether this Court can conclude beyond a reasonable doubt that this evidence was "unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record" or that the jury's verdict was "surely unattributable" to that evidence. (*Neder v. United States* (1999) 527 U.S. 1, 38 (*Neder*).)

For the reasons stated in Argument I, *ante*, the People cannot meet this burden and this Court cannot conclude beyond a reasonable doubt that the verdict was surely unattributable to

the error.  Indeed, RD's CALICO statements were central to the prosecution's case.  RD later recanted the statements in her trial testimony and statements to police.  The fact the jury was instructed that it could consider the CSAAS evidence "in evaluating the believability of [RD's] testimony" was devastating to the defense.  It was particularly devastating when the experts testified, as set forth above, about symptoms and patterns, from children who were known to be abused, which were directly applicable to RD.  Then, the prosecutor told the jury that RD's recantation of her CALICO statements could be attributed to being sexually abused based on the CSAAS evidence.

If the juror had not been erroneously instructed that they may consider the CSAAS evidence in evaluating whether RD's statements were true – allowing the prosecutor to make the same argument, but were instead left only with RD's testimony, there is a reasonable chance at least one juror would have concluded that the prosecution failed to prove Molina's guilt beyond a reasonable doubt.

Even if this Court does not believe that the erroneous instruction implicated Molina's constitutional rights, reversal is still required under *People v. Watson*, *supra*, 46 Cal.2d 818.  Under the *Watson* test set forth in Argument I, *ante*, reversal is required if absent the error, there is a reasonable probability of a more favorable result.  (*Id*. at 836.)

Reversal of all convictions is therefore required.

## III.

## ALL CONVICTIONS SHOULD BE REVERSED BECAUSE RD'S OUT-OF-COURT STATEMENTS WERE INADMISSIBLE UNDER EVIDENCE CODE SECTION 1360.

Before trial, the prosecutor filed a motion in limine, seeking the trial court's permission to introduce in evidence RD's out-of-court statements made during her CALICO interview as statements made by a sexual abuse victim under the age of 12 years (Evid. Code, § 1360)[12] and as her prior inconsistent

---

[12] Evidence Code section 1360 provides: "(a) In a criminal prosecution where the victim is a minor, a statement made by the victim when under the age of 12 describing any act of child abuse or neglect performed with or on the child by another, or describing any attempted act of child abuse or neglect with or on the child by another, is not made inadmissible by the hearsay rule if all of the following apply: [¶] (1) The statement is not otherwise admissible by statute or court rule. [¶] (2) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability. [¶] (3) The child either: (A) Testifies at the proceedings. (B) Is unavailable as a witness, in which case the statement may be admitted only if there is evidence of the child abuse or neglect that corroborates the statement made by the child.  [¶] (b) A statement may not be admitted under this section unless the proponent of the statement makes known to the adverse party the intention to offer the statement and the particulars of the statement sufficiently in advance of the proceedings in order to provide the adverse party with a fair opportunity to prepare to meet the statement. [¶] (c) For purposes of this section, 'child abuse' means an act proscribed by Section 273a, 273d, or 288.5 of the Penal Code, or any of the acts described in Section 11165.1 of the Penal

(continued...)

statements (Evid. Code, § 1235)[13] based on RD's anticipated recantation at trial.  (1-CT 144-148; 1-RT 7-8.)  Defense counsel moved to exclude the out-of-court statements.  (1-CT 110, 118-120; 1-RT 10-11.)

The trial court viewed the video of the interview (1-RT 22), ruled that RD's CALICO statements "reliable," and allowed the prosecutor to introduce them under section 1360 provided that RD testified at trial (1-RT 18-19).  The trial court also ruled the statements were admissible under section 1235 based on the prosecutor's belief that RD would recant at trial.  (1-RT 19.)

As summarized in the Statement of Facts, RD's CALICO statements were introduced at trial during her testimony.  (3-RT 326-328; 1-CT 215-273 [transcript]; People's Exhibits Nos. 4A [video] & 4B [transcript].)  When defense counsel objected to their

---

[12](...continued)
Code, and 'child neglect' means any of the acts described in Section 11165.2 of the Penal Code."  (Evid. Code, § 1360.)

[13]  Evidence Code section 1235 provides: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770."  (Evid. Code, § 1235.)  In turn, Evidence Code section 770 provides: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: (a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or (b) The witness has not been excused from giving further testimony in the action."  (Evid. Code, § 770.)

admission, the court overruled the objection, stating they were admitted for multiple reasons.  (3-RT 326.)

The trial court later instructed the jury according to CALCRIM No. 226 [Witnesses] that "[i]f you do not believe a witness's testimony that he or she no longer remembers something, that testimony is inconsistent with the witness's earlier statement on that subject" (2-CT 493), and "[i]f you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says.  Or, if you think the witness lied about some things, but told truth about others, you may simply accept the part that you think is true and ignore the rest."  (2-CT 493.)

The trial court also instructed the jury according to CALCRIM No. 318 [Prior Statements as Evidence] as follows: "You have heard evidence of [a] statement[s] made before trial.  If you decide that the witness made those statement[s], you may use those statement[s] in two ways: 1. To evaluate whether the witness's testimony in court is believable AND 2. As evidence that the information in [that/those] earlier statements is true."  (2-CT 500, original brackets.)

All convictions should be reversed because RD's out-of-court statements made in her CALICO interview were inadmissible under Evidence Code section 1360.

## A.    THE ERROR.

Hearsay, defined as an out-of-court statement by someone other than the testifying witness offered to prove the truth of the

matter stated, is generally inadmissible unless it falls under an exception.  (Evid. Code, § 1200, subds. (a), (b).)

Section 1360 creates a limited exception to the hearsay rule in criminal prosecutions for a child's statements describing acts of child abuse or neglect, including statements describing sexual abuse.  (*People v. Roberto V.* (2001) 93 Cal.App.4th 1350, 1367.) Section 1360 safeguards the reliability of a child's hearsay statements by requiring that: (1) the court find that the time, content and circumstances of the statement provides sufficient indicia of reliability; (2) the child either testifies at the hearing or there is corroborating evidence of the hearsay statements; and (3) the proponent of the statement gives notice to the adverse party that it intends to use the statement at trial.  (*Ibid.*; *People v. Eccleston* (2001) 89 Cal.App.4th 436, 438, 444-445 (*Eccleston*); *People v. Brodit* (1998) 61 Cal.App.4th 1312, 1329 (*Brodit*).)

Here, RD testified at trial and the prosecution gave notice to the defense of its intent to use RD's CALICO statements at trial.  Accordingly, the second and third requirements for admissibility were met.  But, the trial court should have excluded RD's CALICO statements because the content and circumstances of the statements did not provide sufficient indicia of reliability.

The California Supreme Court discussed the indicia of reliability requirement in *In re Cindy L.* (1997) 17 Cal.4th 15 (*Cindy L.*).  There, the Supreme Court approved a judicially created hearsay exception for child dependency cases (*In re Carmen O.* (1994) 28 Cal.App.4th 908, 921) but clarified and

augmented that exception by holding that the proponent of the evidence must meet three requirements before the evidence can be admitted.  (*Cindy L.*, *supra*, 17 Cal.4th at 29; *Brodit*, *supra*, 61 Cal.App.4th at 1329.)  First, the court must find "that the time, content and circumstances of the statement provides sufficient indicia of reliability."  (*Cindy L.*, at 29.)  Second, the child must be available for cross-examination or there must be evidence to corroborate the child's hearsay statements.  (*Ibid.*)  And third, the proponent must provide adequate notice of its intent to use the hearsay evidence.  (*Ibid.*)  The Supreme Court explicitly acknowledged that these requirements were derived, in part, from the statutory requirements now found in Evidence Code section 1360.  (*Ibid.* & fn. 7; *Brodit*, *supra*, 61 Cal.App.4th at 1329.)

The Supreme Court noted in *Cindy L.* that it would not overturn the lower court's conclusion that hearsay evidence was admissible under the child dependency exception unless the court had abused its discretion.  (*Cindy L.*, *supra*, 17 Cal. 4th at 35; *People v. Mitchell* (2020) 46 Cal.App.5th 919, 927 [section 1360]; *People v. Kopatz* (2015) 61 Cal.4th 62, 85 [the admission or exclusion of evidence is reviewed for abuse of discretion].)

It is well established that " 'all exercises of legal discretion must be grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue.' "  (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977; *People v. Stone* (1999) 75 Cal.App.4th 707, 716; *People v.*

*Myers* (1999) 69 Cal.App.4th 305, 309.)  A trial court abuses its discretion when the factual findings critical to its decision find no support in the evidence.  (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1065; *Johns v. City of Los Angeles* (1978) 78 Cal.App.3d 983, 991-998; *Stack v. Stack* (1961) 189 Cal.App.2d 357, 368 ["It would seem obvious that, if there were no evidence to support the decision, there would be an abuse of discretion."].)

A trial court's findings concerning the indicia of reliability, which are at issue here, are subject to independent review on appeal.  (*Eccleston*, *supra*, 89 Cal.App.4th at 445-446, citing *Lilly v. Virginia* (1999) 527 U.S. 446, 116, 136.)

With respect to the indicia of reliability requirement, the *Cindy L.* court stated that it would consider the following non-exclusive factors in determining whether the statement was reliable: (1) spontaneity and consistent repetition; (2) mental state of the declarant; (3) use of terminology unexpected of a child of similar age; and (4) lack of motive to fabricate.  (*Cindy L.*, *supra*, 17 Cal. 4th at 29- 30, citing *Idaho v. Wright* (1990) 497 U.S. 805, 821-822.)  The court further held that, even if the child was incompetent to testify at trial because he or she did not understand the duty to tell the truth, this did not necessarily render the child's hearsay statements unreliable, but was merely a factor to consider.  (*Cindy L.*, *supra*, 17 Cal. 4th at 31-36.)

The trial court erred here when it ruled that RD's CALICO statements were reliable.

First, the trial court failed to hold an evidentiary hearing to ascertain the pertinent facts to allow it to make an informed decision.  The court merely reviewed a recording of the interview and made its ruling.  This was insufficient.  (Compare *Eccleston*, *supra*, 89 Cal.App.4th at 439-445 [court held an extensive evidentiary hearing before ruling on the admissibility of extrajudicial statements].)

Second, the statements at issue were not spontaneous but were made in response to the CALICO interviewer's questions after RD had repeatedly denied sexual abuse or molestation by Molina.  (1-CT 215-254; see 8-RT 975 [the prosecutor states RD made the statements after 40 minutes of saying that nothing happened].)  Also, RD did not consistently repeat the allegations.  In fact, as summarized in the Statement of Facts, she repeatedly denied any molestation of sexual abuse after her CALICO interview and recanted her CALICO statements when she was interview by RCP and in her trial testimony.

 Third, there is nothing about RD's mental state at the time she made the statements which indicates the statements were reliable.  In fact, some of RD's claims (i.e. that Edson witnesses the sexual intercourse and beat up Molina and that the police were called to the family's residence but did not arrest Molina because Nidia would not let them) were outright absurd.

Fourth, RD did not use of terminology unexpected of a child of similar age.  (1-CT 215-273.)  To the extent she described an ejaculate, masturbation and other sex acts, she could have been

exposed to sexual matter at home because the parents shared the same bedroom with the girls and watched pornography and had sex while the girls were asleep.  (6-RT 697-700, 712; 7-RT 904-909.)  Also, there is evidence that the girls had sex education at school and talked about sex with their friends.  (2-CT 325-328.)

Fifth, RD had a motive to fabricate.  She was present during XD's meeting with the substitute teacher during which XD made the allegations concerning Molina's sexual conduct with RD.  (2-RT 168, 176.)  RD was also aware that XD's statements to the teacher led to the police investigation.  Accordingly, RD had a motive to fabricate her accusations in order to corroborate XD's statements to the teacher to make sure XD did not get in trouble for lying.

Based on the totality of these circumstances, the trial court erred in ruling that RD's CALICO statements were reliable.  The court should have excluded them.

Because section 1360 is not a firmly rooted exception to the hearsay rule (*Eccleston*, *supra*, 89 Cal.App.4th at 445; *Idaho v. Wright*, *supra*, 497 U.S. at 816, 818) and there is inadequate guaranty of trustworthiness or indicia of reliability of the CALICO statements, their admission violated Molina's rights under the Confrontation Clause.  (*Ohio v. Roberts* (1980) 448 U.S. 56, 66.)  Indeed, the statements were testimonial for the purpose of the Confrontation Clause because they were given in the course of an interview or other conversation whose "primary purpose . . . is to establish or prove past events potentially relevant to later

97

criminal prosecution." (*People v. Rangel* (2016) 62 Cal.4th 1192, 1214; *Ohio v. Clark* (2015) 576 U.S. 237, 249.)

### B.    PREJUDICE.

Reversal of all convictions is required under the federal *Chapman* test set forth in Argument I, *ante*, because the People cannot prove beyond a reasonable doubt that the inadmissible statements did not contribute to the guilty verdicts.

Errors in admitting plainly relevant evidence which possibly influenced the jury cannot be harmless under *Chapman*. (*People v. Neal* (2003) 31 Cal.4th 63, 86.) When the guilty-not-guilty issue could reasonably be decided either way, *Chapman* prejudice has been established. (*People v. Wilkins* (2013) 56 Cal.4th 333, 350-351.)

RD's CALICO statements are undoubtedly prejudicial because, without them, there is no evidence to substantiate the charges. Indeed, during her closing and rebuttal arguments, the prosecutor relied on RD's CALICO statements and re-played a recording of some of the statements to the jury. (8-RT 973, 975-976, 980-983, 988-1010; 9-RT 1086-1089.) The prosecutor's reliance on the inadmissible statements establishes prejudice. (*People v. Cruz*, *supra*, 61 Cal.2d at 868; *People v. Woodard*, *supra*, 23 Cal.3d at 341.)

The People will not be able to prove the error harmless beyond a reasonable doubt, because Molina's guilt was contested and was susceptible to dispute. (*Neder*, *supra*, 508 U.S. at 19.) There was no corroborating medical evidence and there was

evidence that some of the touching was misinterpreted by RD and XD, who were raised by their mother to by hyper-vigilant and report any touching. Also, Edson testified that some of the allegations were simply absurd and could not have happened. A witness may be disbelieved if there is any rational ground for doing so. (*Leonard v. Watsonville* (1956) 47 Cal.2d 509, 518.) Consequently, for these reasons and the reasons set forth in Argument I, *ante*, without RD's CALICO statements, the prosecution case was not so "overwhelming" that the jury "could have had no reasonable doubt." (*People v. Williams* (1997) 16 Cal.4th 635, 689-690.)

Respondent will likely argue that any error was harmless because RD's CALICO statements were admissible under Evidence Code section 1235, as prior inconsistent statements. Any such claim should be rejected because, as will be established in Argument IV, *post*, RD's CALICO statements were also inadmissible under section 1235.

For the same reasons, the error is prejudicial under the state *Watson* test (*People v. Watson*, *supra*, 46 Cal.2d at 836-837), because without RD's CALICO statements, it is reasonably probable, i.e. "merely a reasonable chance" (*People v. Wilkins*, *supra*, 56 Cal.4th at 351), that Molina would have obtained a more favorable outcome had the error not occurred (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 214).

Reversal of all convictions is therefore required.

# IV.

## ALL CONVICTIONS SHOULD BE REVERSED BECAUSE THE CONVICTIONS ARE BASED ON RD'S "FALSE" TESTIMONY.

As set forth above, over defense counsel's in limine objection (1-CT 110, 118-120; 1-RT 10-11), the trial court allowed the prosecutor to introduce at trial RD's out-of-court CALICO statements under Evidence Code sections 1235 and 1360.  (1-RT 18-19.)  As summarized in the Statement of Facts, RD's CALICO statements were played for the jury during RD's trial testimony. (3-RT 326-328; 1-CT 215-273 [transcript]; People's Exhibits Nos. 4A & 4B.)  Defense counsel's contemporaneous objection was overruled by the trial court.  (3-RT 326.)

Notwithstanding RD's prior statements being admissible for purposes of the hearsay rule, their admission based on her false trial testimony requires reversal of all convictions under California law and federal due process.

Hearsay, defined as an out-of-court statement by someone other than the testifying witness offered to prove the truth of the matter stated, is generally inadmissible unless it falls under an exception.  (Evid. Code, § 1200, subds. (a), (b).)

The California Supreme Court has interpreted Evidence Code section 1235 to mean that "'normally, the testimony of a witness that he or she does not remember as evidence is not inconsistent with that witness's prior statements describing the event,'" but, "'[w]hen a witness's claim of lack of memory amounts

to deliberate evasion, inconsistency is implied'" and, "'[a]s long as there is a reasonable basis in the record for concluding that the witness's "I don't remember" statements are evasive and untruthful, admission of his or her prior statements is proper.'" (*People v. Ledesma* (2006) 39 Cal.4th 641, 711; *People v. Jones* (2013) 57 Cal.4th 899, 956.)

However, neither the state Constitution nor the United States Constitution and the criminal justice system "condone perjury." (*United States v. Wong* (1977) 431 U.S. 174, 178.) "Perjured testimony is an obvious and flagrant affront to the basic concepts of judicial proceedings" and "[e]ffective restraints against this type of egregious offense are therefore imperative." (*United States v. Mandujano* (1976) 425 U.S. 564, 576.)

Under California law, if "[f]alse evidence that is substantially material or probative on the issue of guilt . . . was introduced against a person at a . . . trial relating to his or her incarceration," it is a ground for habeas corpus relief. (§ 1473, subd. (b)(1).) "Any allegation that the prosecution knew or should have known of the false nature of the evidence referred to in paragraphs (1) . . . of subdivision (b) is immaterial to the prosecution of a writ of habeas corpus brought pursuant to paragraph (1) . . . of subdivision (b)." (§ 1473, subd. (c).)

Under section 1473, therefore, once a defendant shows false evidence was admitted at trial, reversal is required so long as the false evidence was "material." (*In re Rogers* (2019) 7 Cal.5th 817, 848 (*Rogers*); *In re Figueroa* (2018) 4 Cal.5th 576, 588-589.)

Section 1473 does not require the witness to knowingly or intentionally testify falsely. (*Rogers*, *supra*, 7 Cal.5th at 819.)

" 'False evidence is "substantially material or probative" if there is "of such significance that it may have affected the outcome," i.e., "*with reasonable probability it could have* affected the outcome . . ." ' " (*Id.* at 848.)  " 'In other words, false evidence passes the indicated threshold if there is a "reasonable probability" that had it not been introduced, the result would have been different.  [Citation.]  The requisite "reasonable probability" we believe, is such as undermines the reviewing court's confidence in the outcome.' " (*Ibid.*, quoting *In re Sassounian* (1995) 9 Cal.4th 535, 546.)

The " 'burden is to show that the possibility of a different verdict is "a chance great enough, under the totality of the circumstances, to undermine our confidence in the outcome." ' " (*Rogers*, at 848.)

Under the Fourteenth Amendment's Due Process Clause, "[a] defendant's due process rights are violated if the prosecutor knowingly presents false testimony." (*In re Masters* (2019) 7 Cal.5th 1054, 1089 (*Masters*); *People v. Vines* (2011) 51 Cal.4th 830, 873 (*Vines*); *Mooney v. Holohan* (1935) 294 U.S. 103, 122.)  A conviction obtained by the knowing use of perjured testimony is fundamentally unfair and must be set aside if it is reasonably likely the false testimony affected the verdict. (*People v. Kasim* (1997) 56 Cal.App.4th 1360, 1384-1386.)

While the California Supreme Court has concluded that mere inconsistencies between a witness's testimony and prior statements do not prove falsity of the testimony (*Vines*, *supra*, 51 Cal.4th at 874), and a prosecutor may present conflicting testimony and let the jury make a determination as to the witness's credibility (*Masters*, *supra*, 7 Cal.5th at 1089), due process and the Sixth Amendment rights to confrontation and cross-examination preclude a prosecutor from knowingly introducing false testimony in order to admit a witness's prior statements.  (See Argument V, *post*.)

Reversal of all convictions is required because the false evidence was materially used against Molina to admit RD's out-of-court statements.  Those statements were used by the prosecutor to obtain the convictions.  (*Rogers*, *supra*, 7 Cal.5th at 849.)  The false testimony, therefore, had a significant effect on the outcome of the trial.  (*Ibid*.)  RD's false testimony undermines confidence in the trial and therefore was "material" within the meaning of section 1473.

The error was prejudicial under *Chapman* and *Watson* for the reasons set forth in Argument III, *ante*.

Reversal of all convictions is therefore required.

/ / /

/ / /

## V.

### ALL CONVICTIONS SHOULD BE REVERSED BECAUSE, AS INTERPRETED BY CALIFORNIA COURTS AND APPLIED TO THIS CASE, EVIDENCE CODE SECTION 1235 VIOLATES DUE PROCESS AND THE SIXTH AMENDMENT RIGHTS TO CONFRONTATION AND CROSS-EXAMINATION.

All convictions should be reversed because, as interpreted by California courts and applied to Molina's case, Evidence Code section 1235 violates due process and the Sixth Amendment rights to confrontation and cross-examination. The admission of RD's extrajudicial statements in violation of the United States Constitution requires reversal under the *Chapman* test.

In *California v. Green* (1970) 399 U.S. 149 (*Green*), the High Court ruled that newly enacted Evidence Code section 1235 did not on its face violate the Sixth Amendment right to confrontation and cross-examination. (*Id*. at 150, 153, 155, 164, 167-170.) Since *Green* was decided California courts have interpreted and expanded section 1235 to include as "inconsistent statements" any testimony which the jury might not believe – "implied" inconsistent statements – and allows the prosecutor to knowingly elicit "false" or "perjured" testimony for purposes of admitting extrajudicial statements. (*People v. Freeman* (1971) 20 Cal.App.3d 488, 495 [prosecutors can "intentionally bring[] in the declarant for the purpose of eliciting a predictably false version . . . to open the door to a second witness with a conceivably reliable indicator

104

of the actual events"]; *id*. at 495 [this approach "is not misusing section 1235 but utilizing it for the very purpose it is designed to fulfill" and "conforms to the letter and spirit of section 1235"].)

While the High Court has created a Sixth Amendment confrontation-cross-examination rule, which authorizes admissibility of a witness's out-of-court statements so long as there is an opportunity to cross-examine the witness, the Court has not authorized prosecutors to solicit false testimony or allowed witnesses to give false testimony or commit perjury so that their out-of-court statements may be admitted against the defendant.  The "precise holding" of *Green* was that "the Confrontation Clause of the Sixth Amendment does not preclude the introduction of an out-of-court declaration, taken under oath and subject to cross-examination, to prove the truth of the matters asserted therein, when the declarant is available as a witness at trial."  (*Green*, *supra*, 399 U.S. at 172, Harlan, J., concurring.)  The question of whether the Confrontation Clause permitted a witness's out-of-court statement to be admitted at trial as substantive evidence when the witness claims to be unable to remember the events with which his prior statement dealt was left unresolved.  (*Id*. at 168-170.)

In *United States v. Owens* (1988) 484 U.S. 554 (*Owens*), the High Court concluded the Confrontation Clause is not violated by "admission of an identification statement of a witness who is unable, because of memory loss, to testify concerning the basis for the identification."  (*Id*. at 564.)  The Court reasoned: " '[T]he

105

Confrontation Clause guarantees only "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." ' " (*Owens*, *supra*, 484 U.S. at 559.)  "[T]hat opportunity is not denied when a witness testifies as to his current belief but is unable to recollect the reason for that belief. It is sufficient that the defendant has the opportunity to bring out such matters as the witness' bias, his lack of care and attentiveness, his poor eyesight, and even (what is often a prime objective of cross-examination, [citation omitted] the very fact that he has a bad memory."  (*Id*. at 560.)  "If the ability to inquire into these matters suffices to establish the constitutionally requisite opportunity for cross-examination when a witness testifies as to his current belief, the basis for which he cannot recall, we see no reason why it should not suffice when the witness' past belief is introduced and he is unable to recollect the reason for that past belief."  (*Ibid*.)

In reaching this conclusion, the *Owens* court noted "[i]t would seem strange, for example, to assert that a witness can avoid introduction of testimony from a prior proceeding that is inconsistent with his trial testimony [citation omitted] by simply asserting lack of memory of the facts to which the prior testimony related."  (*Id*. at 563.)

In *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), the High Court "reiterate[d] that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no

constraints at all on the use of his prior testimonial statements." (*Crawford*, *supra*, 451 U.S. at 59, fn. 9.) "The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." (*Ibid*.)

The *Owens-Crawford* line of cases do not stand for the proposition that a declarant's mere appearance at trial suffices to introduce the declarant's out-of-court statements. In *Owens*, the Court expressly noted that "[o]rdinarily a witness is regarded as 'subject to cross-examination' when he is placed on the stand, *under oath*, and *responds willingly* to questions." (*Owens*, *supra*, 484 U.S. at 561, italics added.)

Further, after *Owens*, the High Court reaffirmed that "[t]he central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." (*Maryland v. Craig* (1990) 497 U.S. 836, 845 (*Craig*).) "[T]he right guaranteed by the Confrontation Clause . . . 'insures that the witness will give his statements *under oath* – thus impressing him with the seriousness of the matter and guarding against the lie by the *possibility of a penalty for perjury*." (*Id*. at 845-846, quoting *Green*, italics added.)

The oath and respect for that oath by the trial participants (court, prosecutor, defense counsel and witnesses) is an essential component of the Sixth Amendment right to confrontation and cross-examination. The Sixth Amendment, therefore, prohibits a

107

prosecutor from soliciting false testimony and/or perjury in order to admit a witness's prior out-of-court statements. Furthermore, due process prohibits prosecutors from knowingly introducing false testimony or perjury.

The rights to confrontation and cross-examination are meaningless if the oath is meaningless to the witness. Further, when it becomes clear to a witness from prosecutor and trial court action or inaction that false testimony or perjury will not be inquired into or is acceptable, the witness is given a "green light" to continue to give false or perjured testimony.

Just as "[i]t would seem strange . . . to assert that a witness can avoid introduction of testimony from a prior proceeding that is inconsistent with his trial testimony . . . by simply asserting lack of memory of the facts to which the prior testimony related" (*Owens*, *supra*, 484 U.S. at 563), it would be even stranger to allow prosecutors to solicit false testimony or perjury or allow witnesses to give false testimony or commit perjury so that they may admit the perjurer's out-of-court statements, with court's turning a blind eye to this practice which strikes at the heart of Sixth Amendment and constitutional right to a fair trial.

Here, the prosecutor was soliciting false testimony and perjury from RD in order to admit her prior CALICO statements. Indeed, from the prosecutor's perspective, the more RD lied, the better the chance her out-of-court statements would be admitted into evidence under Evidence Code section 1235.

The court here admitted RD's CALICO statements based on her recantation of the statements in her trial testimony.  But, there was no express finding by the court that RD's recantation or "I don't remember" answers were false testimony.  Further, the court failed to undertake any action or to admonish RD of her duty to tell the truth.  RD could only construe the court's inaction and the prosecutor's continued questioning as a "green light" to keep lying with impunity.

RD's lies and perjury led to the admissibility of her out-of-court CALICO statements, and those statements are prejudicial under *Chapman* and *Watson*.  (See Argument III, *ante*.)

Reversal of all convictions is therefore required.

/ / /

/ / /

## VI.

**THE CHARGING INFORMATION IMPROPERLY
SOUGHT, AND ULTIMATELY LED TO, DUAL
CONVICTIONS FOR CONTINUOUS SEXUAL
ABUSE AND INDIVIDUAL SEX CRIMES UPON
THE SAME VICTIM DURING THE SAME TIME
PERIOD, IN VIOLATION OF PENAL CODE
SECTION 288.5(C).**

The trial court erred in failing to instruct the jury that it
could not convict Molina of both continual sexual abuse of RD (§
288.5) and the individual specific sex crimes against her
committed during the same period of time.

Section 288.5 defines the crime of continuous sexual abuse
of a child.  Any person who has recurring access to a minor child,
and who, over a period of time not less than three months,
engages in three or more acts of lewd or lascivious conduct with
the child is guilty of the offense.  (§ 288.5, subd. (a).)

Section 288.5 "is violated if the defendant (1) resided with,
or had recurring access to, a child under fourteen, and (2)
committed three or more acts of sexual molestation of the child,
and (3) three or more months passed between the first and the
last act of molestation, regardless of whether the defendant
resided with or had access to the child continuously throughout
the three-or-more-month period."  (*People v. Vasquez* (1996) 51
Cal.App.4th 1277, 1287; accord, *People v. Mejia* (2007) 155
Cal.App.4th 86, 94.)

"'[T]he prosecution need not prove the exact dates of the
predicate sexual offenses in order to satisfy the three-month

110

element.  Rather, it must adduce sufficient evidence to support a reasonable inference that at least three months elapsed between the first and last sexual acts.  Generic testimony is certainly capable of satisfying that requirement . . . [but] "the victim must be able to describe the general time period in which these acts occurred (e.g., 'the summer before my fourth grade,' or 'during each Sunday morning after he came to live with us'), to assure the acts were committed within the applicable limitation period." [Citations.]  That is, while generic testimony may suffice, it cannot be so vague that the trier of fact can only speculate as to whether the statutory elements have been satisfied.'" (*People v. Valenti* (2016) 243 Cal.App.4th 1140, 1158.)

By enacting the statute, the Legislature sought to provide additional protection for victims of molestation by assuring that resident child molesters and others who repeatedly abuse a child over a prolonged period of time would not escape prosecution because of difficulties in pleading and proving with sufficient precision the dates, times, and particular nature of each molestation.  (*People v. Rodriguez* (2002) 28 Cal.4th 543, 549.) But, in creating this course of conduct offense, the Legislature was also mindful of its potential due process perils, and took steps to safeguard against multiple convictions for the same conduct by continuous sexual abuse and specific sexual offenses in the same proceeding.  (See *People v. Johnson* (2002) 28 Cal.4th 240, 243; Stats. 1989, ch. 1402, § 1(b), p. 6138.)  To that end, section 288.5, subdivision (c) states, "No other . . . lewd and lascivious acts . . .

111

involving the same victim may be charged in the same proceeding with a charge under this section unless the other charged offense occurred *outside the time period charged* under this section or the other offense *is charged in the alternative*." (§ 288.5, subd. (c), italics added.)

Because multiple convictions for continuous sexual abuse and specific sexual offenses pertaining to the same victim over the same time period are precluded by subdivision (c) of section 288.5 (see *People v. Johnson*, *supra*, 28 Cal.4th at 248), the trial court has a sua sponte duty to so instruct the jury (see CALCRIM No. 3516) when the offenses are charged in the alternative. (See Related Issues, CALCRIM No. 1120 (2020 ed.) at 877-878, citing *People v. Torres* (2002) 102 Cal.App.4th 1053, 1060.)

Here, in count 10 of the information the People charged Molina with continuous sexual abuse of RD (§ 288.5, subd. (a)) between May 28, 2010 and May 27, 2016 (1-CT 18), and counts 3, 5, 7, 8 and 9 charged Molina with five counts of forcible lewd act with RD (§ 288, subd. (b)(1)) committed at various times during the same time period (1-CT 10-18). Additionally, count 1 charged sexual intercourse with RD (§ 288.7, subd. (a)), count 2 charged sexual penetration of RD (§ 288.7, subd. (b)), count four charged attempted sexual penetration of RD (§§ 664/ 288.7, subd. (b)), and count six charged attempted sexual penetration of RD (§§ 664/ 288.7, subd. (b)) committed at various times during the same time period (1-CT 10-18.)

The information did not comply with the section 288.5(c) limitation because the counts were not charged in the alternative. (1-CT 10-19.)  Also, the trial court did not instruct the jury that it could not convict Molina of both continuous sexual abuse and the specific offenses committed during the same time period.  (2-CT 483-526 [all jury instructions given at trial].)

The jury convicted Molina of all charges, except as to counts 3, 5, 7, 8 and 9, the jury convicted Molina of the lesser included offense of non-forcible lewd act under section 288(a).  (2-CT 468-482; 10-RT 1121-1127.)  The trial court sentenced Molina for counts 1 through 10, but stayed the sentences for counts 3, 4, 6 and 10 under section 654.  (2-CT 565-569, 581-584; 11-RT 1137-1138.)

The California Supreme Court has held that where a defendant is erroneously convicted of both continuous sexual abuse and individual sexual offenses against a child taking place during the same time period, "either the continuous abuse conviction or the convictions on the specific offenses must be vacated." (*People v. Johnson*, *supra*, 28 Cal.4th at 245, 248.)

Under *Johnson*, counts 1 through 9 and count 10 should have been charged in the alternative, or the trial court should have instructed the jury that it could not convict Molina both of continuous sexual abuse and the specific offenses.  The dual convictions are improper.

In light of this error, the trial court should have sentenced Molina only on the continuous sexual abuse count and dismissed

the other convictions.  Indeed, in *Johnson*, the Supreme Court affirmed an appellate court decision that vacated the individual sexual offense convictions, rather than the single conviction for continuous sexual abuse.  The procedure the trial court followed here unfairly allowed the prosecutor to avoid the risks entailed by charging in the alternative.

Based on *People v. Torres*, *supra*, 102 Cal.App.4th 1053, the Attorney General may argue that the appropriate remedy is for the trial court to impose punishment most commensurate with Molina's culpability.  If made, such argument should be rejected.

In *Torres*, the Court of Appeal concluded the appropriate remedy, "in deciding which convictions to vacate as the remedy for a violation of the proscription against multiple convictions set forth in section 288.5, subdivision (c) [was to] leave appellant standing convicted of the alternative offenses that are most commensurate with his culpability." (*Id*. at 1059.)  In *Torres*, the defendant was convicted of multiple felony sex offenses and one count of continuous sexual abuse against the same victim, in violation of section 288.5, subdivision (c).  (*Id*. at 1059-1060.)  The *Torres* court concluded that "[b]ecause of the number and severity of these specific offenses, appellant faced a greater maximum aggregate penalty with respect to these than he did on the continuous sexual abuse offense," leading the court to conclude "the appropriate remedy [was] to reverse the conviction for violating section 288.5." (*Id*. at 1060.)

In *People v. Jaramillo* (1976) 16 Cal.3d 752, 754, the California Supreme Court concluded a defendant could not be convicted of both unlawful driving or taking of a motor vehicle under Vehicle Code section 10851) and receiving stolen property under Penal Code section 496 – the same motor vehicle – because the unlawful driving or taking offense could encompass theft of the vehicle, and a person may not be convicted of both stealing and receiving the same property.  In light of the uncertainty as to whether the Vehicle Code section 10851 conviction represented defendant taking, or simply driving, another's vehicle, the Supreme Court reversed the convictions and remanded to allow the prosecution to retry one or both counts or, if the prosecution did not do so, for the trial court to reinstate the Vehicle Code conviction only.  (*Id*. at 760.)

The same remedy should be applied here.  All convictions should be reversed and the case remanded to allow the prosecution to retry the case or, if the prosecution chooses not do so, for the trial court to reinstate the section 288.5 conviction only.

/ / /

/ / /

## VII.

## CUMULATIVE PREJUDICE FROM THE ERRORS REQUIRES REVERSAL OF ALL CONVICTIONS.

The previously established constitutional and state law errors (Arguments I through VI, *ante*), when considered together, requires reversal of all convictions.  On appeal, "[s]ometimes the cumulative effect of errors that are harmless in themselves can be prejudicial."  (*People v. Loy* (2011) 52 Cal.4th 46, 77.)

"A series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error."  (*People v. Hill* (1998) 17 Cal.4th 800, 844 (*Hill*), citing *People v. Purvis* (1963) 60 Cal.2d 323, 348, 353 [combination of "relatively unimportant misstatement[s] of fact or law," when considered on the "total record" and in "connection with the other errors," required reversal].)

Further, cumulative errors resulting in the denial of a fair trial require reversal.  (*Hill*, at 844-848; *People v. Ledesma*, *supra*, 43 Cal.3d at 214-227.)

Finally, defendants are entitled to argue that trial error had the effect of violating the federal Constitution.  (*People v. Partida*, *supra*, 37 Cal.4th at 431, 435-435, 439.)

Here, Molina was denied a fair trial because the trial court: (1) erroneously failed to exclude the CSAAS evidence (Argument I, *ante*); (2) gave an erroneous jury instruction on the CSAAS evidence (Argument II, *ante*); (3) erroneously allowed the prosecution to introduce unreliable out-of-court statements made

116

by RD in her CALICO interview (Arguments III, IV & V, *ante*); and erroneously failed to instruct that Molina could not be convicted of both continual sexual abuse of RD and the individual specific sex crimes against her committed during the same period of time(Argument VI, *ante*).

Because many of the errors that contributed to the cumulative error are subject to the federal *Chapman* prejudice analysis, the cumulative error is also subject to the *Chapman* test.  (See *People v. Woods* (2006) 146 Cal.App.4th 106, 117; *Cargle v. Mullin* (10th Cir. 2003) 317 F.3d 1196, 1220.)

Applying the federal *Chapman* test set forth in Argument I, *ante*, it cannot be concluded beyond a reasonable doubt that the errors did not jointly affect the guilty verdicts or that the guilty verdicts rendered are "surely unattributable to the error[s]." (*Sullivan v. Louisiana*, *supra*, 508 U.S. at 280.)

There is also reasonable probability under the state *Watson* test that Molina would have obtained a more favorable result in the absence of the errors.  (*People v. Holt* (1984) 37 Cal.3d 436, 458-459 [convictions reversed for cumulative prejudice from trial court's errors and prosecutorial misconduct]; *People v. Watson*, *supra*, 46 Cal.2d 818.)  In this context, a hung jury is a more favorable result to Molina.  (*People v. Sanchez*, *supra*, 228 Cal.App.4th at 1535.)

In sum, the cumulative errors combined to deny Molina his right to a fair trial.  (U.S. Const., 14th Amend.; Cal. Const., art. I, § 15.)  Reversal of all convictions is therefore required.

## VIII.

**A REMAND FOR RESENTENCING IS REQUIRED BECAUSE MOLINA WAS CONVICTED OF NON-FORCIBLE LEWD ACT UNDER PENAL CODE SECTION 288(A), BUT THE TRIAL COURT ERRONEOUSLY SENTENCED HIM FOR FORCIBLE LEWD ACT UNDER PENAL CODE SECTION 288(B).**

Molina was charged with five counts of forcible lewd act or lascivious  with a child under the age of 14 years, a violation of section 288, subdivision (b).  (1-CT 10-18; counts 3, 5, 7, 8 & 9.)  Subdivision (b) of section 288 criminalizes lewd or lascivious acts committed "by use of force, violence, duress, menace, or threat of great bodily harm." (§ 288, subd. (b).)  According to the Order on Settled Statement and the prosecutor's Declaration in Support of Settled Statement, during the unreported jury instruction conference the prosecutor asked to reduce those charges from section 288(b) to the non-forcible lewd or lascivious act, a violation of section 288(a), to "conform to the evidence adducted at trial."  (Aug.CT 271, 273.)  The trial court ruled with respect to those counts that the jury instruction corresponding to section 288(a) would be read to the jury.  (Aug.CT 273.)

The appellate record establishes the jury was instructed on the section 288(a) non-forcible lewd or lascivious act.  (2-CT 515; 8-RT 942-943.)  The verdict forms also expressly state the jury convicted Molina of five counts of lewd act or lascivious under section 288(a) (counts 3, 5, 7, 8 & 9).  (2-CT 470, 473, 476, 478, 480; 10-RT 1122-1127.)

118

The non-forcible lewd or lascivious act under section 288(a) is punishable by 3 years, 6 years, or 8 years in prison. (§ 288, subd. (a).) However, at sentencing, the trial court sentenced Molina to the lower term of 5 years for each violation of subdivision (b) of section 288 (counts 3, 5, 7, 8 & 9). (2-CT 565-569, 581; 11-RT 1137-1138.) Section 288(b) sets punishment at 5 years, 8 years, or 10 years in prison. (§ 288, subd. (b).)

The 5-year prison term imposed for each of the five lewd or lascivious act convictions under section 288(a) must be reversed, because the sentence is unauthorized sentence and violates *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*).

The trial court pronounces the judgment arising from the verdict. (§§ 12, 1191, 1202; Cal. Rules of Court, rule 4.433(c)(5); see also *Apprendi*, at 479, fn. 4.)

Any fact that, by law, increases the penalty for a crime is an "element" that must be submitted to the jury and found beyond a reasonable doubt. (*Mathis v. United States* (2016) 579 U.S. __ [136 S.Ct. 2243, 2252] [under the Sixth Amendment and *Apprendi*, "a judge cannot go beyond identifying the crime of conviction to explore the manner in which the defendant committed that offense"]; *Alleyne v. United States* (2013) 570 U.S. 99, 99-100, 103 [*Apprendi* applies to judicial factfinding that increases the mandatory minimum sentence for a crime]; see also *Descamps v. United States* (2013) 570 U.S. 254, 269-270 [judicial factfinding under the federal Armed Career Criminal Act, which increases sentences of certain federal defendants who have

certain prior convictions, violated the Sixth Amendment under *Apprendi*]; *People v. Gallardo* (2017) 4 Cal.5th 120, 136.)

Because the prosecutor here reduced the charges in counts 3, 5, 7, 8 and 9, to non-forcible lewd or lascivious acts and the jury was never instructed on the forcible lewd or lascivious acts under section 288, subdivision (b), there is no jury finding that the lewd or lascivious acts in those counts were committed "by use of force, violence, duress, menace, or threat of great bodily harm." (§ 288, subd. (b).) Judicial fact-finding with respect to the elements of the charged crime always violates the Sixth Amendment unless the defendant has waived jury trial. (See *United States v. Gaudin* (1995) 515 U.S. 506, 510 (*Gaudin*).)[14]

The 5-year prison term imposed for each of the five lewd or lascivious act convictions under section 288(a) is therefore unauthorized and violates the Fourteenth Amendment, as interpreted in *Apprendi* and *Gaudin*.

Reversal of the sentence and a remand for resentencing is therefore required.

/ / /

/ / /

---

[14]  Because due process requires the prosecution to prove beyond a reasonable doubt every element of the charged crime (*In re Winship*, *supra*, 397 U.S. at 359, 364), juries must be fully instructed on all elements (*Gaudin*, at 522-523).

## IX.

## THE IMPOSITION OF THE FINES AND ASSESSMENTS VIOLATED MOLINA'S RIGHT TO DUE PROCESS.

Without making a finding as to Molina's ability to pay, the court imposed a $500 fine (§ 290.3), a $700 assessment for the forensic examination of the victim (§ 1203.1, subd. (h)(b)), a $400 criminal conviction assessment (Gov. Code, § 70373), a $300 court security fee (§ 1465.8), and a $300 restitution fine (§ 1202.4).  (2-CT 566, 584; 11-RT 1138-1139.)

Under *People v. Dueñas* (2019) 30 Cal.App.5th 1157, 1168, 1172, which was decided after Molina's sentencing hearing, the imposition of the assessments and fine violated Molina's right to due process under the federal and state constitutions.  The fine and assessments should therefore be vacated and the execution of the restitution fines stayed unless and until the prosecution can prove that Molina has the present ability to pay them.

/ / /

/ / /

## CONCLUSION

Reversal of all convictions is required for the errors established in Arguments I to VII.

The case should be remanded for resentencing on the lewd act counts.

The imposed assessments and fines should be vacated.

Dated: March 24, 2021          Respectfully submitted,


    /s/ *Waldemar D. Halka*
Waldemar D. Halka
Attorney for Defendant and
Appellant Rember Genaro Molina

## CERTIFICATE OF WORD COUNT

I, Waldemar D. Halka, counsel for appellant, certify pursuant to the California Rules of Court, that the word count for this document is 25,368 words, excluding the tables, this certificate, and any attachment permitted under rule 8.204(d). This document was prepared in WordPerfect X7, and this is the word count generated by the program for this document.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed, at San Diego, California, on March 24, 2021.


 /s/ *Waldemar D. Halka*
Waldemar D. Halka
Attorney for Defendant and
Appellant Rember Genaro Molina

123

## DECLARATION OF SERVICE

I, Waldemar D. Halka, declare under penalty of perjury I am over 18 years of age; I am not a party to the action herein; my business address is P.O. Box 99965, San Diego, California 92169.  I caused to be served a copy of the following document to each of the parties listed below:

**APPELLANT'S OPENING BRIEF**
*People v. Molina* - **Case No. A155785**

Rember Genaro Molina (CDCR # BH6781)          **Defendant-Appellant**
Sierra Conservation Center
5150 O'Byrnes Ferry Road
Jamestown, CA 95327

Each of said copies was sealed and deposited in the United States mail on March 24, 2021, with proper postage affixed thereto and fully prepaid.

Furthermore, on March 24, 2021, I served the same document by transmitting a .PDF version via electronic mail through the **TrueFiling** docketing system on:

**Hon. Joseph Scott, Judge**
**c/o Clerk of San Mateo County Superior Court**

**First District Appellate Project**

**Office of the Attorney General of California**

**San Mateo County District Attorney**

Executed under penalty of perjury at San Diego, California, on March 24, 2021.

_/s/ Waldemar D. Halka_
Waldemar D. Halka

# EXHIBIT B

Supreme Court of California
Jorge E. Navarrete, Clerk and Executive Officer of the Court
Electronically RECEIVED on 1/10/2022 at 7:55:02 AM

Supreme Court of California
Jorge E. Navarrete, Clerk and Executive Officer of the Court
Electronically FILED on 1/10/2022 by M. Alfaro, Deputy Clerk

**S272603**

**Supreme Court Case No. _____**

# IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

**THE PEOPLE OF THE STATE OF CALIFORNIA,**

                Plaintiff and Respondent,

**v.**

**REMBER GENARO MOLINA,**

                Defendant and Appellant.

Court of Appeal, First Appellate District, Division Four
Case No. A155785

Appeal from a judgment of the San Mateo County Superior Court
Case No. 17SF002494
Honorable Joseph Scott, Judge

## PETITION FOR REVIEW

WALDEMAR D. HALKA
Attorney at Law
State Bar No. 137915
P.O. Box 99965
San Diego, CA 92169
Tel: (858) 395-8626
e-mail: halkalaw@gmail.com

Attorney for Defendant and
Appellant Rember Genaro Molina

# TABLE OF CONTENTS

Page

PETITION FOR REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

QUESTIONS PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . 8

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

NECESSITY FOR REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    Question 1: Admissibility of CSAAS evidence. . . . . . . . . . . 10

    Question 2: Propriety of CALCRIM No. 1193. . . . . . . . . . . 19

    Question 3: Admissibility of the alleged victim's
           forensic interview statements. . . . . . . . . . . . 23

    Question 4: The prosecutor's presentation of the
           alleged victim's false trial testimony. . . . . . . . 28

    Question 5: Cumulative Prejudice. . . . . . . . . . . . . . . . . . . . 33

    Question 6: The *Dueñas* ability-to-pay issue. . . . . . . . . . . 34

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

CERTIFICATE OF WORD COUNT. . . . . . . . . . . . . . . . . . . . . 35

DECLARATION OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . 36

APPENDIX "A" – Unpublished Opinion of the Court of Appeal

# TABLE OF AUTHORITIES

Page(s)

C ASES

*California v. Green* (1970) 399 U.S. 149. . . . . . . . . . . . . . . . . . 29, 31

*Chambers v. Mississippi* (1973) 410 U.S. 284. . . . . . . . . . . . . . . 16

*Commonwealth v. Dunkle* (Pa. 1992) 602 A.2d 830. . . . . . . . 13, 18

*Crawford v. Washington* (2004) 541 U.S. 36. . . . . . . . . . . . . . . . 30

*Estelle v. McGuire* (1991) 502 U.S. 62. . . . . . . . . . . . . . . . . . . . . 20

*Frye v. United States* (D.C. Cir. 1923) 293 Fed. 1013. . . . . . . . . . 10

*Hadden v. State* (Fla. 1997) 690 So.2d 573. . . . . . . . . . . . . . . . . 13

*Idaho v. Wright* (1990) 497 U.S. 805. . . . . . . . . . . . . . . . . . . . 25, 27

*In re Carmen O.* (1994) 28 Cal.App.4th 908. . . . . . . . . . . . . . . . . 25

*In re Cindy L.* (1997) 17 Cal.4th 15. . . . . . . . . . . . . . . . . . . . . . . 25

*In re Masters* (2019) 7 Cal.5th 1054. . . . . . . . . . . . . . . . . . . . . . . 29

*In re Winship* (1970) 397 U.S. 358. . . . . . . . . . . . . . . . . . . . . . . . 20

*Maryland v. Craig* (1990) 497 U.S. 836. . . . . . . . . . . . . . . . . . . . 31

*Mooney v. Holohan* (1935) 294 U.S. 103. . . . . . . . . . . . . . . . . . . 29

*Ohio v. Clark* (2015) 576 U.S. 237. . . . . . . . . . . . . . . . . . . . . . . . 28

*Ohio v. Roberts* (1980) 448 U.S. 56.. . . . . . . . . . . . . . . . . . . . . . . 27

*Parle v. Runnels* (9th Cir. 2007) 505 F.3d 922. . . . . . . . . . . . . . . 33

*People v. Bledsoe* (1984) 36 Cal.3d 236. . . . . . . . . . . . . . . . . 12, 14

*People v. Bowker* (1998) 203 Cal.App.3d 385.. . . . . . . . . . . . 14, 17

*People v. Brodit* (1998) 61 Cal.App.4th 1312.. . . . . . . . . . . . . . 24

*People v. Brown* (2004) 33 Cal.4th 892. . . . . . . . . . . . . . . . . . . 12

*People v. Cuccia* (2002) 97 Cal.App.4th 785. . . . . . . . . . . . . . . 33

*People v. Dueñas* (2019) 30 Cal.App.5th 1157. . . . . . . . . . . . . . 34

*People v. Dungo* (2012) 55 Cal.4th 608. . . . . . . . . . . . . . . . . . . 21

*People v. Eccleston* (2001) 89 Cal.App.4th 436. . . . . . . . . 24, 26, 27

*People v. Freeman* (1971) 20 Cal.App.3d 488. . . . . . . . . . . . . . . 30

*People v. Gardeley* (1996) 14 Cal.4th 605. . . . . . . . . . . . . . . . . . 16

*People v. Gonzales* (2017) 16 Cal.App.5th 494.. . . . . . . . . . . . . . 22

*People v. Harlan* (1990) 222 Cal.App.3d 439. . . . . . . . . . . . . . . 15

*People v. Hill* (1998) 17 Cal.4th 800.. . . . . . . . . . . . . . . . . . . . . 33

*People v. Housley* (1992) 6 Cal.App.4th 947. . . . . . . . . . . . . . . . 14

*People v. Kelly* (1976) 17 Cal.3d 24. . . . . . . . . . . . . . . . . . . . . . 10

*People v. Kopp* (2019) 38 Cal.App.5th 47
    review granted Nov. 13, 2019, S257844.. . . . . . . . . . . . . . 34

*People v. McAlpin* (1991) 53 Cal.3d 1289.. . . . . . . . . . . . 11, 12, 20

*People v. Munch* (2020) 52 Cal.App.5th 464. . . . . . . . . . . . . 14, 16

*People v. Rangel* (2016) 62 Cal.4th 1192. . . . . . . . . . . . . . . . . . 28

4

*People v. Robbie* (2001) 92 Cal.App.4th 1075. . . . . . . . . . . . . . . 17

*People v. Roberto V.* (2001) 93 Cal.App.4th 1350. . . . . . . . . . . . 24

*People v. Sanchez* (2016) 63 Cal.4th 665. . . . . . . . . . . . . . . . . . 21

*People v. Stoll* (1989) 49 Cal.3d 1136. . . . . . . . . . . . . . . . . . . . . 15

*People v. Vines* (2011) 51 Cal.4th 830. . . . . . . . . . . . . . . . . . . . . 29

*People v. Wells* (2004) 118 Cal.App.4th 179.. . . . . . . . . . . . . . . . 14

*Perry v. New Hampshire* (2012) 565 U.S. 228. . . . . . . . . . . . . . . 16

*Sanderson v. Commonwealth* (Ky. 2009) 291 S.W.3d 610. . . . . . 13

*State v. Ballard* (Tenn. 1993) 855 S.W.2d 557. . . . . . . . . . . . . . . 13

*State v. Davis* (Ohio Ct. App. 1989) 581 N.E.2d 604. . . . . . . . . . 18

*State v. Foret* (La. 1993) 628 So.2d 1116. . . . . . . . . . . . . . . . . . . 13

*State v. J.L.G.* (2018) 234 N.J. 265. . . . . . . . . . . . . . . . . . . . . . . 13

*State v. Marks* (1982) 231 Kan. 645. . . . . . . . . . . . . . . . . . . . . . . 14

*State v. Maule* (Wash. App. 1983) 667 P.2d 96. . . . . . . . . . . . . . 13

*State v. Schimpf* (Tenn. Crim. App. 1989) 782 S.W.2d 186. . . . . 18

*State v. Stribley* (Iowa 1995) 532 N.W.2d 170. . . . . . . . . . . . . . . 13

*Taylor v. Kentucky* (1978) 436 U.S. 478. . . . . . . . . . . . . . . . . . . . 33

*United States v. Owens* (1988) 484 U.S. 554. . . . . . . . . . . . . 30-32

*Williams v. Illinois* (2012) 399 U.S. 235. . . . . . . . . . . . . . . 21, 22

STATUTES

Evidence Code

§ 210. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

§ 350. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

§ 800, subdivision (a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

§ 1200, subdivision (a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

§ 1200, subdivision (b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

§ 1360, subdivision (a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Penal Code

§ 288, subdivision (a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

§ 288, subdivision (b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

§ 288.5, subdivision (a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

§ 288.7, subdivision (a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

§ 288.7, subdivision (b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

§ 664. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

§ 1203.066, subdivision (a)(8). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

OTHER AUTHORITIES

Cara Gitlin, Expert Testimony on Child Sexual Abuse Accommodation Syndrome: How Proper Screening Should Severely Limit Its Admission, 26 Quinnipiac L. Rev. 497, 525 (2008). . . . 18

## PETITION FOR REVIEW

Defendant and Appellant Rember Genaro Molina (hereafter "petitioner") petitions for review of the decision by the Court of Appeal for the First Appellate District, Division Four.  The unpublished opinion, which was filed on December 8, 2021, is attached in Appendix "A" (hereafter "Opn.").

## QUESTIONS PRESENTED

**1.**  Did the trial court commit prejudicial error by admitting evidence concerning child sexual abuse accommodation syndrome and thereby deprive petitioner of his constitutional right to a fair trial?

**2.**  Was the trial court's jury instruction on child sexual abuse accommodation syndrome (CALCRIM No. 1193) prejudicially erroneous, and thereby deprive petitioner of his constitutional right to a fair trial?

**3.**  Did the trial court prejudicially err by admitting into evidence the alleged victim's forensic interview statements, and thereby deprive petitioner of his rights to confrontation and cross-examination?

**4.**  Whether the prosecutor's purposeful use of the alleged victim's false testimony at trial in order to introduce her prior forensic interview statements violate petitioner's constitutional right to a fair trial and his right to confront and cross-examine the accuser?

7

**5.** Whether the cumulative effect of the trial errors established in Questions 1 through 4 deprived petitioner of his constitutional rights to due process and a fair trial?

**6.** Did the imposition of the court facilities assessment, court operations assessment, and restitution fine without a determination that petitioner was able to pay them violate his constitutional right to due process of law?

## STATEMENT OF THE CASE

Petitioner was charged by information with several crimes allegedly committed upon his niece, R.D., when she was under the age of 10 years. (Opn. at pp. 1, 2.) The information charged sexual intercourse with a child 10 years of age or younger (Pen. Code[1], § 288.7, subd. (a) – count 1); sexual penetration of a child 10 years of age or younger (§ 288.7, subd. (b) – count 2); five counts of commission of a forcible lewd or lascivious act upon a child under 14 years (§ 288, subd. (b)(1) – counts 3, 5, 7, 8 and 9); two counts of attempted sexual penetration of a child 10 years of age or younger (§§ 664, 288.7, subd. (b) – counts 4, 6); and one count of continuous sexual abuse of a child under 14 years of age (§ 288.5, subd. (a) – count 10). (Opn. at p. 2.) Four of the five forcible lewd act charges and the continuous sexual abuse charge included allegations that petitioner had substantial sexual conduct with the child (§ 1203.066, subd. (a)(8)). (Opn. at p. 2.)

---

[1] All unspecified statutory citations are to the Penal Code.

All section 288, subdivision (b) charges were reduced to subdivision (a) of section 288 before the case was submitted to the jury.  (Opn. at p. 17; § 288, subd. (a) – counts 3, 5, 7, 8 and 9.)

A jury convicted petitioner of all charges and found the allegations of substantial sexual conduct true.  (Opn. at p. 6.)

The trial court sentenced petitioner to 50 years to life in prison.  (Opn. at p. 6.)

Petitioner timely appealed.  In his appellate briefs, he challenged the admissibility of expert testimony on the child sexual abuse accommodation syndrome (hereafter "CSAAS") and argued that the jury instruction on CSAAS (CALCRIM No. 1193) given at his trial incorrectly permitted the jury to find him guilty based on the expert's testimony.  (Opn. at p. 1.)  Also, petitioner challenged the admissibility of the alleged victim's out- of-court statements concerning the abuse.  (Opn. at p. 1.)  He also argued that he was improperly convicted of both continuous sexual abuse under section 288.5 and the specific sex offenses involving the alleged victim during the same time period.  (Opn. at pp. 1-2.)  He also asserted several sentencing errors.  (Opn. at p. 1.)  Finally, he argued that various fees and fines were imposed in violation of his right to due process.  (Opn. at p. 1.)

In an unpublished opinion, filed on December 8, 2021, the Court of Appeal vacated petitioner's conviction for continuous sexual abuse under section 288.5, corrected his sentence to reflect imposition of consecutive three-year terms on counts 3, 5, 7, 8 and 9, and directed the trial court to correct the abstract of judgment.

9

Except for these errors, the Court of Appeal found no evidentiary, jury instruction, or sentencing errors and affirmed the judgment. (Opn. at pp. 1-20.)

Neither party sought rehearing.

Petitioner seeks review.

## STATEMENT OF FACTS

For the purpose of this petition, petitioner adopts the Background from the Court of Appeal's opinion.  (Opn. at pp. 2-6.)

## NECESSITY FOR REVIEW

### Question 1:  Admissibility of CSAAS evidence.

Before trial, the defense filed a motion "to exclude certain evidence of myths and child accommodation syndrome and testimony on characteristics of molest victims."  (Opn. at p. 8.) The prosecution filed a competing motion to authorize introduction of such evidence.  (Opn. at p. 8.)  The trial court permitted introduction of the expert testimony, "with the proviso that the expert will not render any opinion as to whether the victim was actually molested in this case . . . and not to render any opinion that the [alleged victim] suffers from the accommodation syndrome."  (Opn. at p. 8.)

On appeal, petitioner argued that admission of expert testimony on the syndrome violated the *Kelly*/*Frye* rule[2], that the

---

[2]  *Frye v. United States* (D.C. Cir. 1923) 293 Fed. 1013, 1014; *People v. Kelly* (1976) 17 Cal.3d 24, 30.

evidence was irrelevant because jurors no longer harbor
misconceptions that need correcting regarding how child victims
of sexual abuse behave, and that the evidence was more
prejudicial than probative and should have been excluded under
Evidence Code section 352. (Opn. at p. 7.)

      The Court of Appeal rejected the *Kelly/Frye* argument,
concluding the expert testimony concerning CSAAS was not "new
experimental scientific evidence ' "not previously accepted in
court." ' " (Opn. at pp. 7-8.) Further, acknowledging that courts
in other jurisdictions have recognized that changes in public
perception of the victims of child sexual abuse have questioned
and even undermined the rationale for the admission of CSAAS
evidence, the Court of Appeal felt bound by this Court's decision
in *People v. McAlpin* (1991) 53 Cal.3d 1289, which approved a
series of appellate decisions establishing that while "expert
testimony on the common reactions of child molestation victims is
not admissible to prove that the complaining witness has in fact
been sexually abused; it is admissible to rehabilitate such
witness's credibility when the defendant suggests that the child's
conduct after the incident . . . is inconsistent with his or her
testimony claiming molestation." (*McAlpin* at pp. 1300-1301 &
fn. 4.) (Opn. at pp. 6, 8.) Finally, the Court of Appeal concluded
that there was no abuse of discretion under Evidence Code
section 352 because the testimony by the prosecution's expert was
highly probative given the facts of this case. (Opn. at p. 8.)

This Court should grant review of Question 1 to resolve an important legal question on which the Courts of Appeal need guidance.  There are two reasons to grant review on this basis.  First, while this Court has endorsed the use of CSAAS testimony for a limited purpose, it has never considered whether CSAAS evidence meets the *Kelly*/*Frye* test.

In *McAlpin*, a case concerning expert testimony about the behavior of parents of abused children, the Court found that CSAAS evidence was admissible to explain child sex victims' behavior to rehabilitate credibility "when the defendant suggests that the child's conduct after the incident . . . is inconsistent with his or her testimony claiming molestation" or when "needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.'" (*McAlpin*, *supra*, 53 Cal.3d at pp. 1300-1301.)

In *People v. Brown* (2004) 33 Cal.4th 892, 906-908, the Court cited *People v. Bledsoe* (1984) 36 Cal.3d 236 (*Bledsoe*), a "rape trauma syndrome" case, to explain its reasoning in holding that expert testimony about domestic abuse victims' recantation of complaints was admissible.

Notably, neither case considered whether CSAAS evidence is admissible under the *Kelly*/*Frye* test.

Eight states – New Jersey, Kentucky, Tennessee, Florida, Iowa, Louisiana, Pennsylvania, and Ohio – have severely restricted CSAAS evidence or banned it entirely as insufficiently

reliable.  (See, e.g. *State v. J.L.G.* (2018) 234 N.J. 265, 308 (*J.L.G.*); *Hadden v. State* (Fla. 1997) 690 So.2d 573; *Sanderson v. Commonwealth* (Ky. 2009) 291 S.W.3d 610 [reasons to exclude CSAAS evidence is lack of diagnostic reliability, the lack of general acceptance within the discipline from which such testimony emanates, and the overwhelmingly persuasive nature of such testimony effectively dominating the decision-making process]; *State v. Ballard* (Tenn. 1993) 855 S.W.2d 557 [expert testimony on CSAAS is more prejudicial than probative because such testimony encourages the jury to conclude that because a child exhibits symptoms consistent with CSAAS, the defendant is more likely to have committed the charged crime]; *State v. Foret* (La. 1993) 628 So.2d 1116; *State v. Davis* (Ohio Ct. App. 1989) 581 N.E.2d 604; *State v. Stribley* (Iowa 1995) 532 N.W.2d 170; and C*ommonwealth v. Dunkle* (Pa. 1992) 602 A.2d 830, 836 [CSAAS is not generally accepted in scientific community because the syndrome is not specific enough to sexually abused children to be accurate]; see also *State v. Maule* (Wash. App. 1983) 667 P.2d 96 [theory that sexually abused children manifest particular identifiable characteristics is not supported by accepted medical or scientific opinion].)

    In light of this widespread and increasing view that CSAAS evidence is insufficiently reliable to meet constitutional standards, this Court should grant review in petitioner's case.

    In 1984, this Court held that evidence of "rape trauma syndrome" is admissible in rape cases to disabuse a jury of some

widely held misconceptions concerning rape and rape victims, and to guide the jury's evaluation of evidence free of those myths. (*Bledsoe*, *supra*, 36 Cal.3d at pp. 247-248.)  Various lower courts have improperly expanded that holding to find that CSAAS evidence, too, is admissible.  (See e.g. *People v. Bowker* (1998) 203 Cal.App.3d 385; accord *People v. Housley* (1992) 6 Cal.App.4th 947, 955; *People v. Wells* (2004) 118 Cal.App.4th 179, 189; *People v. Munch* (2020) 52 Cal.App.5th 464, 472.)

Those opinions are mistaken; they misread *Bledsoe*.  The *Bledsoe* opinion recognized that even when rape trauma syndrome evidence is offered for a limited purpose, it still has to be generally accepted in the scientific community under *Kelly*/ *Frye*.  (*Bledsoe*, *supra*, 36 Cal.3d at p. 248.)  The Court of Appeal's error is demonstrated by *People v. Bowker*, *supra*, 203 Cal.App.3d at pp. 391-394, where the court says it is "applying the *Bledsoe* exception," to allow CSAAS evidence to dispel common misconceptions the jury may hold as to how such children react to abuse.  (*Id.* at p. 393.)  But, there is no *Bledsoe* exception.

*Bledsoe* allowed rape trauma syndrome evidence on the explicit assumption that it met *Kelly*/*Frye* standards.  Indeed, this Court cited *State v. Marks* (1982) 231 Kan. 645 for the principle that "rape trauma syndrome is generally accepted under *Frye* and admissible in a case where defense is consent."  (*Bledsoe*, *supra*, 36 Cal.3d at p. 248.)  Thus, nothing in *Bledsoe* justifies admitting CSAAS evidence without subjecting it to a *Kelly*/*Frye* analysis.

14

*Kelly/Frye* applies to CSAAS evidence, as it would to any "new scientific process operating on purely psychological evidence." (*People v. Stoll* (1989) 49 Cal.3d 1136, 1156 (*Stoll*) [*Kelly/Frye* standard applies when the expert presents a theory that is new to science].)  The reason for excluding scientific evidence that has not gained general acceptance in the scientific community is to preclude the jury from mistakenly cloaking such evidence with an "aura of infallibility" even though the scientific community has not generally accepted it as valid.  (*Id.* at p. 1156.) That principle is especially germane to CSAAS evidence, which encourages juries to ignore traditional indicia of witness falsity like inconsistencies.

The cases which actually confront the question whether CSAAS satisfies *Kelly/Frye* criteria misread *Stoll*.  For example, in *People v. Harlan* (1990) 222 Cal.App.3d 439, 448-449 (*Harlan*), a case on which the Court of Appeal relied in rejecting petitioner's appeal (Opn. at p. 7), the court cited *Stoll* to support its holding that CSAAS evidence was not a novel scientific theory requiring analysis under *Kelly/Frye*.  But *Stoll* held that a psychologist's opinions that the defendants showed no obvious psychological or sexual problems were admissible circumstantial evidence that they did not commit the charged sexual offenses.  (*Stoll*, *supra*, 49 Cal.3d at p. 1149.)  That testimony did not suffer from the infirmity that plagues CSAAS testimony – that it has not been generally accepted as reliable in the scientific community. Further, *Harlan* ignores the fact that this Court applied *Kelly/*

15

*Frye* to rape trauma syndrome evidence, which is similar to
CSAAS.

*People v. Munch*, 52 Cal.App.5th 464, another case on
which the Court of Appeal relied in rejecting petitioner's appeal
(Opn. at pp. 7, 8), also cites and relies on *Harlan*.

Accordingly, this Court should grant review on Question 1
to clarify the confusion in the lower appellate courts.

Granting review will protect also protect the constitutional
rights of California criminal defendants.  In *People v. Gardeley*
(1996) 14 Cal.4th 605, 618, this Court explained that while expert
testimony may be "premised on material that is not admitted into
evidence" it must still be reliable.  "[A]ny material that forms the
basis of an expert's opinion testimony must be reliable."  (*Ibid*.)
"[S]o long as [the] threshold requirement of reliability is satisfied,
even matter that is ordinarily inadmissible can form the proper
basis for an expert's opinion testimony."  (*Ibid*.)  A trial court,
however, may not admit an expert opinion based on information
that fails to meet a threshold requirement of reliability.

Untrustworthy evidence should not be presented to the
trier of fact.  (*Chambers v. Mississippi* (1973) 410 U.S. 284, 298.)
And where evidence is so extremely unfair that its admission
violates fundamental conceptions of justice, the high court has
imposed constraints pursuant to the Due Process Clause.  (*Perry
v. New Hampshire* (2012) 565 U.S. 228, 237.)

Furthermore, review should be granted because expert
testimony regarding characteristics of children who have been

16

impacted by sexual abuse is irrelevant and inadmissible because there are no longer misconceptions to correct and there is no evidence that any juror in this case held misconceptions related to how abuse victims should act.

For expert testimony to be admissible, the evidence must be relevant to a disputed material issue that the jury is not capable of resolving on its own.  (Evid. Code, §§ 210, 350, 800, subd. (a); *People v. Bowker*, *supra*, 203 Cal.App.3d at p. 390.)  Expert testimony, explaining that children who delay reporting, recant and provide inconsistent stories are sometimes actually molested, has been held admissible to "disabuse" the jury of this common misconception.  (*Id*. at p. 391.)  To admit such evidence, "it is the People's burden to identify the myth or misconception the evidence is designed to rebut.  Where there is no danger of jury confusion, there is simply no need for the expert testimony."  (*Id*. at p. 394.)

The misconceptions that this sort of testimony has been upheld to refute are no longer present.  Indeed, both courts and commentators have acknowledged, that the public no longer holds the presumed misconceptions this testimony purports to address. (See e.g., *People v. Robbie* (2001) 92 Cal.App.4th 1075, 1086, fn. 1; [the "public misconception" assumption should be reexamined]; Cara Gitlin, Expert Testimony on Child Sexual Abuse Accommodation Syndrome: How Proper Screening Should Severely Limit Its Admission, 26 Quinnipiac L. Rev. 497, 525 (2008) ["There is debate over whether jurors hold such

17

misconceptions about sexual abuse victims; courts do not agree on whether knowledge about how a child sexual abuse victim might respond is within the common understanding of a jury."].)  As the Pennsylvania court recognized in 1992, the reasons why sexually abused children may not immediately come forward to report abuse "are easily understood by lay people and do not require expert analysis."  (*Commonwealth v. Dunkle*, *supra*, 602 A.2d at p. 836; see also *State v. Schimpf* (Tenn. Crim. App. 1989) 782 S.W.2d 186, 194 ["We daily submit to juries the question of whether unlawful sexual activity has occurred.  They routinely return verdicts without the assistance of expert psychological testimony.  Couched in scientific terms as it was, it could only have confused and misled them."]; *State v. Davis*, *supra*, 581 N.E.2d at p. 611 [finding that, where the victim is knowledgeable and competent to testify, CSAAS evidence is inadmissible].)

Accordingly, expert testimony is no longer necessary to explain misconceptions about abuse victims, because such misconceptions are no longer generally held.  The CSAAS evidence was therefore irrelevant and inadmissible.  Since there were no misconceptions about how abuse victims should act, the testimony concerning CSAAS was likely misused by the jury to impermissibly bolster R.D.'s and X.D.'s prior accusations and prove petitioner's guilt.

Moreover, in this case, there was no evidence that any of the jurors held the misconceptions that previously prevailed in our society.  Review should therefore be granted.

**Question 2: Propriety of CALCRIM No. 1193.**

The jury was instructed pursuant to a modified version of CALCRIM No. 1193 as follows: "You've heard testimony from Dr. William O'Donohue and Miriam Wolf, a licensed clinical social worker, about child abuse accommodation theory. [¶] Testimony about this syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [R.D.]'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony." (Opn. at pp. 8-9.)

Petitioner argued on appeal that this instruction effectively instructed the jurors that they may take the CSAAS testimony as evidence of his guilt, thereby lessening the prosecution's burden of proof in violation of his Fifth, Sixth and Fourteenth Amendment rights. (Opn. at p. 9.)

The Court of Appeal disagreed, concluding that CALCRIM No. 1193 is a correct statement of the law and sufficiently advises the jury that the CSAAS evidence may not be used to prove that defendant committed any of the charged crimes. (Opn. at pp. 9-10.) The appellate court found the instruction expressly states that the expert's "testimony about [the syndrome] is not evidence that the defendant committed any of the crimes charged against him." (Opn. at p. 9.) The court also noted that both experts also expressly warned that CSAAS is not a checklist or tool that can be used to say a child was abused. (Opn. at p. 9.) The court also

rejected petitioner's argument that "using the CSAAS evidence as evidence that [R.D.] was 'believable', a use the instruction permitted, is indistinguishable from using it as evidence that [petitioner] committed the crimes charged against him, which is not permissible." (Opn. at pp. 9-10.)

This Court should grant review on Question 2 to resolve an important and related question – whether CALCRIM No. 1193 violates a criminal defendant's Sixth and Fourteenth Amendment rights by creating a reasonable probability that a jury will use CSAAS evidence to assess his or her guilt.

Due process requires the prosecution to prove each element of a charged crime beyond a reasonable doubt. (*In re Winship* (1970) 397 U.S. 358.)

An erroneous instruction may so infect the entire trial that the resulting conviction violates due process. (*Estelle v. McGuire* (1991) 502 U.S. 62, 72.)

Courts admit CSAAS evidence on the theory that it dispels jurors' common misconceptions about how child sexual abuse victims should be expected to behave. (*People v. McAlpin*, *supra*, 53 Cal.3d at pp. 1300-1301.) However, because CSAAS is not a diagnosis, it may not be admitted to prove that sexual abuse actually occurred. (*Ibid*.)

CALCRIM No. 1193 purports to set forth these principles, but does exactly the opposite, allowing jurors to use CSAAS evidence as substantive evidence of guilt. Indeed, the second sentence of the instruction cannot be reconciled with the first

20

sentence. Of course CSAAS evidence is being offered to prove that the sex offense charges are true and that the child was molested. Otherwise, such evidence would be irrelevant and there would be no point in offering it. The prosecution here used the evidence to prove that petitioner committed the charged sex crimes upon R.D.

It is not possible to use testimony to evaluate witnesses whose accounts are the only evidence that petitioner committed the charged offenses, and simultaneously not use the testimony as evidence that he committed those offenses. When the instruction told the jury it could use the CSAAS evidence to evaluate the witnesses' credibility, it eviscerated any limiting effect of telling it the testimony was not evidence that petitioner had committed the charged crimes.

This Court has decried instructions that rely on such mental gymnastics, holding that a jury that considers hearsay to evaluate an expert's opinion has necessarily considered that hearsay for its truth. (*People v. Sanchez* (2016) 63 Cal.4th 665, 684.) Both this Court and the United States Supreme Court have explained that when evidence's value depends on the truth of a predicate fact, the predicate fact has necessarily been admitted for its truth. (*People v. Dungo* (2012) 55 Cal.4th 608, 627 (conc. opn., Werdegar, J.); *Williams v. Illinois* (2012) 399 U.S. 235, 132 S.Ct. at pp. 2256-2257 (conc. opn., Thomas, J.).) Thus, as Justice Kagan explained: "Where a statement's utility is dependent upon its truth, the factfinder must necessarily assess whether the

statement is true." Thus "there is no meaningful distinction between disclosing an out-of-court statement so that the factfinder may evaluate the expert's opinion and disclosing that statement for its truth." (*Williams v. Illinois*, *supra*, 132 S.Ct. at pp. 2268-2269 (dis. opn., Kagan, J.).)

This Court should grant review to determine whether CALCRIM No. 1193 requires the jury to exercise impossible mental gymnastics, thereby violating petitioner's rights to due process and fair trial.

*People v. Gonzales* (2017) 16 Cal.App.5th 494, 503-504, a case the Court of Appeal relied on to hold that CALCRIM No. 1193 does not improperly allow the jury to use CSAAS evidence to determine the defendant's guilt (Opn. at pp. 9, 10), does not adequately address the issues petitioner raises here.

*Gonzales* did not address CALCRIM No. 1193's most problematic statement: the statement that CSAAS testimony may be used to determine if the complainant's behavior "was not inconsistent with" that of a sexual abuse victim. It also glossed over the impossibility of using CSAAS evidence to evaluate the complainant's believability while simultaneously putting that evidence out of mind when assessing the defendant's guilt.

*Gonzales* also failed to mention how the prosecution used the CSAAS testimony, which differentiated it from this case, where the prosecution relied heavily that evidence. Finally, because the complaining witness's testimony was corroborated by eyewitnesses, the *Gonzales* court held that even if it was error to

22

instruct with CALCRIM No. 1193, the error was harmless.  No such conclusion is possible here, where the case turned on the niece's credibility.

This Court should therefore grant review to address the problematic jury instruction on CSAAS evidence.

### Question 3: Admissibility of the alleged victim's forensic interview statements.

Before trial, the prosecutor filed a motion under Evidence Code section 1360 seeking permission to introduce R.D.'s out-of-court statements made during her forensic CALICO interview as statements made by a sexual abuse victim under the age of 12 years.   (Opn. at p. 11.)  Defense counsel moved to exclude the out-of-court statements on the ground they lack sufficient indicia of reliability.   (Opn. at p. 11.)  The court viewed the video of the interview, found the statements reliable, and ruled the statements would be admissible under section 1360 if the alleged victim testified at trial.   (Opn. at p. 11.)  A recording of the interview was played for the jury during the alleged victim's testimony.  (Opn. at p. 11.)

Petitioner argued on appeal that the court prejudicially erred in admitting the out-of-court statements under Evidence Code section 1360.  (Opn. at p. 11.)  He also argued that the introduction of the statements under section 1360 implicated his confrontation rights under the Sixth Amendment. (Opn. at p. 11.)

The Court of Appeal rejected both arguments, concluding there was no error because the statements were reliable and the

23

alleged victim testified at trial and was subject to cross-examination.  (Opn. at pp. 11-14.)

Both courts erred, requiring review.

Evidence Code section 1360 creates an exception to the hearsay rule for a child's statements describing acts of abuse "if all of the following apply: [¶] (1) The statement is not otherwise admissible by statute or court rule. [¶] (2) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability. [¶] (3) The child either: [¶] (A) Testifies at the proceedings. [¶] (B) Is unavailable as a witness, in which case the statement may be admitted only if there is evidence of the child abuse or neglect that corroborates the statement made by the child."  (Evid. Code, § 1360, subd. (a).)

Hearsay, defined as an out-of-court statement by someone other than the testifying witness offered to prove the truth of the matter stated, is generally inadmissible unless it falls under an exception.  (Evid. Code, § 1200, subds. (a), (b); *People v. Roberto V.* (2001) 93 Cal.App.4th 1350, 1367; *People v. Eccleston* (2001) 89 Cal.App.4th 436, 438, 444-445 (*Eccleston*); *People v. Brodit* (1998) 61 Cal.App.4th 1312, 1329 (*Brodit*).)

Here, R.D. testified at trial and the prosecution gave notice to the defense of its intent to use R.D.'s CALICO statements at trial.  Accordingly, the second and third requirements for admissibility were met.  But, the trial court should have excluded the CALICO statements because the content and circumstances

of the statements did not provide sufficient indicia of reliability.

This Court discussed the indicia of reliability requirement in *In re Cindy L.* (1997) 17 Cal.4th 15 and approved a judicially created hearsay exception for child dependency cases (*In re Carmen O.* (1994) 28 Cal.App.4th 908, 921), but clarified and augmented that exception by holding that the proponent of the evidence must meet three requirements before the evidence can be admitted. (*In re Cindy L.*, *supra*, 17 Cal.4th at p. 29.) First, the court must find "that the time, content and circumstances of the statement provides sufficient indicia of reliability." (*Ibid.*) Second, the child must be available for cross-examination or there must be evidence to corroborate the child's hearsay statements. (*Ibid.*) And third, the proponent must provide adequate notice of its intent to use the hearsay evidence. (*Ibid.*) The *In re Cindy L.* court explicitly acknowledged that these requirements were derived, in part, from the statutory requirements now found in Evidence Code section 1360. (*Ibid.* & fn. 7.)

With respect to the indicia of reliability requirement, the *In re Cindy L.* court stated that it would consider the following non-exclusive factors in determining whether the statement was reliable: (1) spontaneity and consistent repetition; (2) mental state of the declarant; (3) use of terminology unexpected of a child of similar age; and (4) lack of motive to fabricate. (*Id.* at pp. 29-30, citing *Idaho v. Wright* (1990) 497 U.S. 805, 821-822.)

Applying these factors, the trial court here erred when it ruled that R.D.'s CALICO statements were reliable.

25

First, the trial court failed to hold an evidentiary hearing to ascertain the pertinent facts to allow it to make an informed decision.  The court merely reviewed a recording of the interview and made its ruling.  This was insufficient.  (Compare *Eccleston*, *supra*, 89 Cal.App.4th at pp. 439-445 [court held an extensive evidentiary hearing before ruling on the admissibility of extrajudicial statements].)

Second, the statements at issue were not spontaneous but were made in response to the CALICO interviewer's questions after R.D. had repeatedly denied sexual abuse or molestation by petitioner.  (1-CT 215-254; see 8-RT 975 [the prosecutor states R.D. made the statements after 40 minutes of saying that nothing happened].)  R.D. did not consistently repeat the allegations.  In fact, she repeatedly denied any molestation of sexual abuse after her CALICO interview and later recanted her CALICO statements when she was interview by Redwood City Police and in her trial testimony.

 Third, there is nothing about R.D.'s mental state at the time she made the statements which indicates the statements were reliable.  In fact, some of R.D.'s claims (i.e. that R.D.'s father witnesses the sexual intercourse and beat up petitioner and that the police were called to the family's residence but did not arrest petitioner because R.D.'s mother would not let them) were outright fantastical and ludicrous.

Fourth, R.D. did not use of terminology unexpected of a child of similar age.  (1-CT 215-273.)  To the extent she described

an ejaculate, masturbation and other sexual acts, she could have been exposed to sexual matter at home because the girls shared the same bedroom with the parents, who watched pornography and had sex while the girls were asleep.  (6-RT 697-700, 712; 7-RT 904-909.)  Also, there is evidence the girls had sex education at school and talked about sex with their friends.  (2-CT 325-328.)

Fifth, R.D. had a motive to fabricate.  She was present during X.D.'s meeting with the substitute teacher during which X.D. made the allegations concerning petitioner's alleged sexual conduct with R.D.  (2-RT 168, 176.)  R.D. was also aware that X.D.'s statements to the teacher led to the police investigation.  R.D. therefore had a motive to fabricate her accusations in order to corroborate X.D.'s statements to the teacher to make sure that X.D. did not get in trouble for lying and making a false report.

Based on the totality of these circumstances, the trial court erred in ruling that R.D.'s CALICO statements were reliable.  The court should have excluded the statements under section 1360.

Because section 1360 is not a firmly rooted exception to the hearsay rule (*Eccleston*, *supra*, 89 Cal.App.4th at 445; *Idaho v. Wright*, *supra*, 497 U.S. at 816, 818) and there is inadequate guaranty of trustworthiness or indicia of reliability of the CALICO statements, their admission violated petitioner's rights under the Confrontation Clause.  (*Ohio v. Roberts* (1980) 448 U.S. 56, 66.)  Indeed, the statements were testimonial for the purpose of the Confrontation Clause because they were given in the course

of an interview or other conversation whose "primary purpose . . .
is to establish or prove past events potentially relevant to later
criminal prosecution." (*People v. Rangel* (2016) 62 Cal.4th 1192,
1214; *Ohio v. Clark* (2015) 576 U.S. 237, 249.)

R.D.'s CALICO statements were also inadmissible under
Evidence Code section 1235.  (See Question 4, *post*.)

The CALICO statements are undoubtedly prejudicial
because, without them, there is no evidence to substantiate the
charges.  Indeed, during her closing and rebuttal arguments, the
prosecutor extensively relied on R.D.'s CALICO statements and
re-played a recording of some of the statements to the jury.  (8-RT
973, 975-976, 980-983, 988-1010; 9-RT 1086-1089.)  Petitioner's
guilt was contested and is susceptible to dispute.

Review should therefore be granted.

### Question 4:  The prosecutor's presentation of the alleged victim's false trial testimony.

Petitioner argued on appeal that the prosecutor violated his
constitutional rights to confrontation and due process by
knowingly introducing false testimony from R.D. that he did not
abuse her, in order to admit her prior out-of-court statements in
which she related the alleged abuse.  (Opn. at p. 14.)  The Court
of Appeal rejected the argument, concluding that petitioner was
not prejudiced by the "false" testimony.  Further, although the
prosecutor anticipated that R.D. might recant, admission of her
out-of-court statements under Evidence Code section 1360 did not
require that she recant.  It required only that she testify.  Had

she testified to abuse by defendant the CALICO interview would have corroborated her testimony.  Because the admissibility of her CALICO interview was not dependent on her giving false testimony, defendant was not prejudiced by her testimony in his favor.  (Opn. at p. 14.)

Both courts erred, requiring review.

Under the Fourteenth Amendment's Due Process Clause, "[a] defendant's due process rights are violated if the prosecutor knowingly presents false testimony."  (*In re Masters* (2019) 7 Cal.5th 1054, 1089; *People v. Vines* (2011) 51 Cal.4th 830, 873; *Mooney v. Holohan* (1935) 294 U.S. 103, 122.)

While this Court has concluded that mere inconsistencies between a witness's testimony and prior statements do not prove falsity of the testimony (*People v. Vines*, *supra*, 51 Cal.4th at p. 874), and a prosecutor may present conflicting testimony and let the jury make a determination as to the witness's credibility (*In re Masters*, *supra*, 7 Cal.5th at p. 1089), due process and the Sixth Amendment rights to confrontation and cross-examination preclude a prosecutor from knowingly introducing false testimony in order to admit a witness's prior statements.

In *California v. Green* (1970) 399 U.S. 149 (*Green*), the High Court ruled that newly enacted Evidence Code section 1235 did not on its face violate the Sixth Amendment right to confrontation and cross-examination.

Since *Green* was decided California courts have interpreted and expanded section 1235 to include as "inconsistent

29

statements" any testimony which the jury might not believe –
"implied" inconsistent statements – and allows the prosecutor to
knowingly elicit "false" or "perjured" testimony for purposes of
admitting extrajudicial statements.  (*People v. Freeman* (1971) 20
Cal.App.3d 488, 495 [prosecutors can "intentionally bring[] in the
declarant for the purpose of eliciting a predictably false version . .
. to open the door to a second witness with a conceivably reliable
indicator of the actual events"]; *id*. at p. 495 [this approach "is not
misusing section 1235 but utilizing it for the very purpose it is
designed to fulfill" and "conforms to the letter and spirit of section
1235"].)

     While *Green* has created a broad Sixth Amendment
confrontation-cross-examination rule, which authorizes
admissibility of a witness's out-of-court statements so long as
there is an opportunity to cross-examine the witness, the High
Court has not authorized prosecutors to solicit false testimony or
perjury or allowed witnesses to give false testimony or commit
perjury so that their out-of-court statements may be admitted
against the defendant.  (See also *Crawford v. Washington* (2004)
541 U.S. 36, 59 (*Crawford*); *United States v. Owens* (1988) 484
U.S. 554, 564 (*Owens*).)

     The *Owens-Crawford* line of cases do not stand for the
proposition that a declarant's mere appearance at trial suffices to
introduce the declarant's out-of-court statements.  Indeed, in
*Owens*, the Court expressly noted that "[o]rdinarily a witness is
regarded as 'subject to cross-examination' when he is placed on

the stand, *under oath*, and *responds willingly* to questions."
(*Owens*, *supra*, 484 U.S. at p. 561, italics added.)

Further, after *Owens*, the High Court reaffirmed that "[t]he
central concern of the Confrontation Clause is to ensure the
reliability of the evidence against a criminal defendant by
subjecting it to rigorous testing in the context of an adversary
proceeding before the trier of fact."  (*Maryland v. Craig* (1990)
497 U.S. 836, 845.)  "[T]he right guaranteed by the Confrontation
Clause . . . 'insures that the witness will give his statements
*under oath* – thus impressing him with the seriousness of the
matter and guarding against the lie by the *possibility of a penalty
for perjury*."  (*Id*. at pp. 845-846, quoting *Green*, italics added.)

The oath and respect for that oath by the trial participants
(court, prosecutor, defense counsel and witnesses) is an essential
component of the Sixth Amendment right to confrontation and
cross-examination.  The Sixth Amendment, therefore, prohibits a
prosecutor from soliciting false testimony and/or perjury in order
to admit a witness's prior out-of-court statements.  Furthermore,
due process prohibits prosecutors from knowingly introducing
false testimony or perjury.

The Sixth Amendment rights to confrontation and cross-
examination are meaningless if the oath is meaningless to the
witness.  Further, when it becomes clear to a witness from trial
court action or inaction that false testimony or perjury will not be
inquired into or is acceptable, the witness is given a "green light"
to continue to give false or perjured testimony.

31

Just as "[i]t would seem strange . . . to assert that a witness can avoid introduction of testimony from a prior proceeding that is inconsistent with his trial testimony . . . by simply asserting lack of memory of the facts to which the prior testimony related" (*Owens*, *supra*, 484 U.S. at p. 563), it would be even stranger to allow prosecutors to solicit false testimony or perjury or allow witnesses to give false testimony or commit perjury so that they may admit the perjurer's out-of-court statements, with court's turning a blind eye to this practice which strikes at the heart of Sixth Amendment and constitutional right to a fair trial.

Here, the prosecutor solicited false testimony and perjury from R.D. in order to admit her prior CALICO statements. Indeed, from the prosecutor's perspective, the more R.D. lied, the better the chance her out-of-court statements would be admitted into evidence under Evidence Code section 1235.

The trial court admitted R.D.'s CALICO statements based on her recantation of the statements in her trial testimony. But, there was no express finding by the court that R.D.'s recantation or "I don't remember" answers were false testimony. Further, the court failed to undertake any action or to admonish R.D. of her duty to tell the truth. R.D. could only construe the trial court's inaction and the prosecutor's continued questioning as a "green light" to keep lying with impunity.

R.D.'s lies and perjury led to the admissibility of her out-of-court CALICO statements, and those statements are prejudicial. (See Argument III, *ante*.) Review should therefore be granted.

## Question 5:  Cumulative Prejudice.

Petitioner unsuccessfully argued on appeal that even if the errors addressed in the previous arguments were harmless individually, they combined to cumulatively deprive him of his right to a fair trial.  (Opn. at p. 14, fn. 6.)  He hereby reasserts the cumulative prejudice argument.

The trial errors demonstrated in Questions 1 through 4 jointly infected petitioner's trial with unfairness thereby making his convictions a denial of federal due process.  (*Taylor v. Kentucky* (1978) 436 U.S. 478, 487; *Parle v. Runnels* (9th Cir. 2007) 505 F.3d 922, 927-928 [clearly established federal constitutional principle]; *People v. Hill* (1998) 17 Cal.4th 800, 844 [federal and state law]; *People v. Cuccia* (2002) 97 Cal.App.4th 785, 795 ["The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.'"].)

Here, petitioner was denied a fair trial because the trial court: (1) erroneously failed to exclude the CSAAS evidence (Question 1, *ante*); (2) gave an erroneous jury instruction on the CSAAS evidence (Question 2, *ante*); (3) and erroneously allowed the prosecution to introduce unreliable out-of-court statements made by R.D. in her CALICO interview (Questions 3 & 4, *ante*). It cannot be concluded beyond a reasonable doubt that the errors did not jointly affect the guilty verdicts or that the guilty verdicts rendered are surely unattributable to the errors.  It is also reasonably probable that petitioner would have obtained a more favorable result in the absence of the errors.  Review is required.

**Question 6: The *Dueñas* ability-to-pay issue.**

Petitioner unsuccessfully argued based on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 that the imposition of statutory assessments and fine without first determining that he had the ability to pay them violated his right to due process. (Opn. at pp. 18-19.)

Review should be granted because the *Dueñas* issues are currently pending before this Court and their outcome will affect petitioner's case. (See *People v. Kopp* (2019) 38 Cal.App.5th 47, 98-98, review granted Nov. 13, 2019, S257844.)

## CONCLUSION

For the above reasons, review should be granted to decide important issues of law and to guarantee petitioner his constitutional rights.

Dated: January 10, 2022        Respectfully submitted,


 */s/ Waldemar D. Halka*
Waldemar D. Halka
Attorney for Defendant and
Appellant Rember Genaro Molina

34

## CERTIFICATE OF WORD COUNT

I, Waldemar D. Halka, counsel for appellant/petitioner, certify pursuant to the California Rules of Court, that the word count for this petition is 6,552 words.  This document was prepared in WordPerfect X7, and this is the word count generated by the program for this document.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed, at San Diego, California, on January 10, 2022.

/s/ *Waldemar D. Halka*
Waldemar D. Halka
Attorney for Defendant and
Appellant Rember Genaro Molina

## DECLARATION OF SERVICE

I, Waldemar D. Halka, declare under penalty of perjury I am over 18 years of age; I am not a party to the action herein; my business address is P.O. Box 99965, San Diego, California 92169. I caused to be served a copy of the following document to each of the parties listed below:

### PETITION FOR REVIEW
*People v. Molina* - **A155785**

Rember Genaro Molina (CDCR # BH6781)     **Defendant-Appellant**
Sierra Conservation Center
5150 O'Byrnes Ferry Road
Jamestown, CA 95327

Each of said copies was sealed and deposited in the United States mail on January 10, 2022, with proper postage affixed thereto and fully prepaid.

Furthermore, on January 10, 2022, I served the same document by transmitting a .PDF version via electronic mail through the **TrueFiling** docketing system on:

**Clerk of Court of Appeal, First Appellate District, Div. Four**

**Hon. Joseph Scott, Judge**
**c/o Clerk of San Mateo County Superior Court**

**First District Appellate Project**

**Office of the Attorney General of California**

**San Mateo County District Attorney**

Executed under penalty of perjury at San Diego, California, on January 10, 2022.

　/s/ *Waldemar D. Halka*　
Waldemar D. Halka

36

APPENDIX "A"

UNPUBLISHED OPINION OF THE COURT OF APPEAL

Court of Appeal, First Appellate District
Charles D. Johnson, Clerk/Executive Officer
Electronically FILED on 12/8/2021 by C. Hoo, Deputy Clerk

Filed 12/8/21

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>REMBER GENARO MOLINA,<br><br>Defendant and Appellant. | A155785<br><br>(San Mateo County<br>Super. Ct. No. 17SF002494) |

Defendant Rember Genaro Molina appeals a judgment convicting him of sexually abusing his niece, who was under the age of 10 at the time the crimes were committed. On appeal, defendant challenges the admissibility of expert testimony on the child sexual abuse accommodation syndrome and argues that the jury instruction incorrectly permitted the jury to find him guilty based on the expert's testimony. He also challenges the admissibility of the child's out-of-court statements regarding the abuse.

We find no evidentiary or instructional error. We also reject defendant's argument that various fees and fines were imposed in violation of his right to due process. Defendant argues correctly, however, that he was improperly convicted of both continuous sexual abuse under Penal Code[1] section 288.5 and the specific sex offenses involving the child during the same time period.

_____

[1] All statutory references are to the Penal Code unless otherwise noted.

He has also identified several sentencing errors that must be corrected. Accordingly, we shall vacate defendant's conviction under section 288.5, correct his sentence on several of the remaining counts, and affirm the judgment in all other respects.

## Background

Defendant was charged by information with 10 counts arising out of his sexual abuse of R.D. between May 28, 2010 and May 27, 2016. Specifically, defendant was charged with sexual intercourse with a child 10 years of age or younger (§ 288.7, subd. (a) – count 1); sexual penetration of a child 10 years of age or younger (§ 288.7, subd. (b) – count 2); five counts of commission of a forcible lewd or lascivious act upon a child under 14 years (§ 288, subd. (b)(1) – counts 3, 5, 7, 8 and 9)[2]; two counts of attempted sexual penetration of a child 10 years of age or younger (§§ 664, 288.7, subd. (b) – counts 4, 6); and one count of continuous sexual abuse of a child under 14 years of age (§ 288.5, subd. (a) – count 10). Four of the five forcible lewd act charges (counts 3, 5, 7 & 8) and the continuous sexual abuse charge (count 10) included allegations that defendant had substantial sexual conduct with the child (§ 1203.066, subd. (a)(8)).

Trial testimony established that R.D. lived with her mother, father and two siblings. Defendant, her uncle, would often spend several nights a week at their home. In September 2016, R.D.'s older sister disclosed to a teacher that defendant inappropriately touched R.D. This disclosure led to a police investigation. As part of the investigation R.D. was interviewed at the county's Child Abuse Listening, Interviewing, and Coordination Center

---

[2] At the prosecutor's request, the five counts of forcible lewd acts under section 288, subdivision (b) were reduced at trial to five counts of nonforcible lewd or lascivious acts under section 288, subdivision (a).

(CALICO). Transcripts of the interviews were introduced at trial during R.D.'s testimony.

R.D., who was eight years old at the time of the interview, began by saying that her uncle was really nice to her. She knew that she was being interviewed because of things her sister had told the teacher. She expressed concern that she and her siblings would be removed from her parents' home because of the disclosures. She explained that her mother had told her and her sister to talk only to her and that if they said "something wrong," they would be taken away from their family. After being reassured by the interviewer that the interviewer was trying to keep R.D. safe, not remove her from her home, R.D. reported six incidents in which defendant sexually abused her.

The first occasion that R.D. could remember, she and defendant were "covered up with the blanket" on the bed in the bedroom. Defendant grabbed her shorts and underwear and pulled them down. He tried to put his finger inside her but she screamed and her mother and sister came in and defendant left. Another time, when she was seven, she awoke to find defendant reaching under her pants and underwear with his hand. He "tried to go inside [her] private part," but she slapped him and "kicked him out." On a different occasion when she was still seven years old, defendant pulled her pants and underwear off and touched her inside her "private part" with his finger. She told him to stop but "he didn't care, he just did it." On another occasion, while covered with a blanket watching a movie on the couch, defendant took his pants and underwear off and dropped her hand on his penis. On a separate occasion, defendant grabbed her hand and put it on top of his penis. It felt "round" and "wet." She saw defendant "shaking it" and "white stuff started to come out." Finally, on one occasion defendant took his

pants and underwear off and stood in front of her as she sat on the couch. He held her legs up and penetrated her vagina with his penis.

After describing several of the incidents, R.D. also described how either her mother, sister or father was there and stopped the abuse. She also reported that she told her mother after several incidents, and her mother ordered defendant out of the house. Somewhat confusingly, she told the interviewer that after each incident, defendant left and she "never saw him again."

Shortly after her interview, R.D. spoke with a police investigator and told the investigator that everything she had reported was not "actually true." R.D.'s interview with the police investigator was recorded and played for the jury. In the recording, when asked about her descriptions of the incident in which defendant penetrated her on the couch, R.D. said, "It wasn't true, um, because I made it up." When asked why she would make it up, she said, "I don't know. [¶] . . . [¶] It just flew out my [*sic*] mind for no reason."

At trial, R.D., who was then 10 years old, testified that defendant is her favorite uncle and that he has never made her feel uncomfortable or touched her inappropriately. She claimed not to remember telling the interviewer about the incidents she had described previously. After the recording of her CALICO interview was played, R.D. said that she still did not remember telling the interviewer about the incidents and testified that the incidents did not happen. She testified that the things she had said were not true, she was sad that she had said them and that she wished she could take them back.

R.D.'s parents and older sister all testified that the older sister's initial report to her teacher was based on a misunderstanding. Defendant had kicked a ball towards R.D., hitting her near her "private part" so he rubbed the area to make her feel better. The older sister also testified that she was

present when defendant held R.D.'s hand near his penis. He and R.D. had
been playing and R.D. punched defendant in his penis. When R.D. went to hit
him again, he covered his penis with his hand. He was holding her hand but
not forcing her to touch him. R.D.'s mother testified that her daughters had
reported other incidents to her, but explained, "When I talked to them and I
asked them, 'Are you certain that he really did touch you?' they finally told
me, 'No, Mom.' Because, honestly, they lie about many things. And that's why
I asked them again if it was true that he had touched them; and then, after
that, they told me, 'No, Mom.' "

Two experts testified about the child sexual abuse accommodation
syndrome (CSAAS or the syndrome). The prosecutor's expert testified that
the syndrome sets forth several behaviors commonly observed in children
who report abuse that adults might not understand. She explained that the
syndrome provides a "way of organizing the conversation" about child sexual
abuse, but it does not operate "as a checklist to say, 'Yes, this kid's sexually
abused or not sexually abused.' " As relevant here, she testified that
sometimes a child might be inconsistent in relating details of the abuse and
might include "implausible or fantastical" details in her report. Also, a child
might disclose abuse and later recant if the child experiences the
consequences of disclosure or if they have "poor maternal support."

Defendant's expert testified that was based on the initial author's
observations, not empirical evidence, and that, as such, it has no "positive use
. . . at all." He explained that the behaviors addressed in the syndrome could
be present in a false allegation as well as a true allegation. He also cited
studies that showed that 97 percent of children making true allegations of
sexual abuse were consistent in describing the "core" details, 94 percent did
not include "fantastical" details, and only 4 percent of children making true

allegations recanted. He also emphasized that CSAAS theory was not intended to be "used in courtrooms to try to distinguish true allegations from false allegations" and that the theory does not have "discriminating power to differentiate true allegations from false allegations."

Defendant was convicted of all charges. The jury also found the allegations of substantial sexual conduct true.

Defendant was sentenced to 50 years to life in prison. Defendant timely filed a notice of appeal.

## Discussion

1.  *The court did not abuse its discretion by admitting CSAAS evidence.*

In *People v. McAlpin* (1991) 53 Cal.3d 1289, the California Supreme Court approved a series of appellate decisions establishing that while "expert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident . . . is inconsistent with his or her testimony claiming molestation." (*Id.* at pp. 1300–1301 & fn. 4.)

Before trial, the defense filed a motion "to exclude certain evidence of myths and child accommodation syndrome and testimony on characteristics of molest victims." The prosecution filed a competing motion to authorize introduction of such evidence. The court permitted introduction of the expert testimony, "with the proviso that the expert will not render any opinion as to whether the victim was actually molested in this case . . . and not to render any opinion that the [alleged victim] suffers from the accommodation syndrome."

On appeal, defendant argues that admission of expert testimony on the syndrome violates the *Kelly/Frye* rule,[3] which requires that the proponent of " 'expert testimony based on a new scientific technique . . . establish the reliability of the method and the qualifications of the witness" before the evidence is admitted. (*People v. Munch* (2020) 52 Cal.App.5th 464, 472.) He also argues that the evidence is irrelevant because jurors no longer harbor misconceptions that need correcting regarding how child victims of sexual abuse behave. Finally, he argues that the evidence was more prejudicial than probative and should have been excluded under Evidence Code section 352.

Initially, we reject defendant's argument that the expert testimony is subject to the *Kelly/Frye* rule. Defendant acknowledges that several California courts have rejected his argument. (See, e.g., *People v. Munch*, *supra*, 52 Cal.App.5th at p. 472 [*Kelly/Frye* rule does not apply to expert testimony regarding CSAAS]; *People v. Harlan* (1990) 222 Cal.App.3d 439, 449 [same]; *People v. Gray* (1986) 187 Cal.App.3d 213, 218–219 [same].) Nonetheless, defendant argues that these decisions are based on a misreading of precedent. We disagree.

The expert testimony concerning CSAAS admitted in the present case was not "*new* experimental scientific evidence ' "not previously accepted in court." ' " (*People v. Munch*, *supra*, 52 Cal.App.5th at p. 472.) The CSAAS evidence defendant challenges "has been ruled to be properly admitted by the courts of this state for decades." (*Ibid.*, citing *People v. McAlpin*, *supra*, 53 Cal.3d at pp. 1300–1301.) As noted above, the evidence was not being used as scientific proof that a child had, in fact, been abused. Rather, the evidence was admitted under Evidence Code section 801 because it is " [r]elated to a

---

[3] *Frye v. United States* (D.C. Cir. 1923) 293 Fed. 1013, 1014; *People v. Kelly* (1976) 17 Cal.3d 24, 30.

subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' " (*People v. McAlpin, supra,* 53 Cal.3d at p. 1299.) Such expert testimony meets "traditional standards for competent expert opinion, without need for additional screening procedures" under *Kelly/Frye.* (*People v. Stoll* (1989) 49 Cal.3d 1136, 1161.) Moreover, as noted in *People v. Munch,* defendant has ample means to challenge the validity of this expert testimony by cross-examination on the source materials and studies on which the expert relies. (52 Cal.App.5th at p. 473.) Here, defendant's attorney extensively cross-examined the prosecution's expert and introduced contrary testimony by defendant's own expert witness.

Similarly, while we acknowledge that courts in other jurisdictions have recognized that changes in public perception of the victims of child sexual abuse have questioned and even undermined the rationale for the admission of CSAAS evidence (see fn. 4, *post*), we are bound by the California Supreme Court's decision in *People v. McAlpin, supra,* 53 Cal.3d 1289. (See also *People v. Brown* (2004) 33 Cal.4th 892, 906; *People v. Perez* (2010) 182 Cal.App.4th 231, 245.)

Finally, insofar as expert testimony is admissible under California law to explain why child victims of sexual abuse might recant or include fantastical details in their reports of abuse, the testimony by the prosecution's expert was highly probative given the facts of this case. The court did not abuse its discretion under Evidence Code section 352 in admitting the expert testimony.

2. *The jury was properly instructed on the use of CSAAS evidence under CALCRIM No. 1193.*

The jury was instructed pursuant to a modified version of CALCRIM No. 1193 as follows: "You've heard testimony from Dr. William O'Donohue and Miriam Wolf, a licensed clinical social worker, about child abuse

accommodation theory. [¶] Testimony about this syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [R.D.]'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

Defendant contends that the instruction "effectively instructs the jurors that they may take [the CSAAS] testimony as evidence of the defendant's guilt" thereby lessening "the prosecution's burden of proof in violation of [his] Fifth, Sixth and Fourteenth Amendment rights." He argues, "The problem with the modified CALCRIM No. 1193 is that it . . . is worded entirely in terms of the purposes for which the jury can use the testimony; it does not say that there is any purpose for which they cannot use it." We disagree. The pattern instruction expressly states that the expert's "testimony about [the syndrome] is not evidence that the defendant committed any of the crimes charged against him." Both experts also expressly warned that CSAAS is not a checklist or tool that can be used to say a child was abused.

Defendant also asserts that "using the CSAAS evidence as evidence that [R.D.] was 'believable', a use the instruction permitted, is indistinguishable from using it as evidence that [defendant] committed the crimes charged against him, which is not permissible." This argument has repeatedly been rejected by other courts. (See *People v. Munch*, *supra,* 52 Cal.App.5th at p. 474; *People v. Gonzales, supra*, 16 Cal.App.5th at p. 504.) In *Munch*, defendant made the argument that CALCRIM No. 1193 " 'effectively instructs the jury that they may take [the expert's] testimony as evidence of the defendant's guilt' " because "instructing jurors that they may use it 'in evaluating the believability' of the child's testimony means they will improperly use it to find the defendant is guilty." (52 Cal.App.5th at p. 474.)

The court disagreed, explaining, " 'The purpose of CSAAS is to understand a child's reactions when they have been abused. [¶] A reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [the expert's] testimony to conclude that [the child's] behavior does not mean she lied when she said she was abused. The jury also would understand it cannot use [the expert's] testimony to conclude [the child] was, in fact, molested. The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior. Thus, under CALCRIM No. 1193, a juror who believes [the expert's] testimony will find both that [the child's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested. There is no conflict in the instruction.' " (*Ibid.*, quoting *People v. Gonzales, supra*, 16 Cal.App.5th at p. 504.) We agree that CALCRIM No. 1193 is a correct statement of the law and sufficiently advises the jury that the syndrome evidence may not be used to prove that defendant committed any of the charged crimes. Nothing in the instruction permits the jury to conclude that because the victims' behavior is consistent (or not inconsistent) with that of other child victims of sexual assault, defendant necessarily committed such abuse.[4]

---

[4] This court noted in a recent, unrelated unpublished decision that "[a]lthough the instruction is literally accurate and consistent with prior decisions of California courts, we do perceive a possibility of it being misunderstood. We suggest that consideration be given to modifying CALCRIM No. 1193 to incorporate explicit language drawn from CALJIC No. 10.64 or from the CSAAS instruction given in New Jersey before the New Jersey Supreme Court limited use of CSAAS evidence (see *State v. J.L.G.* (2018) 234 N.J. 265), both of which tend to make the distinction between the proper and improper use of the evidence somewhat clearer. The limitations on the use of child sexual abuse accommodation evidence thoughtfully discussed in the New Jersey opinion also merits careful consideration by our Supreme Court." (*People v. Reconco* (Oct. 18, 2021, A157670) [nonpub. opn.].) We reiterate our concern.

3.  *The trial court did not abuse its discretion in admitting into evidence R.D.'s CALICO interview.*

Before trial, the prosecutor filed a motion under Evidence Code section 1360 seeking permission to introduce R.D.'s out-of-court statements made during her CALICO interview as statements made by a sexual abuse victim under the age of 12 years. Defense counsel moved to exclude the out-of-court statements on the ground they lack sufficient indicia of reliability. The court viewed the video of the interview, found that R.D.'s CALICO statements were "reliable" and, therefore, would be admissible under section 1360 if R.D. testified. As set forth above, a recording of R.D.'s interview was played for the jury during her testimony.

On appeal, defendant contends the court erred in admitting R.D.'s out-of-court statements under Evidence Code section 1360. This section creates a limited exception to the hearsay rule for a child's statements describing acts of abuse "if all of the following apply: [¶] (1) The statement is not otherwise admissible by statute or court rule. [¶] (2) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability. [¶] (3) The child either: [¶] (A) Testifies at the proceedings. [¶] (B) Is unavailable as a witness, in which case the statement may be admitted only if there is evidence of the child abuse or neglect that corroborates the statement made by the child." (Evid. Code, § 1360, subd. (a); *People v. Brodit* (1998) 61 Cal.App.4th 1312, 1327.) Despite defendant's argument to the contrary, the introduction of R.D.'s statements under Evidence Code section 1360 did not implicate his confrontation rights under the 6th Amendment. (*People v. Stevens* (2007) 41 Cal.4th 182, 199, citing *Crawford v. Washington* (2004) 541 U.S. 36, 59, fn. 9 ["The Sixth Amendment confrontation clause does not bar hearsay statements of a witness who testifies at trial and is subject to cross-

examination."].) Because the determination under section 1360 is purely a matter of state evidentiary law, questions of admissibility are reviewed for abuse of discretion. (See *People v. Waidla* (2000) 22 Cal.4th 690, 725.)

Initially, defendant contends the court erred by failing to hold an evidentiary hearing to determine the reliability of the statements. The statute, however, requires only that the court conduct a hearing outside the presence of the jury to determine the reliability of the statements. Here, the court watched the interview and counsel argued regarding its admissibility. Defendant did not proffer any additional evidence on the admissibility issue. Nor has defendant suggested in his appellate briefs what additional evidence might have been submitted. Hence, there was no violation of the statutory requirement.

Defendant also contends the court erred in admitting the statements "because the content and circumstances of the statements did not provide sufficient indicia of reliability." In determining whether a statement is reliable, California courts may consider the following nonexclusive factors: "(1) spontaneity and consistent repetition; (2) mental state of the declarant; (3) use of terminology unexpected of a child of similar age; and (4) lack of motive to fabricate." (*People v. Brodit, supra*, 61 Cal.App.4th at p. 1330, citing *In re Cindy L.* (1997) 17 Cal.4th 15, 29–30.) Based on the totality of the circumstances, the trial court reasonably found R.D.'s statements reliable.

While the statements were made during the CALICO interview, they were made in response to open-ended questions. The details of the abuse were provided by R.D., not the interviewer. The statements were spontaneous in that R.D. only disclosed the abuse after the interviewer indicated the interview was over: "Well, I don't have any more questions for you. And if there's nothing else you wanna talk to me about, whenever you're ready we

can go out and see your family." Some of the details R.D. provided involved sexual content beyond what a child that age would be expected to have been exposed to, and she used age-appropriate words to describe those details. Finally, the record established that R.D. did not have a motive to fabricate the abuse. To the contrary, R.D. indicated she was fond of defendant and was hesitant to say anything because she was afraid she would be taken from her mother. She disclosed the abuse only after the interviewer assured her that the interviewer's job was to make sure she was safe and not to remove her from her family.

Defendant's arguments to the contrary are not persuasive. The fact that some of her statements regarding her parents and sister stopping the abuse might have been fantastical does not establish that all of her statements are necessarily unreliable. Similarly, the fact that R.D. recanted her statements shortly after returning to her mother's care does not necessarily render the statements unreliable. Defendant speculates that R.D. might have lied to the interviewer "in order to corroborate [her sister's] statements to the teacher to make sure [her sister] did not get in trouble for lying," but nothing in her statement supports this claim. Defendant's speculation that R.D.'s description of "ejaculate, masturbation and other sex acts" could have been based on her exposure to sexual matter at home is based on trial testimony received well after the evidentiary ruling in question. In any event, R.D.'s exposure to sexual content at home was evidence the jury could consider in evaluating the believability of her statements but does not necessarily render her CALICO interview unreliable.

Accordingly, the trial court did not abuse its discretion in admitting into evidence R.D.'s CALCIO interview.[5]

4. *Defendant's rights were not violated by the presentation of R.D.'s "false" trial testimony.*

Defendant makes the surprising contention that the prosecutor violated his constitutional rights to due process and confrontation by knowingly introducing false testimony from R.D. that he did not abuse her, in order to admit her CALICO interview. Less surprising, defendant did not object to R.D.'s testimony at trial or argue that her testimony was false. In any event, defendant's argument fails because he was not prejudiced by the testimony he now claims to have been false. Moreover, although the prosecutor anticipated that R.D. might recant, admission of her CALICO interview under section 1360 did not require that she recant. It required only that she testify. Had she testified to abuse by defendant the CALICO interview would have corroborated her testimony. Because the admissibility of her CALICO interview was not dependent on her giving false testimony, defendant was not prejudiced by her testimony in his favor.[6]

---

[5] As noted, Evidence Code section 1360 contains the rather odd provision that it applies only if the evidence is not admissible under another rule or statutory provision. (Evid. Code, § 1360, subd. (a)(1).) At trial, defendant argued that R.D.'s interview was not admissible under Evidence Code section 1235, and on appeal makes no argument that the interview was not admissible under section 1360 because it was admissible under some other section. Needless to say, it is not necessary to decide whether defendant was correct that the interview was inadmissible under section 1235 because either way the evidence was properly received.

[6] In light of this conclusion, we need not address defendant's additional argument that Evidence Code section 1235 improperly allows a prosecutor to use "deliberate perjury" to admit a prior unsworn statement. For the same reason, we need not reach defendant's argument that reversal is required under section 1473, subdivision (b)(1), which authorizes a defendant to file a

5. *Defendant's conviction for continuous sexual abuse of a child must be vacated.*

Defendant was charged and convicted under count 10 with the continual sexual abuse of R.D. on or between May 28, 2010 and May 27, 2016, and charged and convicted under counts 1 through 9 with individual sex crimes committed during the same time period. On appeal, defendant contends his convictions violate section 288.5, subdivision (c), which prohibits dual convictions for continuous sexual abuse and additional sex offenses involving the same victim during the same period.[7]

The Attorney General concedes the case was prosecuted in violation of section 288.5, subdivision (c), but argues defendant forfeited his right to invoke that provision because he did not demur to the charges below. We disagree.

The Attorney General relies on *People v. Goldman* (2014) 225 Cal.App.4th 950, 956–957 (*Goldman*), in which the court held a violation of section 288.5, subdivision (c) is a pleading defect that must be challenged by

_____

petition for writ of habeas corpus on the ground that "[f]alse evidence that is substantially material or probative on the issue of guilt or punishment was introduced against a person at a hearing or trial relating to the person's incarceration." Putting aside the Attorney General's argument that section 1473 is not applicable in a direct appeal, defendant's guilt was not dependent in this case on R.D.'s false testimony. Finally, having found no substantive error with regard to defendant's convictions, we reject defendant's cumulative error argument.

[7] Section 288.5, subdivision (c) provides in relevant part that when the defendant is charged with continuous sexual abuse of a child, "[n]o other act of substantial sexual conduct [including sexual intercourse or lewd acts] involving the same victim may be charged in the same proceeding . . . unless the other charged offense occurred outside the time period [alleged with respect to the continuous sexual abuse charge] or the offense is charged in the alternative."

demurrer to preserve the issue for appeal. *Goldman*, however, is factually distinguishable. There, the information alleged only a one-month overlap between the period covered by the continuous sexual abuse and that of the specific sexual offense. (*Id.* at p. 955.) Here, the period alleged in count 10 encompassed all the dates alleged in counts 1 through 9. While the defect in *Goldman* could have been corrected by amendment, the same is not true in this case. More importantly, we disagree with the *Goldman* court that section 288.5, subdivision (c) is merely a "charging prohibition." (*Id.* at p. 956.) As the Supreme Court explained in *People v. Johnson* (2002) 28 Cal.4th 240, 245–248, by prohibiting multiple charges, section 288.5, subdivision (c) also prohibits multiple convictions for continuous sexual abuse of a child and for the discrete sexual offenses underlying the continuous sexual abuse conviction. (See also *People v. Bautista* (2005) 129 Cal.App.4th 1431, 1436 [interpreting *Johnson* to preclude multiple convictions under those circumstances]; *People v. Torres* (2002) 102 Cal.App.4th 1053, 1055 [same]; *People v. Rojas* (2015) 237 Cal.App.4th 1298, 1308–1309 [same].) Thus, defendant's challenge to the propriety of his convictions under section 288.5, subdivision (c) is not forfeited by the failure to raise the objection at the pleading stage.

In *People v. Johnson*, *supra*, 28 Cal.4th at page 245, the court agreed that where a defendant is erroneously convicted of both continuous sexual abuse and individual sexual offenses against a child taking place during the same time period, "either the continuous abuse conviction or the convictions on the specific offenses must be vacated." In *People v. Torres*, *supra*, 102 Cal.App.4th at page 1059 the court concluded the appropriate remedy, "in deciding which convictions to vacate . . . for a violation of the proscription against multiple convictions set forth in section 288.5, subdivision (c) [is to]

leave appellant standing convicted of the alternative offenses that are most commensurate with his culpability." Despite wide acceptance by appellate courts of the *Torres* remedy (see, e.g., *People v. Wilson* (2019) 33 Cal.App.5th 559, 574; *People v. Rojas, supra*, 237 Cal.App.4th at pp. 1308–1309; *People v. Bautista, supra*, 129 Cal.App.4th at p. 1437), defendant asserts that all of his "convictions should be reversed and the case remanded to allow the prosecution to retry the case or, if the prosecution chooses not do so, for the trial court to reinstate the section 288.5 conviction only." We believe the *Torres* approach is sound and that given the number and seriousness of the individual convictions, the appropriate remedy is to reverse the conviction for violating section 288.5. Accordingly, we shall vacate defendant's conviction on count 10.

6. *Defendant's sentence must be correct and the abstract of judgment must be amended on remand.*

As set forth above, defendant was initially charged in counts 3, 5, 7, 8 and 9 with violations of section 288, subdivision (b) but the charges were reduced before the case was submitted to the jury. (See fn. 2, *ante.*) Accordingly, defendant was convicted under counts 3, 5, 7, 8 and 9 with having violated section 288, subdivision (a). The parties agree that the court improperly sentenced defendant to the low term of five years on each count as if he had been convicted under section 288, subdivision (b), rather than the low term of three years which is applicable to violations of section 288, subdivision (a). We agree with the parties that the proper remedy is to correct defendant's sentence to reflect imposition of consecutive three-year terms on each of these counts and to amend the abstract of judgment to reflect the new terms. At the same time, the abstract shall be amended to remove the incorrect notation that the sentence on count 3 is stayed.

The parties agree that the abstract also must be amended as to counts 4 and 6, under which defendant was convicted of attempted sexual penetration. For each count the court imposed the "lower term" without stating the term of years and stayed execution of sentence under section 654. On remand, the abstract shall be amended to reflect imposition of the lower term of five years each for counts 4 and 6 with a stay of execution imposed under section 654.

Finally, the Attorney General notes that counts 3, 4 and 6 are reflected in the abstract of judgment as indeterminate rather than determinate terms. This error should also be corrected on remand.

7. *Any error with regard to the imposition of court fees and fines without a determination of defendant's ability to pay is harmless.*

At sentencing, the court imposed a $500 sex-offender fine (§ 290.3), a $700 assessment for the forensic examination of the victim (§ 1203.1, subd. (h)(b)), a $400 criminal conviction assessment (Gov. Code, § 70373), a $300 court operations fee (§ 1465.8), and a $300 restitution fine (§ 1202.4). Defendant contends that the court violated his right to due process under the federal and state constitutions by imposing these fees and fines without making a finding as to his ability to pay. He relies on *People v. Dueñas* (2019) 30 Cal.App.5th 1157, 1164, in which the court held that imposition of a restitution fine without consideration of a defendant's ability to pay violates due process. Several decisions have disagreed with the due process analysis in *Dueñas*, and the California Supreme Court is currently considering the issue. (E.g., *People v. Hicks* (2019) 40 Cal.App.5th 320, review granted Nov. 26, 2019, S258946; *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.) This court has previously declined to "join the courts that have declared *Dueñas* to have been wrongly decided" but has agreed that "[a] suitable framework for analyzing the constitutionality" of a minimum

18

restitution fine imposed under Penal Code section 1203.4 "is the excessive fines prohibition in the Eighth Amendment and its counterpart under the California Constitution, article I, section 17." (*People v. Cowan* (2020) 47 Cal.App.5th 32, 42, review granted, June 17, 2020, S261952.) Although *People v. Cowan* was decided long before defendant filed his briefing in this case, defendant focuses his argument solely the failure to consider his ability to pay in violation of his due process rights under *Dueñas*.

We decline to analyze the propriety of defendant's individual fines and assessments based solely on his inability to pay, and defendant has forfeited any claim under the Eighth Amendment. We note briefly, however, that on the record before us, any error arising from the trial court's failure to make an ability to pay finding was harmless beyond a reasonable doubt because defendant has the ability to pay the fines, fees, and assessments over the course of his prison sentence. (*People v. Johnson* (2019) 35 Cal.App.5th 134, 139–140; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1076 [ability to pay fines includes consideration of wages that appellant may earn in prison].) At the time of sentencing, defendant was 29 years old and had no financial obligations in the community. The record reflects that he had worked regularly in construction prior to his convictions and nothing suggests that he is no longer capable of working while in prison. While it may take defendant some time to pay the amounts imposed in this case, defendant is serving a lengthy prison term and should, under reasonable circumstances, be able to satisfy his financial obligations.

## Disposition

Defendant's conviction for continuous sexual abuse under section 288.5 is vacated. Defendant's sentence is corrected to reflect imposition of consecutive three-year terms on counts 3, 5, 7, 8 and 9. The trial court is also

directed to correct the abstract of judgment as set forth in part 6 of this opinion. In all other respects, the judgment is affirmed. The trial court shall prepare a corrected and amended abstract of judgment and forward it to the Department of Corrections and Rehabilitation.

POLLAK, P. J.

WE CONCUR:

BROWN, J.
ROSS, J.*

---

* Judge of the Superior Court of California, County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.