IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REMBER GENARO MOLINA,<br>　　　　Plaintiff,<br>　　v.<br>GENA JONES,<br>　　　　Defendant. | Case No. 23-cv-02238-CRB<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

Petitioner Rember Genaro Molina petitions for a writ of habeas corpus, alleging that the California state court denied him his federal constitutional rights in his 2018 criminal trial. For the reasons below, the Court **DENIES** Molina's petition.

I.   **BACKGROUND**

　　A.   **State Court Proceedings**

In 2018 Molina went to trial on ten counts: one count of sexual intercourse with a child 10 years of age or younger (Cal. Penal Code § 288.7(a)), one count of sexual penetration of a child 10 years of age or younger (id. § 288.7(b)), five counts of forcible lewd or lascivious acts upon a child under 14 years of age (id. § 288(b)(1)), two counts of attempted sexual penetration of a child 10 years of age or younger (id. §§ 288.7(b), 664), and one count of continuous sexual abuse of a child under 14 years of age (id. § 288.5(a)). Clerk's Tr. Vol. I (dkt. 17-3, Ex. F-1) at 10–19. The state alleged in four of the § 288(b)(1) counts and the § 288.5(a) count that Molina had substantial sexual conduct with the child, R.D. Id. at 12–19; see also Cal. Penal Code § 1203.066(a)(8).

> Trial testimony established that R.D. lived with her mother, father and two siblings. Defendant, her uncle, would often spend several nights a week at their home. In September 2016,

R.D.'s older sister disclosed to a teacher that defendant inappropriately touched R.D. This disclosure led to a police investigation. As part of the investigation R.D. was interviewed at the county's Child Abuse Listening, Interviewing, and Coordination Center (CALICO). Transcripts of the interviews were introduced at trial during R.D.'s testimony.

R.D., who was eight years old at the time of the interview, began by saying that her uncle was really nice to her. She knew that she was being interviewed because of things her sister had told the teacher. She expressed concern that she and her siblings would be removed from her parents' home because of the disclosures. She explained that her mother had told her and her sister to talk only to her and that if they said "something wrong," they would be taken away from their family. After being reassured by the interviewer that the interviewer was trying to keep R.D. safe, not remove her from her home, R.D. reported six incidents in which defendant sexually abused her.

The first occasion that R.D. could remember, she and defendant were "covered up with the blanket" on the bed in the bedroom. Defendant grabbed her shorts and underwear and pulled them down. He tried to put his finger inside her but she screamed and her mother and sister came in and defendant left. Another time, when she was seven, she awoke to find defendant reaching under her pants and underwear with his hand. He "tried to go inside her private part," but she slapped him and "kicked him out." On a different occasion when she was still seven years old, defendant pulled her pants and underwear off and touched her inside her "private part" with his finger. She told him to stop but "he didn't care, he just did it." On another occasion, while covered with a blanket watching a movie on the couch, defendant took his pants and underwear off and dropped her hand on his penis. On a separate occasion, defendant grabbed her hand and put it on top of his penis. It felt "round" and "wet." She saw defendant "shaking it" and "white stuff started to come out." Finally, on one occasion defendant took his pants and underwear off and stood in front of her as she sat on the couch. He held her legs up and penetrated her vagina with his penis.

After describing several of the incidents, R.D. also described how either her mother, sister or father was there and stopped the abuse. She also reported that she told her mother after several incidents, and her mother ordered defendant out of the house. Somewhat confusingly, she told the interviewer that after each incident, defendant left and she "never saw him again."

Shortly after her interview, R.D. spoke with a police investigator and told the investigator that everything she had reported was not "actually true." R.D.'s interview with the police investigator was recorded and played for the jury. In the recording, when asked about her descriptions of the incident in which defendant penetrated her on the couch, R.D. said, "It wasn't true, um, because I made it up." When asked why she would make it up, she said, "I don't know. It just flew out my mind for no reason."

2

At trial, R.D., who was then 10 years old, testified that defendant is her favorite uncle and that he has never made her feel uncomfortable or touched her inappropriately. She claimed not to remember telling the interviewer about the incidents she had described previously. After the recording of her CALICO interview was played, R.D. said that she still did not remember telling the interviewer about the incidents and testified that the incidents did not happen. She testified that the things she had said were not true, she was sad that she had said them and that she wished she could take them back.

R.D.'s parents and older sister all testified that the older sister's initial report to her teacher was based on a misunderstanding. Defendant had kicked a ball towards R.D., hitting her near her "private part" so he rubbed the area to make her feel better. The older sister also testified that she was present when defendant held R.D.'s hand near his penis. He and R.D. had been playing and R.D. punched defendant in his penis. When R.D. went to hit him again, he covered his penis with his hand. He was holding her hand but not forcing her to touch him. R.D.'s mother testified that her daughters had reported other incidents to her, but explained, "When I talked to them and I asked them, 'Are you certain that he really did touch you?' they finally told me, 'No, Mom.' Because, honestly, they lie about many things. And that's why I asked them again if it was true that he had touched them; and then, after that, they told me, 'No, Mom.'"

Two experts testified about the child sexual abuse accommodation syndrome (CSAAS or the syndrome). The prosecutor's expert testified that the syndrome sets forth several behaviors commonly observed in children who report abuse that adults might not understand. She explained that the syndrome provides a "way of organizing the conversation" about child sexual abuse, but it does not operate "as a checklist to say, 'Yes, this kid's sexually abused or not sexually abused.'" As relevant here, she testified that sometimes a child might be inconsistent in relating details of the abuse and might include "implausible or fantastical" details in her report. Also, a child might disclose abuse and later recant if the child experiences the consequences of disclosure or if they have "poor maternal support."

Defendant's expert testified that was based on the initial author's observations, not empirical evidence, and that, as such, it has no "positive use at all." He explained that the behaviors addressed in the syndrome could be present in a false allegation as well as a true allegation. He also cited studies that showed that 97 percent of children making true allegations of sexual abuse were consistent in describing the "core" details, 94 percent did not include "fantastical" details, and only 4 percent of children making true allegations recanted. He also emphasized that CSAAS theory was not intended to be "used in courtrooms to try to distinguish true allegations from false allegations" and that the theory does not have "discriminating power to differentiate true allegations from false allegations."

3

People v. Molina (Molina I), No. A155785, 2021 WL 5822400, at *1–3 (Cal. App. Ct. Dec. 8, 2021).

At the end of trial, the trial court gave a modified version of CALCRIM No. 1193, the California model instruction regarding CSAAS testimony, instead of Molina's proposed instruction. The trial court's instruction was as follows:

> You've heard testimony from Dr. William O'Donohue and Miriam Wolfe, a licensed clinical social worker, about child abuse accommodation theory.
>
> Testimony about this syndrome is not evidence that the defendant committed any of the crimes charged against him.
>
> You may consider this evidence only in deciding whether or not [R.D.]'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony.

Reporter's Tr. Vol. VIII (dkt. 17-3, Ex. G-8) at 934:19–935:4; Clerk's Tr. Vol. II at 502. This language differs from the pattern instruction only in that it replaced "child sexual abuse accommodation syndrome" with "this syndrome" in the second paragraph. See CALCRIM No 1193 (2018). Molina had proposed an alternative instruction:

> A witness has given testimony relating to the child sexual abuse accommodation syndrome. This evidence is not received and must not be considered by you as proof that the alleged victim's molestation claim is true. Child sexual abuse accommodation syndrome research is based upon an approach that is completely different from that which you must take to this case. The syndrome research begins with the assumption that a molestation has occurred, and seeks to describe and explain common reaction of children to that experience. As distinguished from that research approach, you are to presume the defendant innocent. The People have the burden of proving guilt beyond a reasonable doubt. Thus, you may consider the evidence concerning the syndrome and its effect only for the limited purpose of showing, if it does, that the alleged victim's reaction, as demonstrated by the evidence, are not inconstant with her having been molested.

Clerk's Tr. Vol. I at 159.

The jury convicted Molina of the counts under California Penal Code §§ 288.7(a), 288.7(b) (both the attempt counts and the completed offense), and 288.5(a). Clerk's Tr. Vol. II (dkt. 17-3, Ex. F-2) at 468–69, 472, 475, 481. As for the § 288(b)(1) counts, those

4

charges were ultimately reduced to § 288(a) counts of non-forcible lewd acts upon a child under 14 years, and the jury found Molina guilty of those five counts as well. Id. at 470, 473, 476, 478, 480. The jury found true all allegations of substantial sexual conduct. Id. at 471, 474, 477, 479, 482.

Molina appealed his conviction in California state court, which culminated in the California Supreme Court denying his petition for review on February 16, 2022. Molina I, 2021 WL 5822400; People v. Molina (Molina II), No. S272603, 2022 Cal. LEXIS 839 (Cal. Feb. 16, 2022). Molina's judgment became final 90 days later, when the deadline passed for him to file a writ of certiorari with the U.S. Supreme Court. U.S. Sp. Ct. R. 13.1; see also Bowen v. Roe, 188 F.3d 1157, 1158–59 (9th Cir. 1999) ("[T]he period of 'direct review' in 28 U.S.C. § 2244(d)(1)(A) includes the period within which a petitioner can file a petition for a writ of certiorari from the United States Supreme Court.").

### B. Federal Court Proceedings

Molina then filed a petition for a writ of habeas corpus in federal court on May 8, 2023. See Pet. In his petition Molina raised three claims:

(1) The trial court violated his Fifth, Sixth, and Fourteenth Amendment rights by admitting expert testimony about Child Sexual Abuse Accommodation Syndrome, or CSAAS. Id. ¶ 12.

(2) The trial court violated his Fourteenth Amendment rights by giving a modified jury instruction that allowed the jury to consider the CSAAS evidence as proof of the victim's truthfulness. Id. ¶ 16.

(3) The prosecutor violated his Fourteenth Amendment rights by inducing R.D.'s false trial testimony that she was not molested in order to introduce recorded statements that he did, in violation of the Confrontation Clause. Id. ¶ 20.

Respondent does not dispute that these three claims were timely brought and exhausted in state court. See Ans. (dkt. 16) at 12. Molina later sought to amend his habeas petition to add two more claims, but the Court found those claims untimely and, therefore, futile. Order Denying Mot. for Stay (dkt. 35).

5

## II. LEGAL STANDARD

"The writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law." Harrington v. Richter, 562 U.S. 86, 91 (2011). For properly exhausted claims, "the availability of federal habeas relief is limited with respect to claims previously 'adjudicated on the merits' in state-court proceedings." Id. at 92 (quoting 28 U.S.C. § 2254(d). The Antiterrorism and Effective Death Penalty Act of 1996 requires that

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim
>
> (1) Resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) Resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

22 U.S.C. § 2254(d). Thus, "federal habeas relief functions as a 'guard against extreme malfunctions in the state criminal justice systems,' and not as a means of error correction." Greene v. Fisher, 565 U.S. 34, 38 (2011) (citation omitted). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007). Relatedly, federal courts must "presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'" Id. at 473–74 (quoting 28 U.S.C. § 2254(e)(1)).

AEDPA applies in the same manner "even where there has been a summary denial." Cullen v. Pinholster, 563 U.S. 170, 187 (2011). So when a defendant raises claims in state postconviction proceedings and state courts deny those claims without explanation, the claims have nonetheless been "adjudicated on the merits" for purposes of AEDPA. Id. When a federal court considers such claims, it "must determine what arguments or theories could have supported the state court's decision; and then it must ask whether it is possible

fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the U.S. Supreme Court. Id. at 188 (citation omitted) (cleaned up).

### III. DISCUSSION

Molina advances three constitutional claims: (1) that the trial court violated his Fifth, Sixth, and Fourteenth Amendment rights by admitting expert testimony about CSAAS; (2) that the trial court violated his Fourteenth Amendment rights by giving a modified jury instruction that allowed the jury to consider the CSAAS evidence as proof of the victim's truthfulness; and (3) that the prosecutor violated his Fourteenth Amendment rights by knowingly presenting victim R.D.'s false statements at trial to introduce evidence that would otherwise violate the Confrontation Clause. The Court considers each of these claims in turn.

#### A. Expert CSAAS Testimony

The California Court of Appeal affirmed the trial court's admission of expert testimony on CSAAS on the basis that it was neither an improper expert opinion nor unduly prejudicial under California Evidence Code § 352. Molina I, 2021 WL 5822400, at *3–4. Molina argues that the admission of this evidence was a constitutional error, rather than an evidentiary one, citing decisions from other state courts holding CSAAS evidence inadmissible. Mem. ISO Pet. (dkt. 1) at 20–25 (citing Blount v. Commonwealth, 392 S.W.3d 393 (Ky. 2013); State v. J.L.G., 190 A.3d 442 (N.J. 2018); and Commonwealth v. Dunkle, 602 A.2d 830 (Pa. 1992)). He therefore contends that the CSAAS evidence was so unduly prejudicial that it deprived him of his right to a fair trial in violation of the Fifth, Sixth, and Fourteenth Amendments.

But AEDPA restricts habeas relief to instances where a state court ruled contrary to or using an unreasonable application of "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (emphasis added). "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by" the

7

Supreme Court. Harrington, 562 U.S. at 101; see also Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) ("Under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established federal law,' as laid out by the Supreme Court." (quoting 28 U.S.C. § 2254(d))). And the Supreme Court has not drawn clear lines as to when the admission of arguably prejudicial evidence rises to the level of a due process violation. Holley, 568 F.3d at 1101; see also Estelle v. McGuire, 502 U.S. 62, 70 (1991) (finding expert opinion evidence relevant and thereupon declining to decide whether or when the admission of irrelevant evidence constitutes a due process violation).

This proves fatal to Molina's first constitutional claim. Though he cites valid criticisms of CSAAS evidence—criticisms that have prevailed in a handful of other states—such criticisms cannot be the basis for habeas relief under AEDPA absent a decision by the U.S. Supreme Court. Indeed, the Ninth Circuit and habeas courts across California have rejected challenges to CSAAS evidence for this very reason. See Brodit v. Cambra, 350 F,3d 985, 991 (9th Cir. 2003); see also, e.g., Higgins v. Kernan, No. 18-cv-411-JAK (MAA), 2020 WL 6385810, at *10 (C.D. Cal. Sept. 11, 2020); Noble v. Adams, 06-cv-7114-EMC, 2020 WL 4001479, at *10 (N.D. Cal. 2020); Mendez v. Paramo, EDCV 17-1020-R (JEM), 2019 WL 8643747, at *6 (C.D. Cal. Dec. 31, 2019); Amaya v. Frauenheim, 823 F. App'x 503, 505 (9th Cir. 2020). The admission of expert CSAAS evidence therefore was not contrary to, nor was it an unreasonable application of, federal law as determined by the U.S. Supreme Court.

Molina tries to avoid AEDPA deference altogether by asserting that the California Court of Appeal "overlooked" his federal claims related to the introduction of CSAAS testimony. Mem. ISO Pet. at 16–17. To be sure, Molina is correct that the presumption that a state court considered the merits of a habeas petitioner's federal constitutional claims is a rebuttable one. Johnson v. Williams, 568 U.S. 289, 301–02 (2013). If a state court discusses only state law and the state standard is less protective than, or altogether different from, the federal one, then the presumption of a decision on the merits is rebutted

and the habeas court can consider the claim without deference. Id. But this principle has no application here. California Evidence Code § 352 (which the Court of Appeal considered, see Molina I, 2021 WL 5822400, at *4) prohibits evidence where "its probative value is substantially outweighed by the probability that its admission will … create substantial danger of undue prejudice." The Due Process Clause, in turn, prohibits only evidence that "is so extremely unfair that its admission violates fundamental conceptions of justice." Perry v. New Hampshire, 565 U.S. 228, 237 (2012). These tests are complimentary, not in tension. See Perry v. Rushen, 713 F.2d 1447, 1453 (9th Cir. 1983) ("Due process draws a boundary beyond which state rules cannot stray; it does not displace the law of evidence with a constitutional balancing test."). Thus, the California Court of Appeal reached and rejected, implicitly if not expressly, the merits of this claim.

Molina's first claim for habeas relief therefore fails.

### B. CALCRIM No. 1193

The California Court of Appeal affirmed the trial court's use of a modified version of CALCRIM No. 1193 to instruct the jury regarding CSAAS expert testimony, explaining that the instruction did not improperly tell the jury that they could use CSAAS testimony as evidence of Molina's guilt. Molina I, 2021 WL 5822400, at *4. Molina argues that the instruction was improper because it did not expressly warn jurors that the CSAAS testimony should not be used to decide whether the sexual abuse allegations were true, and that Respondent cannot prove that the jury did not use the CSAAS testimony for the improper purpose of determining that the sexual abuse happened. Mem. ISO Pet. at 27–31. He thus asserts that the state court deprived him of a fair trial in violation of the Fourteenth Amendment.

At the outset, the Court is bound by the California Court of Appeal's determination that CALCRIM No. 1193 is a correct statement of California law. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (per curiam) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); see also People v. McAlpin, 53 Cal. 3d 1289, 1300–01

(1991) (explaining that CSAAS testimony "is admissible to rehabilitate [a] witness's credibility when the defendant suggests that the child's conduct after the incident … is inconsistent with his or her testimony claiming molestation"). Federal habeas courts have repeatedly held as much and denied habeas relief on that ground. See Matias v. Gipson, No. 14-cv-526-JD, 2015 WL 5935324, at *17 (N.D. Cal. Oct. 13, 2015); Rodriguez v. Spearman, No. 12-cv-1923-JKS, 2014 WL 2465945, at *12 (E.D. Cal. May 29, 2014); Barkley v. Beard, No. 11-1269 CW, 2014 WL 991094, at *7–8 (N.D. Cal. Mar.11, 2014). Indeed, it is sufficient grounds to deny Molina's second claim.

Even if there was instructional error, though, federal habeas relief is available for such an error only where it "by itself so infected the entire trial that the resulting conviction violates due process." Waddington v. Sarausad, 555 U.S. 179, 190–91 (2009) (quoting Estelle, 502 U.S. at 72). Thus, the core question is whether there is "'a reasonable likelihood' that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." Id. (quoting Estelle, 502 U.S. at 72). (Respondent does not have the burden, as Molina suggests, Mem. ISO Pet. at 30, of proving that the jury did not erroneously apply CALCRIM No. 1193.) Courts do not review alleged instructional errors "in artificial isolation" but rather "in the context of the instructions as a whole and the trial record." Id. at 191 (quoting Estelle, 502 U.S. at 72).

There was no reasonable likelihood that the jury misapplied CALCRIM No. 1193. The trial judge instructed the jury on how to evaluate the testimony of expert witnesses and how to consider evidence that was admitted for a limited purpose. See Clerk's Tr. Vol. II at 499, 501 (instructing the jury on CALCRIM Nos. 332 and 499). The Court presumes, as it must, that the jury followed the instructions that it was given. See Weeks v. Angelone, 528 U.S. 225, 226 (2000). Molina's reliance on Patterson v. Gomez, where the Ninth Circuit affirmed habeas relief based on an erroneous instruction that a criminal defendant is presumed sane, is unconvincing. That jury instruction "[told] the jury to presume a mental condition that—depending on its definition—is crucial to the state's proof beyond a

10

reasonable doubt of an essential element of the crime." 223 F.3d 959, 965 (9th Cir. 2000). CALCRIM No. 1193, by contrast, tells the jury that they can use certain expert testimony for the limited purpose of determining whether another witness is reliable; it does not create nor suggest any presumption with respect to the State's burden of proof. The California Court of Appeal's affirmance of the modified version of CALCRIM No. 1193 therefore is not contrary to, nor does it involve an unreasonable application of, federal law.

Once again, Molina argues that the appellate court "overlooked" his federal claim and ruled only on the state-law issue of whether CALCRIM No. 1193 is correct as a matter of state law. Mem. ISO Pet. at 25. Again, if that were true, it would mean that the Court owes no deference to the state court's determinations. But it is false. The state court expressly recognized Molina's argument that CALCRIM No. 1193 "lessen[s] 'the prosecution's burden of proof in violation of his Fifth, Sixth and Fourteenth Amendment rights." Molina I, 2021 WL 5822400, at *4 (cleaned up). It then "disagree[d]" with that argument. Id. AEDPA deference is therefore required.

Molina's second claim for habeas relief therefore fails.

### C. R.D.'s Recorded Testimony

The California Court of Appeal affirmed the trial court's admission of R.D.'s recorded statements against Molina's Confrontation Clause and false testimony challenges. Id. at *5–6. It explained that the Sixth Amendment "does not bar hearsay statements of a witness who testifies at trial and is subject to cross-examination" and that the State's introduction of allegedly false testimony "in [Molina's] favor" did not prejudice Molina because the testimony would have been admitted regardless. Id. Molina's now-familiar argument that the Court should not defer to the state court's determination because the state appellate court "overlooked" his federal claims plainly fails here too; the court clearly addressed his Confrontation Clause and false testimony claims as just described.

In any event, Molina's challenges to R.D.'s recorded testimony lack merit. His Confrontation Clause argument was rejected in California v. Green, where the U.S. Supreme Court held that "the Confrontation Clause does not require excluding from

11

evidence the prior statements of a witness who concedes making the statements, and who may be asked to defend or otherwise explain the inconsistency between his prior and his present version of the events in question, thus opening himself to full cross-examination at trial as to both stories." 399 U.S. 149, 164 (1970); accord United States v. Owens, 484 U.S. 554, 560 (1988). It does not matter whether the witness can, at trial, remember the events recounted in the earlier statement or even making that statement. Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam); see also Green, 399 U.S. at 188 (Harlan, J., concurring) ("The fact that the witness, though physically available, cannot recall either the underlying events that are the subject of an extra-judicial statement or previous testimony or recollect the circumstances under which the statement was given, does not have Sixth Amendment consequence."). R.D. testified and was subject to extensive cross-examination at trial—including about her earlier recorded statements. Reporter's Tr. Vol. IV (dkt. 17-3, Ex. G-4) at 335:20–339:20; see generally Reporter's Tr. Vol. III (dkt. 17-3, Ex. G-3) at 313–28; Reporter's Tr. Vol. IV at 335–408. This puts an end to Molina's Confrontation Clause argument.

      Molina's secondary point—that the State knowingly presented false testimony at trial when it asked R.D. about the alleged molestation knowing that she would contradict her earlier statements—fares no better. Of course, the Due Process Clause prevents prosecutors from knowingly using false evidence. Napue v. Illinois, 360 U.S. 264, 269 (1959). Yet the Court is unaware of any examples where a court has found that the State violated this principle by inducing allegedly false testimony that, on its face, favors the defendant—even if a downstream effect of the false testimony is the introduction of other evidence unfavorable to the defendant. And either way, as the California Court of Appeal correctly observed, the introduction of R.D.'s recorded statements was not dependent upon any alleged false testimony but instead on the simple fact that she testified at trial. Molina I, 2021 WL 5822400, at *6. So even if the State knowingly presented false testimony, it in no way prejudiced Molina.

      Molina's third claim for habeas relief therefore fails.

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** Molina's petition for a writ of habeas corpus. The Court declines to issue a certificate of availability on any of Molina's claims.

**IT IS SO ORDERED.**

Dated: July 17, 2025



CHARLES R. BREYER
United States District Judge

13